# EXHIBIT 6

LEXSEE 2000 U.S. DIST. LEXIS 20500

Caution
As of: Mar 14, 2007

**JOANNE CARTWRIGHT, Plaintiff, v. TACALA, INC., et al., Defendant.**

**CIVIL ACTION NO. 99-W-663-N**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION**

***2000 U.S. Dist. LEXIS 20500***

**November 1, 2000, Decided**
**November 1, 2000, Filed, Entered**

**DISPOSITION:** [*1] Defendant's motion for summary judgment granted in part and denied in part.

**COUNSEL:** For Plaintiff: M. Wayne Sable, Mark W. Sabel, Jr.

For Defendant: Ricky J. McKinney, James E. Fleenor, Jr.

**JUDGES:** SUSAN RUSS WALKER, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** SUSAN RUSS WALKER

**OPINION:**

**MEMORANDUM OF OPINION AND ORDER**

Plaintiff Joanne Cartwright commenced this action on June 29, 1999 against defendants Tacala, Inc. and John Russ, alleging that defendants discriminated against her and retaliated against her in violation of Title VII of the Civil Rights Act of 1964 and *42 U.S.C. § 1981,* due to her support of and association with African-American employees. Plaintiff also brings suit pursuant to *42 U.S.C. § 1985*(3), claiming that defendants conspired with Tacala's district managers for the purpose of depriving her of her rights under the Constitution and federal law. Plaintiff further alleges that she was retaliated against and harassed in violation of the Fair Labor Standards Act for opposing defendant Russ' illegal conduct in altering employees' hours in the store computer. She brings state law claims of invasion of privacy, negligent supervision [*2] and training, negligent retention, assault and battery, and conspiracy. This action is presently before the court on the motion for summary judgment filed by defendant on June 30, 2000. Upon consideration of the motion, the court concludes that it is due to be granted in part and denied in part.

**BACKGROUND** n1

n1 As it is required to do, the court has viewed the evidence presented on the motion for summary judgment in the light most favorable to the plaintiff. *Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992).* The court considers any objections not made to the use or admissibility of the evidence waived for purposes of this motion. *Davis v. Howard, 561 F.2d 565, 570 (5th Cir. 1977).*

Defendant Tacala, Inc. is a franchisee of Taco Bell Corporation and operates Taco Bell restaurants in several states. (Defendant's Exhibit B, personnel manual, p. 2). Plaintiff, a white female, was hired as a cashier at defendant's Greenville, Alabama location in October 1990. (Plaintiff's [*3] Exhibits 1, 3; Cartwright depo., pp. 54-55). In 1993, plaintiff became a shift manager. In this position, plaintiff opened and closed the restaurant, made cash deposits, worked with the manager on schedules, ordered and received food, processed time cards and other paperwork and supervised her shift. Plaintiff worked as a shift supervisor until her employment with defendant ended in 1997. (Cartwright depo., pp. 57-59).

In 1996, plaintiff required surgery on her knee and took a six-month leave of absence from work. (Cartwright depo., pp. 50-51, 62-63). Two or three months before plaintiff left for her surgery, Clarence Clay, a black male, became manager of the Greenville store. (Plaintiff's Exhibit 3, EEOC charge; Cartwright depo., pp. 59-60). At a store staff meeting prior to plaintiff's surgery, Dennis Hagler, an area supervisor, and John Figgert, who worked for Tacala in Birmingham, stated that the Greenville store had gone from the bottom to the top of Tacala's stores with regard to sales. (Cartwright depo., pp. 55, 59-62). When plaintiff returned to work after her surgery, Clay was no longer working for the store, and defendant John Russ, a white male, was the store manager. (Cartwright [*4] depo., pp. 63, 67-68). Archie Demmings, a black male who had been a shift manager prior to plaintiff's surgery, was also no longer working at the store. (Id., pp. 57-58, 67). Plaintiff testified that she does not have any personal knowledge of the circumstances surrounding Demmings' or Clay's departure from Taco Bell. (Id., pp. 68-69, 182). Another employee, Jennifer, told plaintiff that Probasco, the district manager, had used the word "nigger," and had stated that there were too many black people in the store and that "we are going to get rid of some of them and get it back to white, like it should be to start with." (Id., pp. 64, 206-07).

In three staff meetings after plaintiff's return to work, Russ commented that management and crew should not have anything to do with each other. As he made these comments, Russ looked at plaintiff when he said "management," and at another employee, Chris Pressley, when he said "crew." (Id., pp. 72-77; Pressley depo., pp. 79-80). Pressley is black. (Pressley depo., p. 134). Russ also told plaintiff privately "fifty, sixty times" that "It does not look good for management to have anything to do with crew members." Plaintiff and [*5] Pressley had no relationship other than friendship, and plaintiff had told Russ that there was no relationship between plaintiff and Pressley. (Cartwright depo., pp. 75-76, 106-07).

On one occasion, plaintiff gave Pressley a ride to work. Russ asked plaintiff what she was doing with Pressley in her car. She told Russ that Pressley needed a ride to work. Russ told plaintiff that Pressley "could have rode with somebody else," and said, "You don't need to be doing that stuff. It doesn't look good." (Cartwright depo., pp. 80-83). On another occasion, Pressley brought medicine to plaintiff at work because she was ill. Russ and other employees commented that Pressley was buying plaintiff's prescriptions and paying her doctor's bills, and that she was pregnant with his child. (Id., pp. 83-84). After Pressley was no longer employed at the store, Russ asked plaintiff if she had "seen [her] friend, and he'd give [her] that grin." Russ asked plaintiff if she and Pressley were sleeping together. (Id., pp. 85-86). Russ made remarks to plaintiff like "How can you be in the car with him," or "Why do you go over and talk to his mom? . . . You don't belong in places like that." (Id., [*6] pp. 87-88). Plaintiff testified that Russ' remarks were "continuous, twenty-four/seven, as long as that store was open." (Id., p. 85). Plaintiff asked Russ on several occasions to put a stop to the rumors. Russ replied that "people talk; you just have to deal with it." (Id., p. 106-07).

According to plaintiff, Russ "constantly harassed Pressley throughout the work day." (Plaintiff's Exhibit 3, EEOC charge; see also Plaintiff's Exhibit 8, Pressley declaration). Plaintiff told Russ to leave Pressley alone, that Pressley was not doing anything, that Russ did not treat Pressley like a human being and that, if he did, Russ and Pressley would get along. (Plaintiff's Exhibit 3). Russ would not allow plaintiff to call Pressley in to work, even if no one else were available. (Id.; Cartwright depo., p. 87). When plaintiff arrived at work one day, Betty Sue Albritton told her that when Pressley had reported to work without a hat, Russ threw a hat at him. (Cartwright depo., pp. 104-05).

One day, an interracial couple came through the drive-through with three children in the back seat of their car. Russ called an employee to the front to "come take a look at this." Russ remarked [*7] that it was "really disgusting," and that the "mixing of races" wouldn't work. (Pressley depo., p. 78). Russ also stated, "Did you see that piece of shit -- that will make you want to puke." Plaintiff responded by telling Russ that he was sick. (Plaintiff's Exhibit 3, EEOC charge).

Plaintiff heard Russ talking with two higher managers, Joe Crump and someone she did not recognize. One of the three men "made the statement that they didn't want Taco Bell to be like NiggerDonald's up the street, that they had to get rid of some of the niggers in the store and get more white folks in there." (Cartwright depo., pp. 181, 208-10). Plaintiff observed Russ marking job applications with a "B" or a "W." (Id., p. 199). If the applicant was black, Russ would throw the application away. Plaintiff spoke with Russ and with Brenda Kelley, the assistant manager, about this practice. (Id., pp. 199-200).

On one occasion, when a black female co-worker, Betty Sue Albritton, was unable to leave work when her child was sick, plaintiff picked the baby up from the babysitter, took him to the doctor, got his medicine, and took care of him. Russ questioned plaintiff about why she had to help "those people. [*8] " (Plaintiff's Exhibit 3; Cartwright depo., p. 175).

Plaintiff became aware that Russ was manipulating pay records to reflect that employees had worked fewer hours than they had actually worked. Russ had done this

with regard to Pressley, Valona Merriweather, Betty Sue Albritton, "Sonya", and "Tim." Tim is a white male. Russ manipulated plaintiff's hours by shifting hours from one week to the next to avoid paying her for overtime. Plaintiff telephoned Crump and complained, and Crump corrected the problem so that "everybody got their time back." (Cartwright depo., pp. 66, 89-96, 177-78). After plaintiff complained to Crump, Russ changed the password in the pay computer so that plaintiff could no longer have access to the pay records. He also was late to relieve plaintiff from some of her shifts, causing her to be late in picking her children up from school. Russ also cut plaintiff's hours for a couple of weeks from over forty hours a week to twenty-two or twenty-three hours. Russ assigned plaintiff to work mostly night shifts and allowed Brenda Kelley to work day shifts. Kelley, who is black, was the Assistant Manager. According to plaintiff, she and Kelley were supposed to rotate night [*9] shifts. (Id., pp. 97-103, 173-75).

Pressley was suspended from work on June 19, 1997 and was terminated shortly thereafter. (Pressley dec., P 4). Sometime after Pressley's termination, plaintiff was placing stock on shelves in the back of the store. As plaintiff was lifting a box to the top shelf, Russ walked up behind plaintiff, pushed against her with his arms around hers and placed his hands on her hands. Plaintiff told him, "Go away. Leave me alone. I got it." Russ laughed and walked away. (Cartwright depo., pp. 108-12). For the next couple of months, on a daily basis, Russ touched plaintiff. He would "put his hands on [her] waist or walk by and he'd brush across [her] butt with his hand" or would "rub[] up against her" when she bent over to pick something up. (Id., pp. 112-16, 127-28). When plaintiff told him to quit touching her, Russ laughed. (Id., p. 116). On one occasion, plaintiff was sitting in the office working on the computer. Russ came in and closed the door, and asked plaintiff about a work schedule. He then stepped behind plaintiff and reached around her, touching her breast with his forearm. Plaintiff moved and told him not to do that. He laughed [*10] and responded that he was "just trying to get a pencil." (Id., pp. 117-20). The next day, when plaintiff was in the cooler, Russ joined her in the cooler and asked her whether her boyfriend was "taking care of [her] at home." Plaintiff responded that it was none of his business. (Id., pp. 120-23). As plaintiff started to leave the cooler with tubs of vegetables in her hands, Russ reached around plaintiff to open the door. Plaintiff told Russ to leave her alone. (Id., pp. 123-24).

After the incident in the office, plaintiff complained to Brenda Kelley. Kelley told plaintiff not to tell anyone about it or Russ would make it "so unbearable" for plaintiff that she would quit. (Cartwright depo., pp. 128-29). Kelley had previously told plaintiff on several occasions that plaintiff was "next on the hit list once they got rid of Chris." (Id., p. 149). A few weeks after plaintiff complained to Kelley, Crump called the store to check on something. Plaintiff told him she was "having some problems with Mr. John and [she] needed to talk to him, that it was something really bad." Crump responded that every store has problems and he did not have time to deal with it. Crump hung [*11] up before plaintiff could say anything else. (Id., pp. 129-30). Russ was transferred from Greenville to defendant's restaurant in Troy on November 19, 1997. (Russ depo., pp. 29-30; Plaintiff's Exhibit 9).

Plaintiff complained to Dennis Hagler, the area manager, about Russ, but did not talk to him about Russ touching her inappropriately. (Cartwright depo., pp. 151, 162-63). After plaintiff complained to Hagler, his demeanor toward her changed. He became "very short, very rough" in his answers to her, and he "questioned everything that [she] did." (Id., pp. 152-53).

On November 25, 1997, plaintiff opened the store. She had traded shifts with Kelley. Plaintiff was working with three new employees and two employees that had only been working at the restaurant for a couple of months. The store was very busy. Hagler "walked in and looked at the dining room full of people, drive-through full, proceeded to yell and scream at [plaintiff], tell [her] how incompetent [she] was, that if [she] knew what [she] was doing, [they] wouldn't be having the problems that [they] were having right then." (Cartwright depo., pp. 152-56). Plaintiff asked Hagler not to yell at her four [*12] different times. The last time, she told him, "I can't handle it no more." (Id., p. 156). Plaintiff waited until the end of her shift, then left. She did not return to work. (Id., p. 165).

**THE SUMMARY JUDGMENT STANDARD**

A party seeking summary judgment bears the initial burden of demonstrating to the court the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions that it believes show an absence of any genuine issue of material fact. *Hairston v. Gainesville Publishing Co., 9 F.3d 913 (11th Cir. 1993).* In *Celotex Corp. v. Catrett, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986),* the Court held that if a party opposing summary judgment "fails to make a showing sufficient to establish the existence of an element essential to their party's case, and on which their party will bear the burden of proof at trial," summary judgment shall be granted.

> Where the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) . . . requires the non-

> moving party to go beyond the pleadings and by . . . affidavits, or by the "depositions, [*13] answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial. . . We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56 except the mere pleadings themselves. . . ."

*Id. at 324.*

For summary judgment purposes, an issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Matsushita Electrical Industrial Company v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* The court must view the evidence, and all factual inferences properly drawn from the evidence, [*14] in the light most favorable to the nonmoving party. *Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987).* It is improper for this court to weigh conflicting evidence or make credibility determinations; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson, 477 U.S. at 255.* Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989)* (citation omitted).

**DISCUSSION**

**Hostile Environment Claims**

In Count I of her complaint, plaintiff asserts that she was subjected to a hostile work environment as a result of her support of and association with African-American employees in violation of Title VII. In Count III, she brings the same claim pursuant to *42 U.S.C. § 1981.* Defendant argues that it is entitled to summary judgment on plaintiff's hostile environment [*15] claims because: (1) the acts alleged are not severe and pervasive enough to objectively constitute a hostile environment; and (2) plaintiff did not subjectively perceive the environment as abusive. (Defendants' brief, pp. 12-15).

Severe or Pervasive

To prevail on her hostile environment claim, plaintiff must establish that: (1) she belongs to a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her protected status; (4) the harassment affected a term, condition, or privilege of her employment; and (5) a basis for holding the employer liable. See *Ellis v. Wal-Mart Stores, Inc., 952 F. Supp. 1513, 1518 (M.D. Ala. 1996).* To satisfy the fourth element, conduct must be objectively "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)*(quoting *Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)).* "Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all [*16] the circumstances: These may include the frequency of the discriminatory conduct; its severity; whether it is a physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris, 510 U.S. at 23.*

As an initial matter, the court notes that only those incidents of which plaintiff was aware during her employment could have altered the terms and conditions of that employment. See *Edwards v. Wallace Community College, 49 F.3d 1517, 1522 (11th Cir. 1995)*("Some of the incidents relied upon were not made known to Edwards until after her termination and, therefore, could not have contributed to her subjective view of a hostile environment."). Thus, in evaluating whether plaintiff was subjected to conduct sufficiently severe or pervasive to alter the conditions of her employment, the court has considered only that conduct for which plaintiff has produced evidence demonstrating that the conduct was either witnessed by or known to plaintiff during her employment. n2

> n2 Plaintiff has introduced the deposition testimony and EEOC charges of Pressley and Merriweather, in which they describe instances of racial comments and discriminatory conduct on the part of Russ and other managers. Much of this evidence has not been shown by plaintiff to have any connection to her claim that she was herself subjected to a hostile environment. For example, plaintiff relies Pressley's testimony regarding an incident in which Russ declined to retrieve Kid's Meal toys for meals for black customers but, shortly thereafter, he got toys for white custom-

ers. She also cites Pressley's testimony regarding Russ' comments about a black employee and black customers who wore a lot of gold jewelry having a "Mr. T starter kit," and Russ' statement that a black customer driving a Lexus "had to sell drugs to get that car." See Plaintiff's brief, pp. 3-5. The cited testimony, however, does not indicate that plaintiff was present on those occasions, or that she was aware of the incidents. See Pressley depo., pp. 76-77, 141-44; Merriweather EEOC charge.

[*17]

Additionally, defendant contends that plaintiff's sexual harassment allegations are not relevant to her racial harassment claim. (See Defendant's brief, p. 11 n. 1). Plaintiff does not clearly respond to this argument, but does argue, in connection with her retaliation claim, that she was "[]sexually harassed and otherwise discriminated against in the terms and conditions of her employment because of her association with African Americans . . . ." (Plaintiff's brief, p. 16). Plaintiff does not bring a federal claim of discrimination based on sex. (See Complaint, Claims I through III). Plaintiff's detailed EEOC charge makes no reference whatsoever to sexual harassment or to any of the touching incidents which she now argues resulted from her association with African Americans. (See Plaintiff's Exhibit 3). Plaintiff has directed the court to no evidence that would permit an inference that Russ' touching plaintiff in an offensive manner had any connection with her association with or support of black employees. In the absence of such evidence, the touching incidents are not relevant to plaintiff's race discrimination claims.

Plaintiff sets forth the factual basis for her [*18] hostile environment claims on pages 5-11 of her brief. The evidence relied on by plaintiff, except for the evidence excluded from consideration above, is that: Russ gave plaintiff "weird looks;" questioned and criticized her about giving Pressley rides to work; started rumors that she and Pressley had a relationship; announced in staff meetings (while looking at plaintiff and Pressley) that management and crew were not to have anything to do with each other; on numerous occasions told plaintiff privately that it did not look good for management to have anything to do with the crew; refused to do anything to stop rumors that Pressley was plaintiff's "secret lover," that she was pregnant with his child and that he was paying her doctor's bills; prohibited plaintiff from calling Pressley into work; threw a hat at Pressley; manipulated plaintiff's hours in the computer (as well as those of other employees); barred plaintiff from access to the computer; cut plaintiff's hours on occasion; was late relieving plaintiff from her shifts; and assigned her to night shifts with crews that he or Kelley did not want to work with. (Id.) Additionally, plaintiff relies on evidence that Hagler yelled [*19] at her repeatedly on her final day of work.

Even assuming that plaintiff can establish that all of this conduct resulted from her association with and support of black employees, n3 the conduct at issue, under the totality of the circumstances, is not sufficiently severe or pervasive to support plaintiff's hostile environment claim. Of the factors set forth in *Harris, supra,* only the first -- frequency of the conduct -- weighs in favor of plaintiff. The conduct directed at plaintiff is not overtly racial in nature and is not physically threatening or humiliating. Plaintiff testified that she continued to work as usual, that she worked almost every day, and that she did a good job. (Cartwright depo., p. 138). See *Mendoza v. Borden, Inc., 195 F.3d 1238, 1248 (11th Cir. 1999)*(sexual harassment case)("Three of the four factors -- physically threatening or humiliating conduct, interference with job performance, and severity -- are clearly absent from the conduct established by Mendoza. The other factor -- frequency of the harassing conduct -- is also for the most part lacking, but to the extent Mendoza showed frequent conduct, the frequency of it does not compensate [*20] for the absence of the other factors. First and most importantly, Mendoza did not present evidence that Page's conduct was 'physically threatening or humiliating' or that the cumulative effect of this conduct 'unreasonably interfered' with Mendoza's job performance."); see also *id. at 1255* (Carnes, J., concurring)(" . . . I write separately to discuss the reluctance courts should have about permitting plaintiffs who claim sexual harassment to rely upon their subjective interpretations of ambiguous conduct.").

n3 This is a generous assumption. Plaintiff testified that some of this conduct -- cutting her hours, showing up late to relieve her, and assigning her to night shift with undesirable crew -- was in retaliation for her complaint to Crump about Russ' manipulation of employees' hours. Although plaintiff, in her brief, characterizes this conduct as based on her support of African American employees, her deposition testimony was that her hours and the hours of another white employee, "Tim," were also manipulated, and that everybody "got their time back." There is no indication in her testimony that plaintiff specifically complained to Crump that the manipulation was racially motivated. (See Cartwright depo., pp. 89-100).

[*21]

The court concludes that defendant is entitled to summary judgment as to plaintiff's Title VII and § 1981 hostile environment claims.

**Constructive Discharge Claims**

In Claims I and III, plaintiff also asserts that she was constructively discharged for supporting and associating with African American employees in violation of Title VII and *42 U.S.C. § 1981*. "To successfully claim constructive discharge, a plaintiff must demonstrate that working conditions were 'so intolerable that a reasonable person in her position would have been compelled to resign.'" *Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 (11th Cir. 1997)*(quoting *Thomas v. Dillard Dep't Stores, Inc., 116 F.3d 1432, 1433-34 (11th Cir.1997));* see also *Morgan v. Ford, 6 F.3d 750, 755 (11th Cir.1993); Landgraf v. USI Film Products, 968 F.2d 427, 430 (5th Cir. 1992), affirmed, 511 U.S. 244, 128 L. Ed. 2d 229, 114 S. Ct. 1483 (1994)*("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment. [*22] "). The relevant evidence of record does not rise to a level sufficient to support plaintiff's constructive discharge claim. n4

> n4 For the reasons stated previously, the court has not considered evidence regarding incidents of which plaintiff has not demonstrated that she was aware during her employment, and the court has not considered the "touching" incidents.

**Other Terms and Conditions of Employment**

Plaintiff also alleges in Claims I and III that "white employees and/or white female employees who support and associate with African-Americans on a non-discriminatory basis, are not given equal opportunities in the terms and conditions of employment, including hiring, promotion, assignment of overtime, assignment to full time positions, or advancement to supervisory positions." (Complaint, PP 73, 80). Defendant argues, *inter alia*, that plaintiff cannot establish a *prima facie* case of discrimination because she cannot show that she was treated disparately from employees outside her protected class. [*23] Plaintiff responds that she has produced direct evidence of discrimination, which relieves her of the burden of establishing a circumstantial case of discrimination. However, plaintiff has not identified the specific evidence that she contends constitutes direct evidence. See Plaintiff's brief, pp. 14-15. In its review of the record, the court has located no evidence that qualifies as direct evidence as to any of plaintiff's claims. "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998)*(citations omitted).

> "Only the most blatant remarks, whose intent could be nothing other than to discriminate . . . constitute direct evidence of discrimination." One example of direct evidence would be a management memorandum saying, "Fire Earley--he is too old." But the evidence at issue here, at most, suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence; by definition then, the evidence is circumstantial.

*Earley v. Champion International Corp., 907 F.2d 1077, 1081-82 (11th Cir. 1990)* [*24] (citations omitted).

Since plaintiff has failed to produce direct evidence of discrimination, her claims must be evaluated in accordance with the McDonnell Douglas/Burdine n5 burden-shifting framework established by the Supreme Court. See *Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir. 1997).* Under this framework, plaintiff is required to present a *prima facie* case of discrimination. *Burdine, 450 U.S. 248 at 252-53, 67 L. Ed. 2d 207, 101 S. Ct. 1089; Walker v. Mortham, 158 F.3d 1177, 1183 (11th Cir.1998); Combs, 106 F.3d at 1527-28.* "Establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." Id. (quoting *Burdine, 450 U.S. at 254); Walker, supra.*

> n5 *Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981); McDonnell Douglas Corp v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).*

[*25]

"To establish a *prima facie* case of disparate treatment based on conditions of employment . . . plaintiff is required to show that: (1) she belongs to a protected class; and (2) she was similarly situated to a person who was not a member of the protected class; but (3) did not receive a condition of employment provided to that person." *Givhan v. Electronic Engineers, Inc., 4 F. Supp. 2d*

*1331, 1340-41 (M.D. Ala. 1998)*. Again, defendant argues that plaintiff cannot establish that she was treated differently than a similarly situated employee outside her protected class. Plaintiff does not respond to this argument and has not identified or introduced evidence regarding an appropriate comparator. Thus, the court concludes that plaintiff has failed to establish a *prima facie* case of discrimination as to her Title VII and § 1981 terms and conditions claims and that defendant is entitled to summary judgment on those claims.

**Retaliation**

In Claim II, plaintiff alleges that she was retaliated against in violation of Title VII. To establish a *prima facie* case of retaliation, the plaintiff must show: "(1) a statutorily protected expression; (2) an adverse [*26] employment action; and (3) a causal link between the protected expression and the adverse action." *Raney v. Vinson Guard Service, Inc., 120 F.3d 1192, 1196 (11th Cir. 1997).*

Defendant contends, *inter alia*, that plaintiff cannot prevail on her retaliation claim because she cannot demonstrate that she was subjected to an adverse employment action. Defendant points to plaintiff's testimony that after she complained to Crump about Russ' manipulation of employees' hours, Russ retaliated against her for that complaint by changing the computer password to deny her access, cutting her hours from more than forty hours a week to twenty-two or twenty-three hours a week for two weeks, assigning her to all night shifts with undesirable crews, and reporting late to relieve her from her shifts four or five times, causing her to be late picking up her children from school. (See Cartwright depo., pp. 89-103).

> An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or [*27] adversely affects his or her status as an employee. Conduct that falls short of an ultimate employment decision must meet 'some threshold level of substantiality . . . to be cognizable under the anti-retaliation clause.' In evaluating what actions meet that required level of substantiality, [the Eleventh Circuit] recognizes that 'Title VII [] is neither a "general civility code" nor a statute making actionable the "ordinary tribulations of the workplace."' Whether an action is sufficient to constitute an adverse employment action for purposes of a retaliation claim must be determined on a case-by-case basis, using both a subjective and an objective standard.

*Gupta v. Florida Board of Regents, 212 F.3d 571, 587 (11th Cir. 2000)*(citations omitted).

Of all of the conduct complained of by plaintiff, only Russ' action in cutting plaintiff's hours nearly in half for a two week period constitutes an adverse employment action. See *Reynolds v. CSX Transportation, Inc., 115 F.3d 860, 868 (11th Cir. 1997), vacated on other grounds, 524 U.S. 947 (1998)*(finding adverse employment action where defendant caused "temp" agency to replace [*28] plaintiff with a different temporary employee for a one week period; plaintiff was not paid for the absence until almost six months later). However, plaintiff specifically testified that this action occurred as a result of her report to Crump about Russ manipulating employees' hours. (See Cartwright depo., pp. 89-103; see also Plaintiff's brief, p. 8). The evidence before the court does not establish the existence of a genuine issue of material fact regarding whether this complaint to Crump constituted protected expression so as to support a Title VII retaliation claim.

Plaintiff testified that Russ had manipulated the hours of two white employees -- plaintiff and "Tim" -- and four black employees. She complained to Crump, who corrected the problem so that "everybody got their time back." (Cartwright depo., pp. 93-96, 177-78). There is nothing in the record to indicate that plaintiff complained to Crump that Russ had taken the action because of any kind of racial animus or discriminatory motive.

> It is well-established that an employee's express complaints to supervisors about perceived discriminatory practices constitutes protected activity . . . . At the other end [*29] of the spectrum, however, the "wide range" of protected activity clearly does not include those situations where the opposition relates not to unlawful employment practices but to a personal grievance. . . . Employees often do not speak with the clarity or precision of lawyers. At the same time, however, employers need not approach every employee's comment as a riddle, puzzling over the possibility that it contains a cloaked complaint of discrimination. But the thrust of inartful, subtle, or circumspect remarks

> nevertheless may be perfectly clear to the employer, and the Court discerns no evidence that Congress intended to protect only the impudent or articulate. The relevant question, then, is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner.

*Garcia-Paz v. Swift Textiles, Inc., 873 F. Supp. 547, 559-60 (D. Kan. 1995)*(citations and parentheticals omitted). In her conversation with Crump, plaintiff clearly complained about Russ' manipulating hours. As discussed [*30] above, however, there is no evidence to indicate that plaintiff suggested in any way that the manipulation occurred because of the race of any of the employees. Thus, the court concludes that -- while plaintiff has established an adverse action -- the complaint to which she attributes that adverse action was not a statutorily protected expression sufficient to support her Title VII retaliation claim. See *Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1313 (6th Cir. 1989)*(employee's allegation in letter that charges against him were a result of "ethnocism" and that supervisor may be a racist is a "vague charge of discrimination" insufficient to constitute "opposition" under state statute patterned after Title VII); *Aldridge v. Tougaloo College, 847 F. Supp. 480, 484-85 (S.D. Miss. 1994)*("Nowhere in the above grievance does plaintiff protest any form of sex discrimination. Her grievance does not even mention that a male was hired for this position. Instead, her grievance complains that the job vacancy was not properly noticed and that Mrs. Lee had treated her unfairly in certain respects. Plaintiff, then, has not met the first element -- statutorily [*31] protected expression -- of her prima facie case. Her grievance had nothing to do with alleged sex discrimination by Tougaloo College."); see also *Primes v. Reno, 999 F. Supp. 1007, 1016 (N.D. Ohio 1998)*("Plaintiff here offered vague suggestions of racism as one possible explanation of what he perceived as a poor evaluation, but this is not sufficient to constitute 'opposition' under Title VII and cannot form the basis for a retaliation claim."). n6

> n6 In the portion of her brief addressing the retaliation claim, plaintiff does not identify the particular opposition which forms the basis of her retaliation claim. (See Plaintiff's brief, pp. 15-16). The only adverse action she specifically identifies is constructive discharge. (Id.). The court has concluded that plaintiff did not suffer a constructive discharge and, thus, this asserted action cannot support plaintiff's retaliation claim. While plaintiff's discussion with Russ and Kelley about Russ' practice of throwing away applications of black applicants might qualify as protected expression, there is no evidence of an adverse action caused by this expression. As noted above, the only adverse action evidenced in the record -- even considering all of the complained of conduct in the aggregate -- is Russ' cutting plaintiff's hours. Plaintiff specifically testified that this resulted from her complaint to Crump regarding Russ' manipulating hours.

[*32]

Accordingly, defendant is entitled to summary judgment on plaintiff's Title VII retaliation claim.

**§ 1981 Retaliation Claim**

For the same reason, plaintiff cannot prevail on her § 1981 retaliation claim. Assuming that a § 1981 claim for retaliation based on "opposition" to racially discriminatory practices is available to plaintiff, n7 she must -- at a minimum -- establish that the opposition for which she suffered an adverse employment action pertained to racial discrimination. As discussed above, the evidence does not create a genuine issue of fact regarding whether plaintiff complained to Crump that Russ' conduct in altering employees' hours was racially discriminatory. Thus, defendant is entitled to summary judgment on plaintiff's § 1981 retaliation claim.

> n7 The scope of § 1981 retaliation claims is not well-defined in the Eleventh Circuit. See *Andrews v. Lakeshore Rehabilitation Hospital, 140 F.3d 1405, 1409-1413 (11th Cir. 1998)*("Even as to retaliation after the 1991 Act, not all retaliation claims are necessarily cognizable. See *Little [v. United Technologies, 103 F.3d 956]* at 961 [11th Cir. 1997](finding no *prima facie* case of retaliation under section 1981 when a white plaintiff claimed he was fired for complaining about a co-worker's derogatory remark against blacks). But see Jackson [v. Motel 6 Multipurpose, Inc.], *130 F.3d [999] at 1007* [(11th Cir. 1997)](indicating that plaintiffs' section 1981 retaliation claim may proceed based on plaintiffs' allegations that they were fired for refusing to participate in employer's discrimination against non-white customers.)").

[*33]

**FLSA Retaliation Claim**

In Claim V, plaintiff asserts that defendant retaliated against her in violation of the Fair Labor Standards Act ("FLSA"). In support of its motion for summary judgment, defendant simply relies on the arguments that it made with regard to plaintiff's Title VII retaliation claim. (Defendant's brief, p. 16 n. 3). The court construes this as an argument that plaintiff cannot establish a *prima facie* case of retaliation. To establish a *prima facie* case of retaliation under the FLSA, plaintiff must demonstrate that: "'she engaged in activity protected under [the] act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action.'" *Wolf v. Coca-Cola Company, 200 F.3d 1337, 1342-43 (11th Cir. 2000)*(citation omitted). The FLSA anti-retaliation provision states that it is unlawful for any person:

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify [*34] in any such proceeding, or has served or is about to serve on an industry committee . . .

*29 U.S.C. § 215*(a)(3). The Eleventh Circuit has held that "unofficial complaints expressed to [the] employer" about pay violations are protected by the FLSA's anti-retaliation provision. *EEOC v. White and Son Enterprises, 881 F.2d 1006, 1011 (11th Cir. 1989);* see also *Lambert v. Ackerley, 180 F.3d 997 (9th Cir. 1999)(en banc).*

There is evidence that plaintiff complained to Crump about Russ' altering hours in the computer to avoid paying overtime and to avoid compensating employees for all of the hours they worked, actions which are violations of the FLSA. See *29 U.S.C. §§ 206*, 207. Russ subsequently cut plaintiff's hours substantially for a two-week period. The court has previously determined that this constituted an "adverse employment action." To establish causation, plaintiff must demonstrate that her hours would not have been cut "but for" her complaint to Crump. See *Reich v. Davis, 50 F.3d 962, 965-66 (11th Cir. 1995)*("[Plaintiffs] are entitled to relief only if they establish [*35] that the filing of the complaint with the Wage and Hour Division, or their cooperation in the ensuing investigation, caused them to suffer adverse action that they otherwise would not have suffered."). For purposes of establishing her *prima facie* case, it is sufficient if plaintiff shows that the adverse employment action closely followed her complaint under the statute. See *Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1457 (11th Cir. 1998)*(Title VII case)(plaintiff established causation element by showing that series of adverse employment actions "commenced almost immediately after management learned she had filed the [EEOC] charge."). In her deposition, plaintiff testified as follows:

> Q. All right. Now, you say your hours were cut?
>
> A. Right.
>
> Q. How many hours were you getting before you allegedly reported to Mr. Crump about --
>
> A. Forty-plus.
>
> Q. And then afterwards?
>
> A. I'd be cut down to three days a week, maybe twenty-two, twenty-three hours. And then after he left it like that for a couple weeks, then he'd start pulling me back up again.
>
> Q. So you say your hours went down for a couple of weeks and then it came back [*36] up to where it was before?
>
> A. Right.

(Cartwright depo, pp. 98-99). Viewing this testimony in the light most favorable to plaintiff, it permits a reasonable inference that the reduction in hours closely followed plaintiff's complaint to Crump. Thus, plaintiff has established a *prima facie* case of FLSA retaliation on the present motion, and defendant is not entitled to summary judgment on this claim.

**§ 1985(3) Conspiracy Claim**

In Claim IV, plaintiff alleges that defendant Tacala conspired with its district managers and defendant Russ to violate plaintiff's rights "on the basis of her race, stereotypes about her race, and her racial associations." (Complaint, PP 84-87). Defendant argues that this claim is due to be dismissed because plaintiff was not discriminated against. (Defendant's brief, p. 15 n. 2). *42 U.S.C. § 1985*(3) provides, in relevant part:

> If two or more persons in any State or Territory conspire . . . for the purpose of

> depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . .; in any case of conspiracy set [*37] forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation against any one or more of the conspirators.

*42 U.S.C. § 1985*(3). A § 1985(3) claim requires proof of: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Park v. City of Atlanta, 120 F.3d 1157, 1161 (11th Cir. 1997)*(citations omitted). "In order to prove a private conspiracy in violation of the first clause of § 1985(3), a plaintiff must show, *inter alia*, (1) that 'some racial, or perhaps [*38] otherwise class-based, invidiously discriminatory animus lay behind the conspirators' action,' and (2) that the conspiracy 'aimed at interfering with rights' that are 'protected against private, as well as official, encroachment.'" *Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 267-68, 122 L. Ed. 2d 34, 113 S. Ct. 753 (1993)*(citations and footnote omitted). n8

n8 The first clause of § 1985(3) is the one at issue here. Generally, the second clause prohibits conspiracies directed to preventing state authorities from giving all persons equal protection of the laws; the third clause prohibits conspiracies to prevent a citizen from voting in presidential and congressional elections.

The court agrees with defendant that plaintiff's case fails on proof of the fourth element, *i.e.*, that she was injured in her person or property or deprived of any right or privilege of a citizen of the United States. As noted above, plaintiff has failed to present sufficient evidence to overcome summary [*39] judgment on her claims that she was discriminated against on the basis of her association with and support of African American employees. For the same reasons discussed with regard to plaintiff's Title VII and § 1981 discrimination claims, plaintiff has failed to produce evidence sufficient to establish the existence of a genuine issue of material fact regarding whether she was "deprived of any right or privilege of a citizen of the United States" n9 so as to support a § 1985(3) claim. Accordingly, defendant is entitled to summary judgment on Claim IV of the complaint.

n9 Plaintiff does not allege that she was "injured in her person or property."

**Invasion of Privacy**

In Claim VI, plaintiff brings a state law tort claim of invasion of privacy. In Alabama, the tort of invasion of privacy "'consists of four limited and distinct wrongs: (1) intruding into the plaintiff's physical solitude or seclusion; (2) giving publicity to private information about the plaintiff that violates ordinary decency; (3) putting [*40] the plaintiff in a false, but not necessarily defamatory, position in the public eye; or (4) appropriating some element of the plaintiff's personality for a commercial use.'" *Ex Parte the Birmingham News, Inc., 778 So. 2d 814, 818, 2000 WL 739592 (Ala. 2000)*(quoting *Johnston v. Fuller, 706 So. 2d 700, 701 (Ala. 1997))*. Plaintiff contends that defendant is liable to her for "false light" and "wrongful intrusion" invasion of privacy.

False Light

Plaintiff claims that "Russ falsely portrayed to Plaintiff's co-workers through a false rumor created and perpetuated by Defendant Russ, that Plaintiff was having sexual relations with Pressley, her African-American friend and former co-worker." (Complaint, P 97). The Alabama Supreme Court has adopted the definition of the "false light" tort set forth in *$S 652E of the Restatement (Second) of Torts*. *Schifano v. Greene County Greyhound Park, Inc., 624 So. 2d 178, 180 (Ala. 1993)*. Section 652E states:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false [*41] light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the

> publicized matter and the false light in which the other would be placed.

Id. (quoting *Restatement (Second) of Torts, § 652E*). Defendant argues, *inter alia*, that the evidence does not establish the requisite publicity to support a false light claim. Comment a to § 652E states, "The Rule stated here is . . . limited to the situation in which the plaintiff is given publicity. On what constitutes publicity and the publicity of application to a simple disclosure, see § 652D, Comment a, which is applicable to the rule stated here."

Comment a to § 652D states:

> "Publicity," as it is used in this Section, differs from "publication," as that term is used in § 577 in connection with liability for defamation. "Publication," in that sense, is a word of art, which includes any communication by the defendant to a third person. "Publicity," on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded [*42] as substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written or by any other means. It is one of a communication that reaches, or is sure to reach, the public.
>
> Thus, it is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons. On the other hand, any publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or statement made in an address to a large audience, is sufficient to give publicity within the meaning of the term as it is used in this Section. The distinction, in other words, is one between private and public communication.

*Restatement (Second) of Torts, § 652D*, Comment a. See also *Swanson v. Civil Air Patrol, 37 F. Supp. 2d 1312, 1332 (M.D. Ala. 1999)*(Comment a to § 652D applicable to a § 652E "false light" claim). Viewed in the light most favorable to plaintiff, the evidence permits an inference that Russ suggested in [*43] three staff meetings that plaintiff and Pressley were having a relationship. n10 Assuming that the entire staff attended, these communications were made to approximately eighteen people, including plaintiff. (Cartwright depo., p. 172). The court concludes that these communications are of a distinctly different nature from the types of "public" communications referred to in the Restatement comment, and that they were not sufficiently public to give rise to a "false light" cause of action. See *Hoover v. Tuttle, 611 So. 2d 290, 292 (Ala. 1992)*(no actionable "false light" claim where false statements were made in an executive committee meeting); see also *Johnston v. Fuller, 706 So. 2d 700, 703 (Ala. 1997)*(in finding insufficient publicity to support an invasion of privacy claim, stating, "[Defendant] did not broadcast over the radio the information obtained about [plaintiff], he did not print it in a newspaper, and he did not tell it to a large number of people."). Accordingly, defendant is entitled to summary judgment on plaintiff's "false light" invasion of privacy claim.

n10 Defendant makes much of the fact that Russ did not mention names during the staff meetings. However, there is evidence that Russ looked pointedly at plaintiff when he said "management," and at Pressley, when he said "crew." (Cartwright depo., pp. 72-77). Pressley testified:

> A. [Russ] made the comment to the effect of, for those of you managers who date your employees, that wouldn't be tolerated. And he looked at Ms. Cartwright and came over there by me and looked at me also, and everyone turned around and started looking.
>
> Q. But as to the comment he made, he didn't refer to the two of you personally, just managers dating employees? That was his spoken comment?
>
> A. Oh, he had started a rumor that me and Ms. --
>
> Q. One second. In this meeting. I just want us to stay with just the meeting for a second. He didn't state your name or Ms. Cartwright's name. He just used terms managers dating employees; is that correct? I know you said he

> came and stood by you, but as far as --
>
> A. It's the way he did it. He let the crowd know who he was addressing. He had ways of letting you know who he was talking about and what was what. You knew and everyone else knew.

(Pressley depo., pp. 79-80).

[*44]

Wrongful Intrusion

Plaintiff also brings a "wrongful intrusion" invasion of privacy claim based upon Russ' questioning plaintiff about her relationship with Pressley, his "disseminating information about Plaintiff's private associations to Plaintiff's co-workers and district manager," and the instances of physical contact. (Complaint, PP 99-102). Alabama recognizes the tort of "wrongful intrusion" in the form set forth in *$S 652B of the Restatement (Second) of Torts*, which provides:

> One who intentionally intrudes physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

*Phillips v. Smalley Maintenance Services, Inc., 435 So. 2d 705 (Ala. 1983); Restatement (Second) of Torts, § 652B.*

Defendant argues that the evidence is insufficient to support a "wrongful intrusion" claim. Defendant characterizes the touching incidents as "inadvertent" and argues that there were only four incidents. (Defendant's brief, pp. 24-25). While a jury may certainly conclude that the touching [*45] was inadvertent, a jury could also reasonably infer from the evidence that Russ intentionally touched plaintiff in an inappropriate manner. Additionally, defendant's argument ignores plaintiff's testimony that the touching was "an everyday thing." (Cartwright depo., pp. 112-16, 127-28). Defendant's argument also omits any discussion of Russ' conduct in implying that she and Pressley were having a relationship, or of plaintiff's testimony that Russ asked her if she and Pressley were "sleeping together," and that he inquired whether her boyfriend was taking care of her at home. (Cartwright depo., pp. 85-86, 122-23).

In Phillips, the Alabama Supreme Court held that the evidence supported a "wrongful intrusion" claim, where plaintiff's boss repeatedly subjected her to inquiries about sex and demanded that she engage in sex with him. On one occasion, he "hit her 'across the bottom' with the back of his hand." *Id., p. 707.* In *Busby v. Truswal Systems Corporation, 551 So. 2d 322 (Ala. 1989),* the court held that the trial court had improperly granted summary judgment where there was evidence that the plaintiffs' supervisor had repeatedly made lewd sexual [*46] comments and propositions to the plaintiffs, and had stared at their sexual anatomy, put his arm around them, grabbed their arms and stroked their necks. In *Norris v. Moskin Stores, Inc., 272 Ala. 174, 132 So. 2d 321 (Ala. 1961),* the court found an actionable "wrongful intrusion" invasion of privacy where a creditor's agent, in an attempt to collect a debt, had called the plaintiff's wife and his sister-in-law and left messages for plaintiff to call her, implying that she had been engaged in an intimate relationship with the plaintiff and was "in trouble" and had to get in touch with the plaintiff.

In view of these authorities, the court concludes that the evidence establishes the existence of a genuine issue of material fact regarding whether Russ' conduct constituted a "wrongful intrusion" invasion of plaintiff's privacy.

**Assault and Battery**

An assault is ""an intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a wellfounded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented. [*47] "" *Wright v. Wright, 654 So. 2d 542, 544 (Ala. 1995)*(citations omitted). A successful assault becomes a battery. Id. "To succeed on a claim alleging battery, a plaintiff must establish: (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." *Ex Parte Atmore Community Hospital, 719 So. 2d 1190, 1193 (Ala. 1998)*(citations omitted). Defendant argues that the evidence does not establish that the touching at issue in this case was hostile, angry or rude. The court concludes, however, that the evidence presented by plaintiff with regard to the instances of touching by Russ is sufficient to create an issue of fact regarding whether Russ committed an assault and/or a battery. See *Atmore Community Hospital, supra, 719 So. 2d at 1194* (finding sufficient evidence of a battery where plaintiff's supervisor "touched her waist, rubbed against her when passing her in the hall, poked her in the

armpits near the breast area, and touched her leg," where there was evidence that the touching was intentional, conducted with sexual overtones, [*48] and unwelcome).

**Conspiracy**

In Claim X, plaintiff asserts a state law conspiracy claim. She alleges that defendant Tacala "conspired with its district managers (Hagler and Probasco) and Defendant Russ, to harm plaintiff in violation of Alabama common law." (Complaint, P 115). She alleges that "defendant Tacala . . . agreed and conspired with its agents to violate the rights of Plaintiff on the basis of her race, stereotypes about her race, and her racial associations. Plaintiff was the target of Defendants' unlawful actions that were motivated by Defendants' animus toward African-Americans." (Complaint, P 117). Defendant argues that it is entitled to summary judgment on this claim because: (1) plaintiff has failed to allege a necessary element of civil conspiracy, in that there can be no conspiracy claim under Alabama law when the only parties to the alleged conspiracy are a corporation and its agents; and (2) plaintiff has failed to present evidence viable causes of action underlying her conspiracy claim. (Defendant's brief, pp. 27-28).

The case relied on by defendant as authority for its first argument does not support the proposition for which defendant has cited it. In [*49] *Williams v. Marcum, 519 So. 2d 473 (Ala. 1988),* the court held that "there is no 'conspiracy' where the only parties to the alleged conspiracy are the corporation and *one of its agents* and the corporation's liability is predicated upon the theory of respondeat superior through the acts of the agent with whom it allegedly conspired." *Id. at 475* (citation omitted)(emphasis added). The court acknowledged, however, that "a corporation 'may be liable for damage to a third person resulting from a conspiracy where *two or more of its agents* participated in the conspiracy.'" *Id. at 474-75* (citation omitted)(emphasis added). As noted above, plaintiff alleged that Tacala entered into a conspiracy with Probasco, Hagler and Russ. (See Complaint, P 115). Thus, defendant is not entitled to dismissal of the claim on this basis.

However, defendant correctly argues that Alabama law does not permit recovery on a conspiracy claim where the causes of action underlying the conspiracy claim are not viable. "'Where civil liability for a conspiracy is sought to be enforced, the conspiracy itself furnishes no cause of action. The gist of the action [*50] is not the conspiracy alleged but the wrong committed.'" *McLemore v. Ford Motor Company, 628 So. 2d 548, 550 (Ala. 1993)*(citations omitted). In McLemore, the Alabama Supreme Court held that where the trial court had properly entered summary judgment on the plaintiff's fraud claim, she could not maintain her claim for civil conspiracy to defraud. *Id. at 550-51.* See also *Allied Supply Co. v. Brown, 585 So. 2d 33, 36 (Ala. 1991)*(summary judgment on conspiracy claim proper where underlying causes of action of fraud, breach of fiduciary duty, and misappropriation of trade secrets were not viable).

Plaintiff's conspiracy claim arises from her allegations of racial discrimination and retaliation. (See Complaint, PP 116-19). This court has determined that plaintiff has failed to produce sufficient evidence to overcome defendant's motion for summary judgment on plaintiff's claims that she was subjected to disparate treatment and retaliation on the basis of her association with and support of African American employees. Thus, defendant is entitled to summary judgment on plaintiff's civil conspiracy claim.

**Employer Liability**

The [*51] court has determined that there is evidence establishing the existence of a genuine issue of material fact with regard to whether Russ committed an invasion of privacy and an assault and battery. Accordingly, the court now turns to the question of whether, as to those torts, Tacala may be held liable for Russ' conduct.

> An employer is liable for the intentional torts of its employee if: (1) the employee's acts are committed in furthermore of the business of the employer; (2) the employee's acts are within the line and scope of his employment; or (3) the employer participated in, authorized, or ratified the tortious acts. . . . An employee's tortious acts occur within the scope of his employment if the acts are "so closely connected with what the servant is employed to do and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment." In *Big B, Inc. v. Cottingham, 634 So. 2d 999, 1002 (Ala. 1993),* [the Alabama Supreme Court] held that there was sufficient evidence that a store manager who falsely imprisoned a customer suspected of shoplifting was acting within [*52] the scope of his employment because preventing shoplifting was closely related to his employment as a store manager. In contrast, where the store manager forced the customer to perform a sexual act with him, [the Alabama Su-

> preme Court] has held that the manager was acting outside the scope of his employment.
>
> * * * *
>
> An employer is also liable for the intentional torts of the employee if the employer ratifies the employee's conduct. An employer ratifies conduct if: (1) the employer has actual knowledge of the tortious conduct; (2) based on this knowledge, the employer knew the conduct constituted a tort; and (3) the employer failed to take adequate steps to remedy the situation.

*Ex Parte Atmore Community Hospital, 719 So. 2d 1190, 1194-95 (Ala. 1998)*(citations omitted). Defendant contends that it is not liable to plaintiff for Russ' conduct because his acts were not in furtherance of Tacala's business or in the line and scope of his employment, and because Tacala did not participate in, ratify, or authorize the tortious acts. Plaintiff argues that Russ' acts were in the line and scope of his employment and, further, that Tacala ratified Russ' behavior. [*53]

"Wrongful Intrusion" Claim

Plaintiff's wrongful intrusion invasion of privacy claim is based, in part, on Russ' conduct in implying by his words and conduct during three staff meetings that plaintiff and Pressley were involved in a relationship. Russ did so by announcing -- while looking at and/or standing by plaintiff and Pressley -- that "management" and "crew" were not to have anything to do with each other. As to this portion of plaintiff's invasion of privacy claim, the evidence is sufficient to permit a finding that Russ was acting in the line and scope of his employment.

However, as to the instances of touching alleged by plaintiff, the evidence is insufficient to permit a conclusion that Russ was acting in the line and scope of his employment. In *Ex Parte Atmore Community Hospital, supra,* the conduct at issue was similar to that involved in the present case -- plaintiff presented evidence that her supervisor had "touched her waist, rubbed against her when passing her in the hall, poked her in the armpits near the breast area, and touched her leg." *Ex Parte Atmore Community Hospital, 719 So. 2d at 1194.* The Alabama Supreme Court found this conduct [*54] to be "entirely personal in nature and not within [the supervisor's] assigned duties," and concluded that it was not within the line and scope of his duties so as to render his employer liable. This court likewise concludes that the evidence of physical contact offered by plaintiff is insufficient to permit a conclusion that Russ was acting within the line and scope of his employment. Additionally, the evidence does not support a conclusion that Russ' conduct in asking plaintiff whether her boyfriend was taking care of her at home or whether she was sleeping with Pressley n11 was within the line and scope of his employment.

> n11 Plaintiff testified that Russ asked her if she and Chris were sleeping together a few weeks "after Chris was gone." (Cartwright depo., pp. 85-86). Thus, the query does not appear to have been related to any legitimate interest Russ may have had in monitoring relationships between "management" and "crew."

As to the remaining incidents supporting plaintiff's invasion of privacy claim, [*55] Tacala may be held liable if it ratified Russ' conduct. To show that an employer has implicitly ratified an employee's sexual harassment of another employee, the plaintiff must prove the underlying tortious conduct and "must show that the employer (1) had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take 'adequate' steps to remedy the situation." *Potts v. BE & K Construction Company, 604 So. 2d 398, 400 (Ala. 1992).*

Plaintiff contends that Tacala had actual knowledge of Russ' conduct in touching plaintiff in an objectionable manner, since plaintiff had complained to Kelley, the store assistant manager. It is undisputed that plaintiff did not complain to anyone else. (Cartwright depo., pp. 162-63). n12 Defendant cites *Kilgore v. Thompson & Brock Management, Inc., 93 F.3d 752 (11th Cir. 1997),* and argues that plaintiff's complaint to Kelley was insufficient [*56] to impart actual knowledge of Russ' conduct to Tacala, because Kelley was not within defendant's "higher management." (Defendant's brief, p. 22).

> n12 Plaintiff testified that she tried to complain to Joe Crump when he telephoned the store, but he hung up on her. (Cartwright depo, pp. 129-30, 162-63). Plaintiff told Crump that she was having problems with Russ, that she needed to speak with Crump about it and that "it was something really bad." (Id.). Crump told plaintiff that he did not have time to deal with it. (Id.). This evidence is insufficient to demonstrate that Crump had actual knowledge of Russ' conduct.

> There is no indication that plaintiff told Crump anything that would have alerted him to the possibility that Russ had committed any of the torts at issue.

In Kilgore, the plaintiffs brought state law claims of outrage and invasion of privacy and a Title VII claim arising from sexual harassment by a co-employee at the Pizza Hut restaurant in Jasper, Alabama. The defendant, Thompson and Brock [*57] Management, Inc., had a contract to manage the restaurant. Plaintiffs claimed to have been sexually harassed by the delivery driver at the Jasper Pizza Hut. Plaintiffs initially complained to the restaurant manager. Subsequently, they complained to defendant's vice president. The court found, for purposes of plaintiffs' Title VII claim, that despite plaintiffs' earlier complaint to the restaurant manager, defendant did not have knowledge of the alleged sexual harassment until plaintiffs contacted the vice president, since the restaurant manager was not part of "higher management" at Thompson and Brock. The court further determined that once Thompson and Brock had notice of the harassment, it took prompt remedial measures. The Eleventh Circuit then stated, with regard to plaintiffs' state law claims, that:

> Thompson and Brock can be held directly liable for invasion of privacy only if the company authorized or participated in [the harasser's] actions or ratified his conduct after learning of the action. *Potts v. BE & K Constr. Co., 604 So. 2d 398, 400 (Ala. 1992).* It can be held vicariously liable only if [the harasser's] acts 'were done in the line and scope [*58] of employment' for Thompson and Brock's benefit. Id. The record fails to include sufficient facts under either theory to withstand summary judgment.

*Kilgore, 93 F.3d at 755.* The Eleventh Circuit affirmed the district court's grant of summary judgment on the state law claims. Although the Eleventh Circuit set forth very little of its analysis on the state law claims, it appears that in reaching its holding as to the invasion of privacy claim, the court must have concluded that the plaintiffs' complaint to the restaurant manager was insufficient, under state law as well as federal law, to provide the defendant with knowledge of the alleged harassment. n13

> n13 Although it is not expressly stated in Kilgore, the case apparently involved a lack of adequate remedial action after the complaint to the restaurant manager. If this were not so, the Eleventh Circuit would have had no occasion to address the question of whether the complaint to the manager were sufficient to impart knowledge of the harassment to the defendant corporation.

[*59]

In this case, defendant's employment handbook, which plaintiff received and read, set forth its sexual harassment policy and complaint procedures. The policy provides that employees who experience or who are aware of sexual harassment should immediately report it to the restaurant manager or, if the complainant is uncomfortable discussing the issue with the restaurant manager or the concerns cannot be resolved at that level, to the District Manager. The policy further provides that complainants may alternatively contact the Vice President of Operations directly. (Cartwright depo., pp. 131-32; Defendant's Exhibit B, Human Resource Guidelines, p. 13). Plaintiff chose, instead of following the policy, to report the alleged harassment only to the restaurant assistant manager, who worked for Russ and had no supervisory authority over him. In view of these facts and the Eleventh Circuit's decision in Kilgore, the court concludes that plaintiff has not presented evidence sufficient to demonstrate a genuine issue of material fact regarding whether defendant Tacala had actual knowledge of Russ' sexually harassing conduct. Absent actual knowledge of the conduct, Tacala cannot be found to [*60] have ratified it. Therefore, defendant is entitled to summary judgment on plaintiff's "wrongful intrusion" invasion of privacy claim to the extent that it arises from Russ' sexually harassing conduct.

Since Russ' conduct in sexually harassing plaintiff is not attributable to Tacala, the court must determine whether his conduct in the staff meetings, which occurred in the line and scope of his employment, is sufficient to support plaintiff's wrongful intrusion claim. Alabama law provides for liability where there has been a "'wrongful intrusion into one's private activities in such manner so as to outrage or to cause mental suffering, shame or humiliation to a person of ordinary sensibilities.'" *Hogin v. Cottingham, 533 So. 2d 525, 530 (Ala. 1988)*(citation omitted). The court concludes under the authority of *Moskin, supra, 132 So. 2d at 324-25,* that a wrongful intrusion may occur where the defendant has falsely implied to other persons, on several occasions, that plaintiff is involved in an intimate relationship. See id. (actionable wrongful intrusion claim where defendant's agent made three telephone calls implying to

plaintiff's wife and sister-in-law that [*61] she and the plaintiff were intimately involved).

Plaintiff has presented evidence that Russ told two of her co-workers, Betty Sue Albritton and Valona Merriweather, that plaintiff and Pressley were "secret lovers." (Pressley depo., pp. 224-25). In view of this evidence, a jury could reasonably infer that by directing attention to plaintiff and Pressley during the staff meetings when he stated that "management" and "crew" were not to have anything to do with each other, Russ was implying the existence of an intimate relationship between plaintiff and Pressley. A jury could also reasonably find this implication to be an intrusion causing "mental suffering, shame or humiliation to a person of ordinary sensibilities." Against the backdrop of Russ' telling employees that plaintiff and Pressley were "secret lovers," the evidence of Russ' comments during the staff meetings is sufficient -- albeit barely so -- to permit submission of plaintiff's wrongful intrusion claim to a jury. Accordingly, Tacala is not entitled to summary judgment on this claim to the extent it arises from Russ' conduct in implying during staff meetings that plaintiff and Pressley were involved in a relationship.

[*62] Assault and Battery Claim

It appears from the complaint that plaintiff brought her assault and battery claim only against Russ, who was dismissed as a defendant by plaintiff. (See Complaint, PP 111-113)(making no allegations against Tacala). However, to the extent that she brings the claim against Tacala, defendant is entitled to summary judgment. Plaintiff's assault and battery claim arises from her allegations that Russ subjected her to unwanted touching. (Id.). As discussed above, plaintiff has not demonstrated a basis for imposing liability on Tacala for this conduct.

**Negligent Retention and Supervision Claims**

In Claims VII and VIII, plaintiff asserts that defendant is liable to her for negligent supervision, training, and retention of its employees. (Complaint, PP 104-09). Defendant argues only that it is entitled to summary judgment on these claims because "plaintiff has failed to allege a valid underlying tort by any of Tacala's employees," and an underlying tort committed by the employer's agent is a prerequisite to these claims. (Defendant's brief, p. 28). As discussed above, plaintiff has presented sufficient evidence to demonstrate the existence of an [*63] issue of fact as to her claims that Russ committed the torts of assault and battery and invasion of privacy. Thus, defendant is not entitled to summary judgment on the basis of the argument it has advanced.

**CONCLUSION**

For the foregoing reasons, it is

ORDERED that defendant's motion for summary judgment is DENIED as to Claim V (Willful Violation of Fair Labor Standards Act, *29 U.S.C. § 215*(a)(3)); Claim VI (Invasion of Privacy), to the extent it arises from Russ' conduct in implying during staff meetings that plaintiff and Pressley were involved in a relationship; Claim VII (Negligent Supervision and Training); and Claim VIII (Negligent Retention). In all other respects, the motion is GRANTED.

The Clerk is DIRECTED to provide this order to counsel by facsimile.

DONE, this 1 day of November, 2000.

SUSAN RUSS WALKER

UNITED STATES MAGISTRATE JUDGE