# EXHIBIT A

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 1

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


NICOLE TAYLOR REED,

      Plaintiff,

vs.               CIVIL ACTION NO.

               2:06-CV-00380-MHT-CSC

BIG LOTS STORES, INC.,

      Defendant.


        *    *    *    *    *


     DEPOSITION OF NICOLE TAYLOR REED,

taken pursuant to notice and stipulation

on behalf of the Defendant, in the offices

of Carpenter, Ingram & Mosholder, 4121

Carmichael Road, Suite 303, Montgomery,

Alabama, before Nicole Paulk, Court

Reporter and Notary Public in and for the

State of Alabama at Large, on January 17,

2007, commencing at 9:32 a.m.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 21

1    Q.    Where was that?  Where did you attend high

2          school?

3    A.    Lanier High School.

4    Q.    In Montgomery?

5    A.    Uh-huh.  Because that was a nice violent

6          fight.  And -- I'm trying to think.  I

7          have a bad memory.

8    Q.    I'm sorry, what did you just say?

9    A.    I said my memory, I have --

10   Q.    You have a poor memory?

11   A.    Uh-huh, very.

12   Q.    So is it hard for you to remember things

13         that occurred years ago?

14   A.    Very.  That's just being honest.  High

15         school.  Okay.  And then coming up to the

16         day about -- what -- have I been arrested?

17         Okay.  And then coming up to the -- what

18         -- when was that, though?  Okay.  See, I

19         had got into some trouble about -- I had

20         some detectives come to my house a while

21         back, some years ago, concerning like Home

22         Depot or something, saying that I was into

23         something with some people there.  Went

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 42

1   Q.    Do you recall the address for McGehee Park
2         Apartments in 2002?
3   A.    Sir, if I recalled the actual address of
4         the thing, I would have put it on there.
5         I don't -- I honestly don't recall it, the
6         number.
7   Q.    And do you recall the dates any more
8         specifically than you have listed in
9         response to Interrogatory Number 1?
10  A.    No.  I mean -- no, I don't recall the
11        dates any more specific.  I know that year
12        I stayed in that apartment.  And I ain't
13        never stayed in an apartment no longer
14        than a year, lease time, or six months.
15        And only one I had six months is when I
16        moved from McGehee Place and I went back
17        home with mama from mid-'05 to '06.  I
18        don't know.  They're correct, though.
19  Q.    For the record, what is your race?
20  A.    Black.
21  Q.    And for the record, you're female?
22  A.    Yes.
23  Q.    Are you currently married?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 49

1    answer the question, you're saying I'm

2    refusing to cooperate?  I don't -- I

3    honestly don't see that that's refusing to

4    cooperate.

5  Q.   That's just your opinion; is that correct?

6  A.   Yeah.  Yes, that's correct.

7  Q.   And what post-high school education have

8    you had?

9  A.   Went to college, Troy State University of

10    Montgomery.

11  Q.   And when did you attend college at Troy

12    State University of Montgomery?

13  A.   From 2000 to -- when I graduated from high

14    school in 2000 until present time.  I sat

15    out two years, from 2004 until now, until

16    January of this year.

17  Q.   Tell me more specifically, have you earned

18    any degrees from Troy State University of

19    Montgomery?

20  A.   I earned two.  I have an associate's

21    degree in general science and education,

22    and I have a BS degree in human resource

23    management.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 110

1    about a 15-minute break.  Ms. Reed, you

2    were hired by Big Lots on December 13,

3    2003; is that correct?

4    A.    Correct.

5    Q.    And that's --

6    A.    2003, you say?

7    Q.    Uh-huh.

8    A.    2002 I thought.  2002?

9    Q.    Okay.  And you were hired as a part-time

10    cashier; is that right?

11    A.    Part-time cashier, correct.

12    Q.    And you were hired to work in Big Lots

13    Store Number 818 in Montgomery, Alabama;

14    is that correct?

15    A.    Correct.

16    Q.    And you worked at Store Number 818

17    throughout your employment with Big Lots;

18    is that true?

19    A.    Correct.

20    Q.    With whom did you interview when you

21    applied with Big Lots; do you recall?

22    A.    James -- I forgot his last name.  James.

23    I forgot his last name.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 111

1    Q.    Do you know who was involved in the

2          decision to hire you?

3    A.    No.

4    Q.    And when you were hired, like all

5          employees, you received an associate

6          handbook; is that true?

7    A.    I don't recall receiving a handbook.

8    Q.    You don't recall whether you received one?

9    A.    Uh-huh.

10   Q.    Do you recall signing a piece of paper

11         acknowledging that you received an

12         associate handbook and had reviewed the

13         contents?

14   A.    Not -- you're talking at the time that I

15         got hired?

16   Q.    When you started working there.

17   A.    Probably later on in the -- as I worked, I

18         probably did, but not as I got hired, not

19         the first day or anything like that.  I

20         probably did later on --

21   Q.    Maybe not the first day, but you recall

22         signing an acknowledgement form that you

23         received an employee handbook?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 112

1    A.    Right.

2    Q.    And you recall receiving an associate

3          handbook?

4    A.    Right.  Correct.

5    Q.    If not the first day, then shortly

6          thereafter?

7    A.    Or -- yeah.

8    Q.    Ms. Reed, I've just handed you a copy of

9          Big Lots' equal opportunity policy, which

10         is contained in the associate handbook; is

11         that correct?

12                   (The referred-to document was

13                    marked for identification as

14                    Defendant's Exhibit No. 6.)

15   A.    I'm not sure if it's in the handbook or

16         not, but you handed me a form saying equal

17         opportunity employment.

18   Q.    You recognize this as Big Lots' equal

19         employment opportunity policy?

20   A.    Yeah, but I'm not sure if this page is in

21         the handbook.

22   Q.    But you recognize this policy as Big Lots'

23         equal employment opportunity policy, is

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 113

1       what I'm asking you.

2   A.  Oh, I've never seen the equal opportunity
3       employment policy.

4   Q.  Did you read the handbook?

5   A.  They brought us in one day soon -- well,
6       towards the end and everything, they
7       brought us in, in order to bring the --
8       the handbooks, to read them.  Told us come
9       to work one hour early just to read the
10      handbook and sign the paper.  But what I'm
11      saying is I don't know if this exact one
12      came out the handbook.  I don't know.

13  Q.  Okay.  Do you recall when you came in to
14      -- had it been revised?  Is that when you
15      came in --

16  A.  Yeah.

17  Q.  -- to read another copy and sign a new
18      acknowledgement form?

19  A.  That's what -- yeah, that's what we did.

20  Q.  All right.  So at some point you recall --
21      some point after you received an associate
22      handbook and signed for it, at some other
23      point it was revised, and so they asked

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 114

1      you to come in early and receive a new

2      version of the associate handbook and sign

3      for that version too?  Is that what you

4      were just talking about?

5    A.    Yes.

6    Q.    So you knew there was an equal opportunity

7      employment policy at Big Lots?

8    A.    Yeah.

9    Q.    And you were aware that the policy states

10      that no person shall be discriminated

11      against in employment because of, among

12      other things, race, color, and sex,

13      correct?

14    A.    Correct.

15    Q.    And you were aware during your employment

16      that Big Lots' policy prohibits

17      discrimination upon, among other things,

18      race, color, and sex, correct?

19    A.    Correct.

20    Q.    And you were aware during your employment

21      that Big Lots' policy stated that any

22      formal or informal allegation that the

23      equal employment opportunity had been

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 115

| | | |
|---|---|---|
| 1 | | violated should be referred immediately to |
| 2 | | human resources; is that correct? |
| 3 | A. | I'm not -- I don't know about that. |
| 4 | Q. | You don't recall? |
| 5 | A. | I don't recall. |
| 6 | Q. | But you were aware that complaints could |
| 7 | | be directed to human resources, correct? |
| 8 | A. | I mean, that's for any company.  Yeah, I'm |
| 9 | | aware of that. |
| 10 | Q. | But at Big Lots you understood that the |
| 11 | | policy was that human resources was one |
| 12 | | place to raise complaints? |
| 13 | A. | Yes. |
| 14 | Q. | I've just handed you, Ms. Reed, what has |
| 15 | | been marked as Exhibit 7, which is a copy |
| 16 | | of the harassment-free environment policy, |
| 17 | | which is also contained in Big Lots' |
| 18 | | associate handbook; is that correct? |
| 19 | | (The referred-to document was |
| 20 | | marked for identification as |
| 21 | | Defendant's Exhibit No. 7.) |
| 22 | A. | It's the policy, but I'm not sure if it's |
| 23 | | in the -- I don't recall it being in the |

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 117

1   A.   I don't recall.

2   Q.   You don't recall whether you did or not?

3   A.   Yeah, I don't recall.

4   Q.   But you knew that Big Lots prohibited

5        harassment and/or discrimination based on

6        race and color and sex and so forth,

7        didn't you?

8   A.   Ask me that question again.

9   Q.   You're aware that Big Lots had a policy in

10       place that prohibited harassment and

11       discrimination based on race and color and

12       gender and such things?

13  A.   Yes.

14  Q.   And if you'll look with me, I'm down to

15       the paragraph that begins "likewise."  Do

16       you see that?

17  A.   Uh-huh.

18  Q.   It states that, quote, any associate who

19       believes he/she has been the subject of

20       harassment is responsible for promptly

21       reporting the alleged act to human

22       resources or his/her immediate supervisor.

23       Is that correct?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 118

1    A.    That's what the statement says, yes.

2    Q.    And you knew during your employment that

3          such complaints should be made to a

4          supervisor or the human resources

5          department, correct?

6    A.    How can you go to the people who are doing

7          this to you?

8    Q.    That's not what my question was.

9    A.    So what's the question?

10   Q.    Do you need me to repeat the question?

11   A.    Please.

12   Q.    The question was, you knew that under Big

13         Lots' policy such complaints could be

14         raised with an immediate supervisor or a

15         supervisor or human resources?

16   A.    Okay.

17   Q.    Is that right?

18   A.    Yes.

19   Q.    And I've just handed you a copy of Exhibit

20         8, which is a copy of Big Lots' open door

21         policy; is that correct?

22                   (The referred-to document was

23                    marked for identification as

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 119

1        Defendant's Exhibit No. 8.)

2   A.   That's what you -- that's what I've
3        received.

4   Q.   And do you recall this policy from the
5        associate handbook?

6   A.   No, I don't.

7   Q.   You don't recall whether it was in there
8        or not?

9   A.   Yeah, I don't recall if it was in there or
10       not.

11  Q.   Is that because of the length of time that
12       it's been since you worked at Big Lots?

13  A.   I'm almost sure that's what it is.

14  Q.   It's hard for you to remember what the
15       policies were or what you knew about them
16       because it's been a while since you worked
17       at Big Lots?

18  A.   Correct.

19  Q.   But if I told you that this open door
20       policy was in the associate handbooks
21       during your employment, you don't have any
22       reason to disagree, do you?

23  A.   No.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 122

1    A.    Only thing, I just -- I couldn't recall

2          that, like actually put it like, oh, yeah,

3          I remember; I couldn't say that.  But I

4          wouldn't dispute saying that it wasn't

5          there.

6    Q.    It's possible it was in there and you just

7          don't recall?

8    A.    Correct.

9    Q.    And was it also possible you saw this

10         policy in other forms other than the

11         associate handbook but you just don't

12         recall?

13   A.    It's possible.

14   Q.    Is it possible that you received training

15         on the Get Real Hotline?

16   A.    I know I did that.

17   Q.    You did receive training on it?

18   A.    I know I -- I know we've done that.

19   Q.    And then that last paragraph states that

20         any attempt to thwart or retaliate against

21         an associate for exercising his or her

22         open door rights will be considered a

23         serious violation of company policy and

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 123

1       may result in disciplinary action up to

2       and including termination of employment.

3       Is that correct?

4    A.    That's what it states.

5    Q.    I've just handed you a document that's

6       been marked as Exhibit 9, Ms. Reed.  And

7       this is a copy of Big Lots standards of

8       conduct policy; is that right?

9                   (The referred-to document was

10                   marked for identification as

11                   Defendant's Exhibit No. 9.)

12   A.    That's what it states.

13   Q.    And the first page states that violations

14       of company policy, including the

15       harassment-free policy, will not be

16       tolerated; is that correct?

17   A.    That's what it states.

18   Q.    And the second page, last paragraph,

19       states, quote, associates are expected to

20       comply with this policy and report

21       violations immediately, end quote.  Is

22       that correct?

23   A.    That's what it states.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 125

1   A.   Started.  Yeah, that sounds about right.

2   Q.   You have no reason to disagree with that

3        amount?

4   A.   No.

5   Q.   Ms. Reed, do you recognize this document?

6             (The referred-to document was

7              marked for identification as

8              Defendant's Exhibit No. 10.)

9   Q.   It indicates that you received a pay

10       increase to $6.05 in June 2003, correct?

11  A.   Correct.

12  Q.   And the document is signed by you and

13       Billy Pridgen?

14  A.   Correct.

15  Q.   And Mr. Pridgen was an assistant manager

16       at Store Number 818; isn't that correct?

17  A.   Correct.

18  Q.   Do you know whether Mr. Pridgen made the

19       decision to give you the pay increase?

20  A.   Repeat it.

21  Q.   Do you know whether Mr. Pridgen made the

22       decision to give you this pay increase?

23  A.   I don't know.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 128

1        cashier position to a store associate

2        position, do you know who made that

3        decision?

4    A.    No.

5    Q.    I've just handed you Exhibit 12, which is

6        another action request form from Big Lots.

7        Do you recognize this document?

8                  (The referred-to document was

9                  marked for identification as

10                 Defendant's Exhibit No. 12.)

11   A.    Yes.

12   Q.    It indicates you received another pay

13       increase to $6.70 in December 2004,

14       correct?

15   A.    Correct.

16   Q.    And this document is signed by you and

17       Jerry Culpepper, correct?

18   A.    Correct.

19   Q.    Do you know who made the decision to give

20       you the pay increase?

21   A.    No.

22   Q.    Was Jerry Culpepper the store manager for

23       Store Number 818 at that time?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 129

1    A.    Correct.

2    Q.    I've just handed you a performance

3          appraisal marked as Exhibit 13.  Do you

4          recognize this exhibit?

5                    (The referred-to document was

6                     marked for identification as

7                     Defendant's Exhibit No. 13.)

8    A.    Yes.

9    Q.    And this is, again, a performance

10         appraisal, and it's for you, and it's

11         signed June 29, 2003 by you, Billy

12         Pridgen, and E. Torbert; is that correct?

13   A.    Correct.

14   Q.    And the first page indicates that Billy

15         Pridgen completed the appraisal.  Is that

16         your understanding?

17   A.    Yes.

18   Q.    And your overall rating was 11 points,

19         which is noted as outstanding; is that

20         correct?

21   A.    Correct.

22   Q.    And you were pleased with this evaluation;

23         is that true?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 134

1   Q.    And isn't it true that Billy Pridgen and
2         Jerry Culpepper gave you only positive
3         evaluations?
4   A.    Correct.
5   Q.    Do you recall ever receiving a verbal or
6         written discipline or reprimand during
7         your employment at Big Lots?
8   A.    No.
9   Q.    So you were never reprimanded or
10        disciplined while you worked there; isn't
11        that true?
12  A.    True.   Correct.
13  Q.    And you were never demoted or punished in
14        any way while you worked at Big Lots, were
15        you?
16  A.    No.
17  Q.    Throughout your employment at Big Lots,
18        did you perform your job duties well?
19  A.    Yes.
20  Q.    And you were always able to perform your
21        job duties well at Big Lots?
22  A.    Not always.
23  Q.    But you always did perform them well?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 136

1           performance and proud of your work?

2    A.     My work, yes.

3    Q.     And throughout your employment at Big

4           Lots, you always performed all of the

5           duties and responsibilities that were

6           asked of you?

7    A.     Yes.

8    Q.     And when you performed your duties and job

9           responsibilities, you performed them well?

10   A.     Correct.

11   Q.     And you're not basing any claims in this

12          lawsuit on any issues concerning your

13          evaluations, are you?

14   A.     No.

15   Q.     All right.  In this lawsuit, you allege

16          you were subjected to a hostile work

17          environment because of your race and sex,

18          correct?

19   A.     Correct.

20   Q.     And those are the only claims you're

21          bringing in this lawsuit, correct?

22   A.     Correct.

23   Q.     And you're bringing your claims under

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 137

1    Title 7 of the Civil Rights Act; is that
2    correct?
3    A.    Correct.
4    Q.    Ms. Reed, I've just handed you what's been
5    marked as Exhibit 17.  Do you recognize
6    this document?
7                    (The referred-to document was
8                     marked for identification as
9                     Defendant's Exhibit No. 17.)
10   A.    Yes.
11   Q.    And is this a copy of the complaint you
12   filed in this matter?
13   A.    Yes.
14   Q.    Who prepared this document?
15   A.    A guy named Attorney Gary Atchison.
16   Q.    Did he prepare this shortly before it was
17   filed?
18   A.    He -- yeah.  This -- yeah.  Yes.
19   Q.    But he's not representing you in this
20   lawsuit, is he?
21   A.    Correct.  He dropped us at the last
22   minute.
23   Q.    Tell me what you mean.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 139

1    Q.    Ms. Reed, we're back on the record after

2          our lunch break.  You understand that

3          you're still under oath; is that correct?

4    A.    Correct.

5    Q.    Ms. Reed, I've just handed you a document

6          that's been marked as Exhibit 18.  Do you

7          recognize this document?

8                      (The referred-to document was

9                      marked for identification as

10                     Defendant's Exhibit No. 18.)

11   A.    Yes, I do.

12   Q.    Is this a copy of your charge of

13         discrimination you filed against Big Lots

14         with the EEOC on June 23rd, 2005?

15   A.    Correct.

16   Q.    And this is Charge Number 130-2005-05212?

17   A.    Correct.

18   Q.    And you filed a copy of this document as

19         an exhibit to your complaint; is that

20         correct?

21   A.    Correct.

22   Q.    Did you review this EEOC charge before it

23         was filed?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 140

1    A.    Yes.

2    Q.    And is that your signature at the bottom

3          of the page?

4    A.    Yes.

5    Q.    And you signed the document on June 16,

6          2005?

7    A.    Yes.

8    Q.    And you understood this was sworn

9          testimony?

10   A.    Yes.

11   Q.    And is everything in the charge truthful

12         and accurate?

13   A.    Yes.

14   Q.    And you've included the relevant facts?

15   A.    Yes.

16   Q.    And in the box on the charge indicating

17         the date the alleged discrimination took

18         place, you've noted March 28 through 30,

19         2005; is that correct?

20   A.    Yes.

21   Q.    And those are the dates you allege the

22         discrimination took place?

23   A.    For the situation on the pictures, but

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO
bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 142

1    Q.    Did you draft this Exhibit A?

2    A.    No, I did not.

3    Q.    Who did?

4    A.    Gary -- Attorney Gary Atchison.

5    Q.    And he represented you at the time this

6          charge was filed; is that correct?

7    A.    Correct.

8    Q.    Now, is the information contained in

9          Exhibit A complete and accurate with

10         respect to the specific facts underlying

11         this EEOC charge?

12   A.    Correct.

13   Q.    And did you file this charge because you

14         were complaining about the pictures Mike

15         Williams made?

16   A.    Correct.

17   Q.    And was Mike Williams an associate manager

18         at Big Lots Store Number 818 where you

19         worked?

20   A.    Yes, he was.

21   Q.    And is his full name Gerald Michael

22         Williams?

23   A.    Yes.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 143

1    Q.    When I refer to Mike Williams, you'll
2          understand who I'm referring to?
3    A.    Correct.
4    Q.    Do you know the age under Alabama law that
5          an individual is considered, under the
6          eyes of the law, an adult, as opposed to a
7          minor?
8    A.    No.
9    Q.    So you don't know the legal age of
10         majority in --
11   A.    Oh, 21?  Is it 21?
12   Q.    I'm asking what you think it is.
13   A.    I think it's 21.  22.
14   Q.    Do you know?
15   A.    I don't know.
16   Q.    Do you know whether it's 18?
17   A.    No.
18   Q.    You don't know?
19   A.    Huh-uh.
20   Q.    And back to your allegations with respect
21         to Mike Williams, what specifically did he
22         do?
23   A.    He went around in the store and he took

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 144

1          pictures of us, supposedly to make us name

2          badges, kind of like the warehouse name

3          badges or ID cards.  And the next day,

4          what he came back with was a photo -- was

5          the photograph with our pictures on the

6          money and the other ladies on the faces --

7          their black bodies on the white faces --

8          their black faces on the white bodies and

9          stuff.  But if you had a color copy, you

10         could actually see that, that the skin on

11         the women and stuff is white.

12    Q.   Do you have color copies?

13    A.   Yeah.  It's in the car.  I left it in my

14         little thing.  It's in the car.

15    Q.   All right.  But you have not produced

16         color copies to us in response to the

17         request for production that Big Lots

18         served in this case, have you?

19    A.   I haven't?  I guess I didn't, but -- guess

20         not.  I thought I did, but I must have

21         gave that copy to the judge's office when

22         I -- because I made a -- when I did my

23         responsive questions, on the back of it,

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 145

1          when I put the things, I had a color -- I
2          mean a copy of the pictures.  But I must
3          have gave that copy to the judge and gave
4          y'all the copy of the -- the black and
5          white copy.
6     Q.   And this conduct by Mike Williams occurred
7          between March 28th and 30th, 2005; is that
8          correct?
9     A.   Concerning the pictures, yes.
10    Q.   The conduct about which you're complaining
11         with respect to Mike Williams occurred
12         between March 28th and 30th, 2005?
13    A.   Yes.
14    Q.   Make sure you answer out loud after I've
15         finished what I'm saying, even if you
16         understand what I'm saying, so that it's
17         clear on the record.  Thank you.  All
18         right.  And are the pictures about which
19         you are complaining in this EEOC charge
20         attached to Exhibit B -- or attached,
21         rather, as Exhibit B to the EEOC charge?
22    A.   Yes.
23    Q.   And is it your understanding that Mike

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 146

1    Williams made all of the pictures that are

2    attached as Exhibit B to the EEOC charge?

3  A.  He did.

4  Q.  Okay.  Looking at the first page of this

5    Exhibit B, that's not a picture of you, is

6    it?

7  A.  No, it's not.

8  Q.  And who are the two individuals in that

9    picture?

10  A.  Linda Sankey and Jerry --

11  Q.  I'm sorry?

12  A.  Lindy Sankey.

13  Q.  Linda Sankey?

14  A.  Uh-huh, and Jerry Culpepper.

15  Q.  Okay.  And is Linda Sankey a black female?

16  A.  Yes.

17  Q.  And the other person in the picture --

18  A.  A white --

19  Q.  -- who you've identified as Jerry

20    Culpepper, is a white male, correct?

21  A.  Correct.

22  Q.  And someone has written 3/29/05 on that

23    picture.  Did you do that?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 147

1    A.    No.  When it was hung up by the time clock

2          where we captured these pictures from in

3          the hallway, Linda Sankey, if I'm not

4          mistaken, either her or Autherine, they

5          put the date on it as soon as it happened,

6          the day that they got it down off the wall

7          so that they could know when this

8          happened.

9    Q.    Okay.  Now, is it your understanding that

10         this particular picture was hung up by the

11         time clock?

12   A.    Yes, it was hung up by the time clock.

13   Q.    Did you see it on the wall --

14   A.    I didn't see -- I didn't see it, no.  I

15         just asked them how they got it, and they

16         said he posted it by the time clock.

17   Q.    So your understanding that this was posted

18         was based on what you heard from someone

19         else?

20   A.    Correct.

21   Q.    And Mike Williams didn't give you a copy

22         of this picture?

23   A.    Correct.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 148

1    Q.    And the only way you saw this picture is
2          because Linda Sankey or Autherine Crosky
3          gave you a copy?
4    A.    Yes.
5    Q.    And you don't know personally what day the
6          picture went up?
7    A.    No.
8    Q.    And you don't know personally how long the
9          picture was up?
10   A.    Like time period, no.
11   Q.    And you don't personally even know whether
12         it was ever even hung up, because you
13         never saw it?
14   A.    I never saw it.
15   Q.    So you don't personally know whether it
16         was?
17   A.    I never saw it.
18   Q.    And again, you're not in this picture?
19   A.    Correct.
20   Q.    And you weren't affected by this picture,
21         were you?
22   A.    No.
23   Q.    Do you have any personal knowledge as to

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 150

1    he be just as offended by it as her?

2    A.    Yes.

3    Q.    And the second page of Exhibit B includes

4          pictures of various individuals on play or

5          fake hundred dollar bills; is that right?

6    A.    Correct.

7    Q.    And I'm referring to the left side of the

8          page there.  Now, were these individuals

9          Big Lots employees?

10   A.    Yes.

11   Q.    And are you pictured on any of these

12         pictures?

13   A.    Yes.

14   Q.    Which one?

15   A.    The last one.

16   Q.    The last one in the column?

17   A.    The fifth one in that column.

18   Q.    Fifth one down.  And who are the other

19         employees on these bills?  If you'll just

20         start with the first one at the top left

21         of the page and go down.

22   A.    You've got number one, Autherine Crosky,

23         number two, Barbara Martin, number three,

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 151

1          Linda Sankey, number four, Lola Abner, and
2          the fifth picture is myself, Nicole Reed.
3    Q.    Okay.  Where did this page -- and by that
4          I'm referring to the second page of
5          Exhibit 2 -- where did this come from?
6    A.    The next day -- you see the date at the
7          bottom --
8    Q.    Uh-huh.
9    A.    -- they also found this one posted by the
10         time clock.  I didn't come to work that
11         evening -- I didn't get to work that day
12         until that evening, and when I arrived at
13         work that evening, that's when they had
14         shown me these pictures.
15   Q.    Okay.  So your understanding of the first
16         picture on the first page of Exhibit B is
17         that someone posted this by the time
18         clock --
19   A.    On that day.
20   Q.    -- on the 29th, and then someone else took
21         it down?
22   A.    Uh-huh.  Linda herself took it down.  She
23         said --

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 152

1    Q.    Linda took it down?

2    A.    Uh-huh.

3    Q.    So you don't know personally who posted it

4          or how long it was up there?

5    A.    Not for -- no.

6    Q.    All right.  Now we're on the second page

7          of Exhibit B, which has 3/30/05.  And it's

8          your understanding this was posted near

9          the time clock, this page of these

10         pictures, just like this?

11   A.    Just like this but it was in color.  It

12         was a color copy.

13   Q.    It was posted by the time clock on

14         3/30/05?

15   A.    Correct.

16   Q.    But you don't know who posted it?

17   A.    No.  I didn't personally see who put it up

18         there, and I didn't personally see who

19         took it down.

20   Q.    And you never saw it up?

21   A.    I never -- no.

22   Q.    You never saw this second page of pictures

23         in Exhibit B posted?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 153

1    A.    I never seen it by -- no.

2    Q.    Never saw it up on display?

3    A.    Correct.

4    Q.    So your understanding that it was

5          displayed near the time clock is only

6          based on what someone else told you?

7    A.    What Autherine told me, the day shift, the

8          ladies who work in the morning time.

9          They're the ones who took it down.

10   Q.    Based on what they tell you?

11   A.    Yeah, based on what they told me.

12   Q.    But again, you don't know anything about

13         that first-hand?

14   A.    Not first-hand.

15   Q.    Do you know whether pictures of all

16         employees who worked in the store at that

17         time were put on play hundred dollar bills

18         by Williams regardless of race or gender?

19   A.    Repeat that again.

20   Q.    Do you know whether pictures of all the

21         employees who worked at Big Lots Store 818

22         were put on the play hundred dollar bills

23         by Williams, regardless of their race or

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 154

1      their gender?

2  A.   No, I don't know.

3  Q.   You don't know whether that happened?

4  A.   No, I don't know.

5  Q.   So again, you don't know if there are

6      other copies of other photographs with

7      different employees on the play hundred

8      dollar bill, do you?

9  A.   I don't know.

10 Q.   You don't know if Mike Williams put his

11     own picture on one?

12 A.   Never seen it if he did.

13 Q.   But do you know?

14 A.   Don't know.

15 Q.   And you don't know whether Jerry Culpepper

16     appeared on one?

17 A.   Don't know.

18 Q.   So in sum, you don't know whether white

19     employees were put on hundred dollar bills

20     by Williams?

21 A.   Don't know.  Never seen it.

22 Q.   And you don't know whether pictures of

23     white employees on the play hundred dollar

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 155

1          bills were posted also?

2     A.   We really didn't have that many white

3          employees at Big Lots.

4     Q.   Okay.  Answer my question.

5     A.   Don't know.

6     Q.   Don't know, okay.  Do you know whether

7          male employees were included on fake or

8          play hundred dollar bills by Mike

9          Williams?

10    A.   Don't know.

11    Q.   And you don't know whether any male

12         employees pictured on play hundred dollar

13         bills were posted near the time clock, do

14         you?

15    A.   Don't -- don't know.  Bogus.  Bogus bills,

16         that's what he called them, bogus cash.

17    Q.   But that's just play money, right?

18    A.   They still discredit the person.

19    Q.   In what way?

20    A.   I mean, it's saying at the top, this

21         person is as bogus as this note, at the

22         top of the bill.  So he's just calling you

23         out of character saying --

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 156

1    Q.    So is that what you find objectionable

2          about it?

3    A.    Yeah.  Because he -- I mean, he hadn't

4          even worked at the store long enough to

5          know your character or to get to know you.

6    Q.    He was a relatively new employee?

7    A.    Right.

8    Q.    Well, do you know whether this is just

9          part of his sense of humor?

10   A.    No, I don't know if that was part of his

11         sense of humor.

12   Q.    You don't know?

13   A.    Huh-uh.

14   Q.    I mean, didn't you think he just thought

15         this was funny?

16   A.    I don't know.

17   Q.    You don't know?

18   A.    He could have, but I don't know.

19   Q.    He could have.  Do you know whether it's

20         possible that he just did this maybe to

21         break the ice and get to know people and

22         have a little fun?

23   A.    Well, I know this wouldn't be a way I

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 157

1          would do it.

2    Q.    Well, but do you know if that's what he
3          intended?

4    A.    Huh-uh, I don't know.

5    Q.    But again, what you find objectionable
6          about this -- what I'll call the play
7          money pictures -- and again, we're talking
8          about these on the left column, the
9          hundred dollar bills -- what you find
10         objectionable is the fact that it says
11         this person is as bogus as this note?  Is
12         that what you have an issue with?

13   A.    Yeah, bogus cash.  Yeah, that's what --
14         yeah.

15   Q.    But these pictures and the text on the
16         bills don't say anything about the
17         employees' race or gender, do they?

18   A.    No, but they're all black females.  All
19         five of them on this picture that we so
20         happened to get was black -- five black
21         females.

22   Q.    On this particular page?

23   A.    Right, on this page.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 158

1    Q.    But you testified that you don't know

2          whether there are others?

3    A.    No, I don't know.

4    Q.    And you testified that the majority of the

5          employees at Store Number 818 were black

6          or African-American; isn't that correct?

7    A.    Correct.

8    Q.    And the majority of the employees there

9          were also women; isn't that correct?

10   A.    Correct.

11   Q.    So again, I'm asking you, these pictures

12         don't show anything about anyone's race,

13         do they?

14   A.    They just -- they're black females.

15   Q.    So -- but is that it, the fact that they

16         just happen to be black?

17   A.    Yeah, they happen to be --

18   Q.    That's the only thing relating to their

19         race, isn't it?

20   A.    Yeah.

21   Q.    And the text doesn't say anything about

22         their race, does it?  The language on the

23         --

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 159

1    A.    Oh, the text on the bill?

2    Q.    Uh-huh.

3    A.    No, it just calls you bogus.

4    Q.    But that doesn't have anything to do with

5          their race, does it?

6    A.    No.

7    Q.    Are you depicted in any of the other

8          pictures on the second page of this

9          Exhibit B?

10   A.    No, I'm not.

11   Q.    And so these other pictures on this page

12         don't affect you, do they?

13   A.    No.

14   Q.    And that's because you're not in them?

15   A.    Correct.

16   Q.    And many of the pictures on the second

17         page of Exhibit B also include a white

18         male; isn't that correct?

19   A.    Yes, it does.

20   Q.    And who is the white male depicted in the

21         pictures?

22   A.    It looks like -- it appears to be Jerry

23         Culpepper.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 160

1    Q.    And Jerry Culpepper is pictured -- or the

2          white male in these pictures is pictured

3          with silly or funny clothing and making

4          funny or silly comments just like the

5          other individuals in the pictures; isn't

6          that correct?

7    A.    He's making comments.

8    Q.    And he's wearing funny clothes too, right?

9    A.    Yeah.  Yes.

10   Q.    And so only one of the pictures on Page 2

11         of Exhibit B includes you; isn't that

12         correct?

13   A.    Correct.

14   Q.    And you didn't write the date 3/30/05 at

15         the bottom of this page?

16   A.    Correct.

17   Q.    And you don't know who wrote it?

18   A.    Correct.

19   Q.    And you don't know the date that these

20         pictures were made?

21   A.    No.  I just know that was the date I seen

22         them.  I know I seen them that day, the

23         30th.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 161

1    Q.    When someone handed it to you?

2    A.    Correct.

3    Q.    But you didn't see it hanging up anywhere?

4    A.    Correct.

5    Q.    Isn't it true that none of the pictures on

6          this second page of Exhibit B have

7          anything to do with race or gender?

8    A.    None of what pictures?

9    Q.    On this page.

10   A.    Yes, they do.

11   Q.    There are no references to anyone's race,

12         are there?

13   A.    But they've got these --

14   Q.    Hold on.  I'm asking you a question.

15         There are no references to anyone's gender

16         or race on this page, are there?

17   A.    Oh, like saying it in words?  No words.

18   Q.    Is there any reason you think any of these

19         have anything to do with race?

20   A.    Yes, because they've got these women in

21         clown -- in -- looks like monkey suits.

22         Yes, I do.  And then you've got their --

23   Q.    What pictures are you talking about?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 162

1    A.    I'm talking about this center of this
2          exhibit, the small ones with Autherine,
3          Linda Sankey, and Lola Abner.  He actually
4          had those -- if you see the color copy,
5          you'll be able to tell that that's monkey
6          suits.
7    Q.    Looks like a clown suit to me.
8    A.    Okay.
9    Q.    Do you know what it is?
10   A.    From what it looks like to me, looks like
11         them little -- like you dress one of them
12         little monkeys that you give the change
13         to -- looks like one of those.
14   Q.    But do you know whether those are just
15         clown costumes?
16   A.    Don't know what it is.
17   Q.    Is there anything else that you think
18         relates to race?
19   A.    He put their -- like at the bottom with
20         Lola, he's got her black face and the
21         white neck, white hands.
22   Q.    Why do you think that has anything to do
23         with race?  Couldn't it just be that the

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 163

1          pictures he was using were of white

2          people?

3     A.    He -- see, he actually took the time to

4          turn these people's faces to sit on these

5          bodies, so he premeditated and knew

6          exactly what he was doing to get these

7          pictures to perfection like he did.

8     Q.    Okay.  What does that have to do with

9          race?

10    A.    Because he's got these five black women on

11         these white bodies.

12    Q.    So maybe -- do you know whether these were

13         just the pictures he had on his software

14         program on his computer and this allowed

15         him to do this?

16    A.    I don't know.

17    Q.    You don't know whether he was

18         intentionally trying to make reference to

19         anyone's race or gender, do you?

20    A.    I don't know what his plans were.

21    Q.    You don't know whether he was

22         intentionally trying to harass someone, do

23         you?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 164

1    A.    No.

2    Q.    Or make someone feel bad, do you?

3    A.    I don't know what his plans were.

4    Q.    And you don't know whether Mike Williams

5          was intentionally referring to any race or

6          gender of these folks, do you?

7    A.    I don't know what he was implying.

8    Q.    You testified that you know that Mike

9          Williams made these pictures.

10   A.    We know he made them because on the next

11         page he took our -- he went around and we

12         posed for him to take ID badges.  So you

13         come back the next day or so with the ID

14         badges and our pictures on clown faces,

15         you're the only one had the camera going

16         around the store taking the pictures, so

17         you did these.

18   Q.    That's why you think he did it?

19   A.    Yeah.

20   Q.    He never told you he did it?

21   A.    Oh, he -- he laughed about these pictures.

22         He thought it was funny.  He laughed about

23         them.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 165

1    Q.    So he did think it was funny?

2    A.    Yeah.

3    Q.    Do you know why he thought it was funny?

4    A.    Don't know.

5    Q.    And so the pictures on Page 3 of Exhibit B

6          appear to be the name badges; is that

7          right?

8    A.    Yeah.

9    Q.    And isn't it true that Mike Williams put

10         the pictures of all the store employees on

11         their name badges?

12   A.    I don't think he got around to everybody,

13         because at the time when he first did it,

14         everybody don't be at the store at the

15         same time.

16   Q.    Okay.  Do you know whether he did it?

17   A.    No.  I don't know whether he was able to

18         complete everybody's name badges or how

19         many he got done.

20   Q.    And you don't find any objectionable or

21         discriminatory with respect to these name

22         badge pictures on Page 3 of Exhibit B?

23   A.    As far as the name badges, no, but the

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 167

1          the pictures on there?

2     A.   I don't know what -- I don't know.

3     Q.   So you don't know who actually put these

4          numbers on these badges, do you?

5     A.   No.

6     Q.   And putting someone's social security

7          number or partial social security number

8          on the badges, that doesn't have anything

9          to do with anyone's gender or race, does

10         it?

11    A.   No.

12    Q.   So you don't find these objectionable on

13         that basis, do you?

14    A.   Other than -- no.  Other than social

15         security numbers, no.

16    Q.   But again, that doesn't have -- you don't

17         find them to be related to race or gender,

18         these pictures?

19    A.   Not the name badge pictures, no, not race

20         or gender.

21    Q.   So those aren't really part of your EEOC

22         charge?

23    A.   They was in there to tell the reason how

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 168

1          he got our pictures.

2     Q.   Okay.  So that's what I'm saying.  But

3          they're not really part of this?

4     A.   Correct.

5     Q.   All right.  And again, it was your

6          testimony that you don't have any personal

7          knowledge as to why Mike Williams used the

8          employees' pictures on the play money and

9          in the other pictures about which you were

10         complaining, did you?

11    A.   I don't know why he did it.

12    Q.   And you don't know whether he just had an

13         odd sense of humor and thought it would be

14         funny, do you?

15    A.   I don't know his sense of humor.  I know I

16         didn't find it funny.

17    Q.   And you don't have any personal knowledge

18         as to whether race or gender had anything

19         to do with Williams making these pictures,

20         do you?

21    A.   Other than the black faces on the white

22         bodies, no.

23    Q.   I'm asking you whether that had anything

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 169

1          -- you don't know whether that had
2          anything to do with him making these
3          pictures, do you?
4     A.   Just like we don't know why he did it.
5     Q.   That's what I'm saying.  You don't have
6          any idea why he did this?
7     A.   No.
8     Q.   And you don't know if there are other
9          pictures that include other employees
10         other than these, do you?
11    A.   Have never seen them.
12    Q.   So is that a no, you don't know?
13    A.   Don't know.
14    Q.   Do you know whether any store manager or
15         any other higher level manager gave
16         Williams permission to make these pictures
17         or otherwise knew he was doing it?
18    A.   Don't know.
19    Q.   And again, the only reason you personally
20         saw these pictures is because Autherine
21         Crosky -- or did you say Linda Sankey --
22    A.   Linda.
23    Q.   -- gave them to you?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 170

1    A.    Yeah, brought it up to me to show me.

2    Q.    And you never spoke to Williams about

3          these pictures?

4    A.    No.

5    Q.    And you did not personally complain to

6          anyone else about these pictures, did you?

7    A.    Huh-uh.  Culpepper tried to -- Culpepper

8          tried to explain --

9    Q.    Hold on.  Let's try to answer my question.

10         You didn't personally complain to anybody

11         about these pictures, did you, to any

12         manager?

13   A.    I said something to Culpepper about it,

14         like what happened, you know, how did

15         these get done.  And he was just like --

16   Q.    Hold on.

17   A.    I said I talked to Culpepper.  I don't

18         know if it went on record or paper or

19         nothing like that, but I said something to

20         him.

21   Q.    Tell me -- and by Culpepper, you mean

22         Jerry Culpepper?

23   A.    Jerry Culpepper, yeah.  I just asked him,

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 172

1          him what happened, like this morning,

2          because it happened like that morning.

3          And he was just like, oh, Michael, he --

4     Q.   Which morning are you talking about?

5     A.   The morning of the 30th.  It happened on

6          the --

7     Q.   You think you had a casual conversation

8          with Culpepper on the morning of March

9          30th --

10    A.   Huh-uh, the evening when I got in.  This

11         incident happened in the morning.

12    Q.   Okay.  The evening of March 30th, 2005?

13    A.   Right, when I got to work.  And I just

14         asked him what happened.

15    Q.   You just said, what happened?

16    A.   Yeah.  I was like, how did this get out;

17         what is this.  And he just brushed it off.

18         It wasn't like no, I was coming to see him

19         as a like employee supervisor to complain

20         to him.  It wasn't that type of comment.

21    Q.   That's not how you were treating it?

22    A.   No, that's not how -- huh-uh.

23    Q.   You weren't complaining about them; you

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 173

1          were just asking him what --

2     A.   Trying to figure out what's going on with

3          it, just to see, you know -- just like I'm

4          trying to get up front to get in one of

5          these things, I'm trying to figure out

6          what happened, how did this get out.

7     Q.   You just casually mentioned it to him?

8     A.   Mentioned it, yeah.

9     Q.   And what did he say?

10    A.   He was just like, oh, something that

11         Michael did, don't worry about it.  He

12         said it like that, oh, don't worry about

13         it; it's nothing.  And so I didn't think

14         anything of it that day -- you know, the

15         rest of that day that I was working.

16    Q.   So you just casually mentioned it to him.

17         You didn't complain about it; you just

18         said --

19    A.   No, I didn't complain about it to --

20    Q.   To Jerry --

21    A.   -- higher -- him or higher.  Yeah, I

22         didn't.

23    Q.   All right.  And you didn't say, I have a

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 174

1                  problem with these or anything like that;

2                  you just asked what they were or where

3                  they came from; is that right?

4     A.     Yeah.  I was in that type -- I was more

5                  like stunned like that somebody can do it,

6                  like what is this; what happened.  I was

7                  more like that until I was able to bring

8                  them and actually sit down and just think

9                  about it.

10    Q.     All right.  But you didn't complain to

11                 anyone at Big Lots, a manager or HR or

12                 anything, about these pictures?

13    A.     No, I did not.  I personally did not, no.

14    Q.     And you didn't indicate to Jerry Culpepper

15                 that you had a problem with the pictures?

16    A.     At that time, no.  No.

17    Q.     Well, I'm just talking about period.  You

18                 never -- you didn't discuss these pictures

19                 with him again, did you?

20    A.     No, didn't discuss them.

21    Q.     So you just mentioned it the one time, and

22                 you didn't tell him that you personally

23                 had a problem; you just asked him what you

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 175

1          said you asked him?

2     A.   Uh-huh, what happened and how did they get

3          out, you know.

4     Q.   And there was only the one picture of you

5          as we discussed, correct?

6     A.   Correct.

7     Q.   And so you testified that at that time you

8          -- on the 30th when you saw these and you

9          did mention it to Jerry Culpepper, you

10         didn't have a problem or find these

11         objectionable at that time, did you?

12    A.   I was more shocked, like, that this was

13         done.  That's the type expression I had,

14         like, what?  What is this?  I was more

15         like stunned that he did it, like I can't

16         believe he did that.  That was my

17         expression, like, what?  What is this?

18         Shocked.  So no, I did not complain to

19         Jerry Culpepper at that time, because I

20         was going to him in like shock stage, just

21         froze.

22    Q.   And these are the -- the one picture not

23         of you on Page 1 of Exhibit B and then

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 176

1          these pictures on Page 2 of Exhibit B,

2          these are the only pictures you raised in

3          your EEOC charge, correct?

4     A.   Correct.

5     Q.   All right.  And these are the only

6          pictures you're aware of that are like

7          this?

8     A.   That was taken -- yeah, correct.

9     Q.   During your employment at Big Lots; is

10         that right?

11    A.   Yeah.  Besides the actual name badges --

12    Q.   Well, you said you didn't have an issue

13         with the name badges, so I'm referring to

14         this picture on Page 1 of Exhibit B and

15         these pictures on the second page of

16         Exhibit B.

17    A.   Okay.

18    Q.   These are the only pictures like this that

19         you encountered or came across during your

20         employment at Big Lots, right?

21    A.   Correct.

22    Q.   And it's your understanding that these

23         were taken on March 29th, '05, or made on

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 177

1           March 29th, '05 and March 30th, '05; is
2           that right?
3     A.    Yes.
4     Q.    Do you know at what time or when Big Lots
5           or the other managers at Big Lots found
6           out about these pictures?
7     A.    Don't know.
8     Q.    Don't know.  Do you know whether anyone
9           had mentioned these pictures or shown
10          these pictures to Jerry Culpepper before
11          you mentioned --
12    A.    I don't know.
13    Q.    Did you show them to Jerry Culpepper, or
14          did you just say something about some
15          pictures?
16    A.    Just said something about some pictures.
17    Q.    But you didn't actually have a copy?
18    A.    I didn't actually have a copy, no, in my
19          hand.
20    Q.    So you don't know when Jerry Culpepper --
21          who was the store manager, correct --
22    A.    Correct.
23    Q.    -- you don't know when he saw these --

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 180

1  Q.    You don't know whether he was fired for

2         these pictures, do you?

3  A.    Don't know.

4  Q.    Are you aware that Williams' separation

5         from Big Lots was effective April 11th,

6         2005?

7  A.    Not aware.

8  Q.    Are you aware that as soon as Big Lots

9         learned about these pictures, it

10        investigated the incident?

11 A.    I didn't know.

12 Q.    Isn't it true that after Big Lots learned

13        of the pictures and disciplined Williams,

14        there were no more such pictures?

15 A.    No more pictures, correct.

16 Q.    And would you agree that Big Lots

17        corrected any problems with Mike Williams?

18 A.    I guess.  As far as I recall.

19 Q.    So as far as you know, Big Lots took

20        action when Big Lots found out about these

21        pictures, and there were no more pictures,

22        correct?

23 A.    I was never told that they took action,

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 184

1          this charge?  You just don't know?

2      A.  I don't know.

3      Q.  Ms. Reed, I've just handed you what has

4          been marked as Exhibit 19, which is a

5          dismissal and notice of rights from the

6          EEOC to you.  And is this a copy of the

7          dismissal and notice of rights you

8          received from the EEOC with respect to

9          your EEOC Charge Number 130-2005-05212?

10                     (The referred-to document was

11                     marked for identification as

12                     Defendant's Exhibit No. 19.)

13     A.  Correct.

14     Q.  And the document indicates it was mailed

15         on June 29th, 2005; is that correct?

16     A.  Correct.

17     Q.  And you received it on June 29th or within

18         a few days; is that correct?

19     A.  Correct.

20     Q.  And it states that the EEOC is closing its

21         file on this charge for the following

22         reason, and the box is checked that

23         states, the facts alleged in the charge

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 185

1          failed to state a claim under any of the

2          statutes enforced by the EEOC.  Is that

3          correct?

4     A.   Correct.

5     Q.   And you understood that the EEOC was

6          dismissing your charge, correct?

7     A.   Correct.

8     Q.   I've just handed you Exhibit 20, which is

9          a letter to you from the EEOC.  Do you

10         recognize this letter?

11                   (The referred-to document was

12                    marked for identification as

13                    Defendant's Exhibit No. 20.)

14    A.   Yes.

15    Q.   And this is a letter to you from Allen

16         Gosa with the EEOC, correct?

17    A.   Yes.

18    Q.   And in this letter, the EEOC states that

19         your charge has been dismissed and that

20         from the facts presented the EEOC did not

21         conclude that the photographs or

22         illustrations constitute a racially or

23         sexually hostile work environment; is that

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 186

1          correct?

2     A.   Correct.

3     Q.   When did you first contact a lawyer

4          regarding your employment at Big Lots?

5     A.   When did I first contact a lawyer

6          regarding my employment?  Are you talking

7          about the situation?

8     Q.   Yeah, regarding anything that happened at

9          Big Lots, when did you first contact a

10         lawyer?

11    A.   I can't recall the very first time because

12         I know I done talked to several.  So I

13         really can't recall the very first one I

14         talked to.

15    Q.   You talked to several --

16    A.   Attorneys.

17    Q.   -- before you filed your EEOC charge or

18         after?

19    A.   Before.  So I can't recall like the exact

20         dates of when I sat in these people's

21         office and talked to them.

22    Q.   Was the first lawyer that actually

23         represented you Gary Atchison?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 187

1    A.    Yes.

2    Q.    Ms. Reed, do you recognize this document?

3    A.    Yes, I do.

4    Q.    And is this document, which has been

5          marked as Exhibit 21, a copy of the second

6          charge of discrimination you filed against

7          Big Lots with the EEOC?

8                    (The referred-to document was

9                    marked for identification as

10                   Defendant's Exhibit No. 21.)

11   A.    Yes.

12   Q.    And you also attached a copy of this

13         charge as an exhibit to your complaint,

14         correct?

15   A.    Yes.

16   Q.    And this is charge number 130-2005-6904,

17         which was filed with the EEOC on September

18         22, 2005; is that correct?

19   A.    Correct.

20   Q.    Did someone prepare this for you?

21   A.    The same attorney, Gary Atchison.

22   Q.    Did you review this charge before you

23         submitted it to the EEOC?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 189

1    Q.    But you testified that you don't know if
2          you provided additional information
3          regarding the first charge or not; is that
4          right?
5    A.    Right, so --
6    Q.    All right.  So I was asking you, did you
7          file the second EEOC charge because the
8          EEOC had dismissed the first charge?
9    A.    Right.
10   Q.    So that's yes?
11   A.    Yes.
12   Q.    And this charge is also based on alleged
13         conduct that took place between March 28th
14         and March 30th, 2005; is that correct?
15   A.    That's what it says on the thing, yeah.
16   Q.    So the answer is yes, this charge is also
17         based on alleged conduct that took place
18         between March 28th and 30th, 2005?
19   A.    Well, that makes it seem like it just
20         happened only between those dates.  Is
21         that what it's saying?
22   Q.    This is your charge.
23   A.    So that might be...

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 190

1    Q.    I'm asking whether the conduct about which

2          this charge is based also took place

3          between March 28th and 30th, 2005, just

4          like your first charge.

5    A.    I know, but what I'm asking, is like March

6          28th through 30th is like the only time

7          period that things happened?  Is that what

8          that's saying?  It's looking like it's

9          saying it only happened between that time

10         period.  I'm just asking a question.

11   Q.    Well, I'm asking you the questions.  This

12         is your EEOC charge.

13   A.    Again, those dates refer to the pictures.

14   Q.    Okay.  So this charge is also based on

15         alleged conduct that took place between

16         March 28th and March 30th, 2005, just like

17         your first charge; is that correct?

18   A.    Referring to the pictures, yes, but little

19         comments and stuff made, no.

20   Q.    This second charge is based on the same

21         allegations of harassment or

22         discrimination that are included in your

23         first charge; isn't that true?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 191

1    A.    Yes.

2    Q.    Attached to the EEOC charge is Exhibit A

3          to the charge; is that correct?

4    A.    Correct.

5    Q.    And does Exhibit A contain all of the

6          allegations on which you base this EEOC

7          charge?

8    A.    Yes.

9    Q.    And this charge and the attached pages are

10         the only documents and information you

11         recall providing to the EEOC in support of

12         this, your second EEOC charge?

13   A.    Correct.

14   Q.    Did you draft Exhibit A?

15   A.    Huh?

16   Q.    Did you draft Exhibit A?

17   A.    The same attorney drafted it, typed

18         everything else up for us -- for me.

19   Q.    And in this Exhibit A to your second EEOC

20         charge, you also complain about the same

21         Mike Williams pictures you complained

22         about in your first EEOC charge, correct?

23   A.    Correct.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 192

1    Q.    And this conduct by Williams you testified

2          occurred between March 28th and 30th,

3          2005; isn't that correct?

4    A.    Correct.

5    Q.    And in Exhibit A to this, your second EEOC

6          charge, you have mentioned an alleged

7          statement made by Jerry Culpepper, the

8          store manager, in February 2005; is that

9          right?

10   A.    Yes.

11   Q.    And this is where he referred to a movie?

12   A.    Yes.  That other employee, Barbara Martin,

13         she had got a -- I guess you could say

14         assaulted like the day before, that

15         Sunday, at the Winn Dixie.  And she came

16         to Big Lots because she didn't know where

17         to go.  She came to Big Lots, and she was

18         telling them what happened about the guy

19         came up to her out of nowhere and pulled

20         his genitals out in front of her and it

21         frightened her.  So when she got back to

22         work, she told Culpepper, so that's when

23         he got to talking about it reminded him of

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 193

1          an old western about the guy behind the --
2          the white guy was managing the black guy
3          or something, and the white guy was
4          looking for the black guy and the white
5          guy was like, where you at or something
6          like that, and he was like shaking my
7          bush, boss, just shaking my bush, like he
8          was using the bathroom behind the bush.
9          And he actually was doing the example,
10         like shaking my bush, boss, just shaking
11         my bush.  But he told me I wouldn't
12         remember the old western because I
13         probably was too young.
14   Q.    Okay.  And so this comment was made
15         allegedly in February of 2005, right?
16   A.    Correct.
17   Q.    And that was before you filed your first
18         EEOC charge on June 23, 2005, correct?
19   A.    Yes.
20   Q.    And this is one of the incidents that you
21         included in your first EEOC charge?
22   A.    No, it wasn't -- that wasn't included in
23         the first EEOC charge.  It was just the --

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 195

1        the phone or something to them.

2   Q.   So it's possible that this is one of the

3        incidents that they were investigating

4        with respect to your first charge?

5   A.   It's possible, but I'm not sure.

6   Q.   Looking back at your first EEOC charge,

7        which was Exhibit 18, Exhibit A states

8        that there were other comments and

9        statements made during the last 180 days

10       other than just these pictures that you

11       were raising --

12  A.   Right.

13  Q.   -- in your charge.  So would this

14       statement, which occurred during that time

15       frame, be one of the incidents you were

16       referring to --

17  A.   Yes.

18  Q.   -- in your first EEOC charge?

19  A.   That would be it.

20  Q.   So you would have included this statement

21       in your first EEOC charge, as far as what

22       you were complaining about?

23  A.   Correct.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 197

1       really saying like what happened to

2       Barbara --

3   Q.  Was he talking to her?

4   A.  Yeah.  She was up there too.

5   Q.  So he wasn't to you; he was talking to

6       Barbara Martin?

7   A.  He was telling us the story.

8   Q.  But he wasn't really talking about you or

9       to you or anything that happened to you?

10  A.  No, because nothing -- no.  He just --

11  Q.  You just overheard him?

12  A.  No.  He got our attention -- stopped us

13      from doing what we were doing to get our

14      attention to tell us this story.  It was

15      like that.

16  Q.  Have you ever seen this movie --

17  A.  Who?

18  Q.  -- that he was referring to?

19  A.  No.  I don't even know what he's talking

20      about, the name of it or anything.

21  Q.  And have you told me all you can recall

22      about that incident?

23  A.  Yes.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 198

1    Q.    So you've never seen the movie that he was
2          referring to?
3    A.    Huh-uh.
4    Q.    So you have no personal knowledge as to
5          what scene he was referring to?
6    A.    No.
7    Q.    Do you know why he was referring to that
8          movie?
9    A.    Because of the other associate, Barbara
10         Martin, got insulted by a guy in a grocery
11         store, and he was referring that incident
12         to the movie.  How --
13   Q.    Do you know why he made that comment?
14   A.    Don't know why.
15   Q.    And do you know what he meant when he said
16         it reminded him of, I assume, what
17         happened to Barbara Martin?
18   A.    I don't know why.
19   Q.    So you have no personal knowledge as to
20         why Culpepper made the comment or what he
21         meant by it, do you?
22   A.    No.
23   Q.    And Culpepper didn't make any reference to

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 199

1      your race or your sex when he made this

2      comment, did he?

3   A.   No.

4   Q.   And he didn't make any reference to her

5      race, Barbara Martin's race or sex when he

6      made this comment, did he?

7   A.   No.

8   Q.   And Barbara Martin was a -- was she

9      another cashier?

10  A.   Yes.

11  Q.   Do you know whether Culpepper ever made

12     the same comment to white or male

13     employees or referenced this movie to

14     white or male employees?

15  A.   No.

16  Q.   You don't think that his statement

17     regarding this movie had anything to do

18     with your race or sex, do you?

19  A.   I mean, we're black females and he's

20     talking about a black guy behind a bush,

21     so it was kind of offensive for him to be

22     talking about a black male behind a bush,

23     you know, using the bathroom behind a

bda54283-b1d2-4c60-a8e5-35ed6c437989

Page 200

1          bush.

2     Q.   What does that have to do with your race

3          or your gender?

4     A.   I mean, why would a white male be sitting

5          here telling us a story about a black male

6          behind a bush shaking his privates?

7          That's insulting.  It's -- I mean, it's

8          like humiliating.

9     Q.   What does race have to do with it; do you

10         know?

11    A.   I'm still like, why would a white guy tell

12         you a story, so -- why would a white

13         supervisor --

14    Q.   What I'm asking you is, did that have

15         anything to do with your race, as far as

16         you know?

17    A.   Not as far as I know.

18    Q.   Now, did that have anything to do with

19         your gender, as far as you know?

20    A.   No.

21    Q.   Okay.  Now, when you said someone shaking

22         their privates, what are you talking

23         about?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 202

1          plant?

2     A.   I don't think that's what he was talking

3          about, the way he did his gesture.

4     Q.   Do you know?

5     A.   I don't know.  You don't know.

6     Q.   I'm asking the questions.  Do you know?

7     A.   You don't know, so -- so no, nobody knows

8          but Jerry.

9     Q.   Well, I've seen the movie, but I'm not

10         testifying here.

11    A.   Well, tell me what the movie's name is and

12         I'll go watch it and see.

13    Q.   This statement here doesn't say anything

14         -- mention anything about him making any

15         hand gesture, does it?

16    A.   No, it doesn't.  It say --

17    Q.   I'll show it to you.

18    A.   Those are my notes and stuff.

19    Q.   I've just handed you copies of two

20         documents that you produced earlier today;

21         they have been marked as Exhibit 22.  Do

22         you recognize these documents?

23                   (The referred-to document was

bda54283-b1d2-4c60-a8e5-35ed6c437989

Page 203

1              marked for identification as

2              Defendant's Exhibit No. 22.)

3    A.    Yes, I do.

4    Q.    Are these your handwriting?

5    A.    This one right here is, but this one is

6          not.

7    Q.    So you're saying that the -- which is your

8          handwriting?

9    A.    This one.  This is my handwriting, the one

10         that's got my name at the top of the page.

11   Q.    The one with your name at the top that's

12         written in manuscript that does not have

13         the exhibit sticker on it?

14   A.    Right.

15   Q.    But the one with the exhibit sticker is

16         not your handwriting?

17   A.    Correct.

18   Q.    Well, whose handwriting is that?

19   A.    This is Barbara Martin's handwriting.

20   Q.    Why would she have your notes?

21   A.    She had my notes because when we sat down

22         together -- when we had our first meeting

23         with the lawyer that we talked to, she was

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 207

1    A.    I don't know 100 percent, no, I do not.

2    Q.    So you don't know why you've written down

3          February 2005 as the date?

4    A.    In her handwriting --

5    Q.    No, I'm not talking about her handwriting;

6          I'm asking about yours.

7    A.    It happened that day.  That's when it

8          happened.  That's the month and the date

9          -- and the year that that incident was

10         said.

11   Q.    This states that he said, I'm just shaking

12         the bush, boss, just shaking the bush --

13         not my bush, but the bush.  Is that

14         accurate?

15   A.    That's what the -- that's what it says.

16   Q.    The bush?

17   A.    Yeah.

18   Q.    Is that what was said?

19   A.    That's what it says on the paper.

20   Q.    Right.  And is that what you wrote down

21         after the incident happened?

22   A.    Could have been.

23   Q.    And this states that the guy was using the

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 208

1          bathroom behind a tree.  Could that be
2          what he was talking about when he said
3          shaking the bush?
4     A.   Could be.
5     Q.   You don't know?
6     A.   Don't know.
7     Q.   And also in Exhibit A you have shaking the
8          bush, and you're referring to someone
9          behind a tree.  So again, that could be
10         referring to the plant or the tree,
11         couldn't it?
12    A.   Could be.
13    Q.   So there's nothing that has anything to do
14         with your sex?
15    A.   Not in that comment, no.  Not in that
16         comment.
17    Q.   Nor is there anything sexual in this
18         comment, is there?
19    A.   I feel it is, but...
20    Q.   What?
21    A.   You're trying to say shaking the -- okay.
22         No, it ain't.
23    Q.   I'm sorry?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 209

1    A.    It's not.

2    Q.    It's not sexual?

3    A.    No.

4    Q.    You never complained about this statement
5          to anyone, did you, at Big Lots?

6    A.    How could you go to the manager that said
7          it about the comment?

8    Q.    Answer my question.

9    A.    How can you go to the manager that said
10         the comment?

11   Q.    Did you go to any other manager?

12   A.    No, not when the other one was the one
13         taking pictures of you, putting your face
14         on --

15   Q.    In February of 2005?

16   A.    In February -- who was the managers then?

17   Q.    You don't recall who the managers were
18         then?

19   A.    I don't even recall who was the managers
20         at that time.

21   Q.    So my question was, did you complain to
22         anyone -- did you tell Jerry Culpepper
23         that you were offended by this statement?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 210

1    A.    Did I say it out my mouth?  No.

2    Q.    Okay.  Did you complain to anyone other

3          than Jerry Culpepper regarding this

4          statement?

5    A.    No.

6    Q.    Have you told me everything you can

7          remember about this alleged statement?

8    A.    To my knowledge, yes.

9    Q.    In Exhibit A you also state that in March

10         of 2005 Culpepper stated to you that,

11         quote, these customers get on my fucking

12         nerves, end quote.  Is that accurate?

13   A.    That's accurate and true.  I heard it with

14         my own ears, and I wrote that down that

15         day -- I wrote that down.  Somebody had --

16         anytime -- Mr. Culpepper used to always

17         cuss.  When somebody make him mad or keep

18         calling him to do this or do that thing

19         and --

20   Q.    I'm just asking you to answer my

21         questions.

22   A.    So yeah.

23   Q.    And this comment also allegedly occurred

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 211

1           prior to your filing the first EEOC charge

2           on June 23, 2005; is that right?

3    A.     Yeah, correct.

4    Q.     And this is also one of the incidents in

5           which you based your June 23rd EEOC

6           charge; is that right?

7    A.     Correct.

8    Q.     And Culpepper was referring to customers,

9           not you, when he allegedly made this

10          comment, correct?

11   A.     Correct.

12   Q.     And this statement had nothing to do with

13          you, did it?

14   A.     It was still -- fucking -- I mean, the

15          word "fucking," you're saying it in an

16          environment around females.  That's not

17          appropriate.

18   Q.     I'm asking whether this comment had

19          anything to do with you.

20   A.     I heard it.  He said it.

21   Q.     Other than the fact that you heard it,

22          this comment had nothing to do with you,

23          did it?  He was complaining about

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 212

1          customers; is that right?

2     A.   Right.

3     Q.   So it had nothing to do with you, correct?

4     A.   Correct.

5     Q.   And Culpepper did not reference your race

6          or your sex when he made this comment, did

7          he?

8     A.   No.

9     Q.   And this comment doesn't have anything to

10         do with your race or your sex, does it?

11    A.   I mean, still, the word "fucking," I mean

12         --

13    Q.   I'm asking -- you may not like the word,

14         but I'm asking whether it has anything to

15         do with your race or your sex.

16    A.   You're asking what you want to hear from

17         the word.  But no, it don't.

18    Q.   I'm sorry?

19    A.   You're asking --

20    Q.   Does it have anything to do with your race

21         or your sex?

22    A.   No, it doesn't.

23    Q.   In the context of this alleged statement,

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 213

1         Culpepper was not using this word in a

2         sexual manner, was he?

3   A.    (No response.)

4   Q.    Go ahead and answer.

5   A.    Oh, repeat the question.

6   Q.    In the context of this alleged statement,

7         Culpepper was not using the word in a

8         sexual manner, was he?

9   A.    No, not towards me.  Around me, but not

10        towards me.

11   Q.    But he's not using the F-word -- is what

12        I'll refer to it as -- in a sexual way, as

13        a sex word, is he?  He's just showing

14        frustration; is that correct?

15   A.    The word itself is a sex word itself,

16        though.

17   Q.    In that context?  He wasn't using it in a

18        sex context, was he?

19   A.    No.

20   Q.    Do you have personal knowledge as to why

21        Culpepper made this statement?

22   A.    No.

23   Q.    Do you know whether Culpepper ever made

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 214

1          the statement to male employees?

2    A.    No.

3    Q.    Do you know whether Culpepper ever made

4          this statement to white employees?

5    A.    No.

6    Q.    Did you complain to anyone about this

7          statement?

8    A.    No.  He used to cuss so much.

9    Q.    I'm sorry?

10   A.    I said he -- he cussed all the time.

11   Q.    Again, did you complain to anyone about

12         this statement made by Culpepper?

13   A.    Who would I complain to, him?  And he's

14         the one saying it?

15   Q.    Please answer my questions.

16   A.    I'm just asking, I'm going to complain to

17         him and he's the one saying it?

18   Q.    Did you complain to his boss?

19   A.    I don't know who his boss is.

20   Q.    You didn't know who the district manager

21         was?

22   A.    No.

23   Q.    Did you complain to HR?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legallink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 215

1   A.   No.

2   Q.   So you didn't complain to the district

3        manager, and you didn't complain to HR,

4        did you?

5   A.   No.

6   Q.   Did you call the complaint hotline?

7   A.   Didn't know the number.

8   Q.   We've already covered that.  The answer is

9        no?

10  A.   No.

11  Q.   You also alleged in your second charge

12       that Billy Pridgen made a comment on or

13       about July 18, 2005, regarding coconut

14       bras; is that correct?

15  A.   Correct.

16  Q.   Tell me about that incident.

17  A.   Lisa, the fellow employee, she was out --

18       she was off work that day.  She came into

19       the store to get boxes --

20  Q.   Was she a cashier?

21  A.   No.  She was like a stocker or something.

22       She came into the store to get boxes, and

23       when she came to the store to get boxes,

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 216

1      Billy was right at the door.  And he was

2      like, hey, Lisa, because I guess he was

3      throwing the boxes for her or whatever.

4      He was just like, hey, Lisa, tell Nicole

5      about them coconut bras.  And -- because

6      she -- it was her family reunion time, and

7      her family reunion theme was Hawaii, so --

8      I was like coconut bras?  And it was over

9      the wall, true enough, the little bitty

10     coconut bras.  And he said, coconut bras,

11     you and her are the only ones can fill

12     them.  And he actually put his hand on his

13     chest as if he had a breast.

14  Q.  You said in your exhibit, you and Lisa are

15     the only ones who can wear those coconut

16     bras.  Is that more accurate about what

17     was said?

18  A.  Yes, that's what he said, y'all the only

19     ones can wear them.  And he placed his

20     hand over his chest and he demonstrated it

21     and laughed, and I walked off.

22  Q.  And this was on or about July the 18th of

23     2005?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 217

1    A.    Yes.

2    Q.    And was this incident also included in

3          your first EEOC charge?

4    A.    It -- I don't know.  Probably over the

5          phone but not like in writing, because I

6          talked to several --

7    Q.    But you think you probably mentioned it to

8          the EEOC investigator?

9    A.    I could have.  Yeah, I could have.  I

10         don't recall, though.

11   Q.    And these coconut bras were being sold at

12         Big Lots with Hawaiian-themed attire?

13   A.    Yes, along with the lace and stuff like

14         that for the summertime, summer stuff.

15   Q.    And Lisa was present?  Lisa Poole was

16         present when the alleged comment was made?

17   A.    Uh-huh.  Yes.

18   Q.    Do you know that Lisa denies that he made

19         that comment?

20   A.    I don't know.

21   Q.    Is it possible you misheard or

22         misunderstood Pridgen?

23   A.    I don't know.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 219

1    A.    Yeah.

2    Q.    And again, you don't have any personal

3          knowledge about what he meant?

4    A.    No.

5    Q.    You don't think that comment had anything

6          to do with your race, do you?

7    A.    No.

8    Q.    Do you think he made that comment because

9          of your sex?

10   A.    Because of my small breasts, yes.

11   Q.    But that's just your speculation?

12   A.    Yes.

13   Q.    Is this the only time you recall Pridgen

14         making such a comment?

15   A.    Talking about as far as sexually, yes.

16   Q.    I'm asking you if this is the only time

17         you recall Pridgen making a similar

18         comment to this one.

19   A.    Similar, yeah.  Yes.

20   Q.    Did you tell Pridgen you were offended by

21         this comment?

22   A.    I walked off from him.

23   Q.    That's not responsive.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 221

1    something --

2  Q.    I'm asking you whether you told him --

3  A.    -- I'll walk off from him.

4  Q.    -- you were offended.  It's a yes or no

5        question.

6  A.    No, I did not tell him.

7  Q.    Thank you.  Did you complain to any

8        manager or supervisor or HR about this

9        comment?

10 A.    No.  Environment too hostile.  Didn't know

11       who to talk to.

12 Q.    I'll move to strike that as nonresponsive.

13 A.    I didn't know who to talk to.

14 Q.    The question was, did you complain to any

15       manager or supervisor about that

16       statement.

17 A.    Environment too hostile.  I didn't know

18       who to talk to.

19 Q.    Again, I'm asking you to answer my

20       question.  Did you?

21 A.    Environment too hostile.  I didn't know

22       who to go to.  I didn't know who to go to.

23       At that time when situations and instances

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 222

1           was happening, that's --

2    Q.    You haven't responded to my question.  You

3          didn't call HR?

4    A.    No.

5    Q.    You also alleged in your second charge

6          that Jerry Culpepper once made a comment

7          after he bought you a soda; is that

8          correct?

9    A.    That's correct.

10   Q.    Tell me about the incident.

11   A.    I was at my register; he was behind the

12         service desk.  And he said, would anybody

13         like something to drink.  I said, yes, I

14         would, a Sprite, please.  He went and got

15         the drink -- he went to the customer

16         service desk and bought it from another

17         cashier, came back, handed it to me.  I

18         said, thank you, Mr. Culpepper.  He said,

19         I'm going to tell you like the old folks

20         used to tell me, all I want to see now is

21         ass and elbows.

22   Q.    And what was your response?

23   A.    What was my response?  I was just like

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 223

1           shocked, was shocked and everything.

2    Q.     Did you have a response?

3    A.     Didn't have one.

4    Q.     So you have alleged here that that

5           incident occurred on or about August 17,

6           2005?

7    A.     Yeah.  I should have it -- I've got a -- I

8           should have a receipt for the soda.  I

9           kept that.

10   Q.     Why did you have the receipt?  Did he not

11          buy it for you?

12   A.     He bought the -- anytime they buy sodas

13          for us, they give us the receipt to keep

14          on the drink.  But if the --

15   Q.     So everyone will know that it was paid

16          for?

17   A.     Yeah, it was paid -- yeah.

18   Q.     So was he being nice, buying you a drink?

19   A.     I suppose.

20   Q.     Did he do that from time to time for the

21          employees?

22   A.     Yeah, after you unload a truck or do

23          something or if the store was just hot

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 226

1          evidence.

2     Q.   You can give me a copy of the receipt.

3     A.   Oh, okay.  I can do that.

4     Q.   Or you can call me and we can discuss it

5          and.  We'll make arrangements.

6     A.   Sure.

7     Q.   Is it possible that this is one of the

8          comments on which your first EEOC charge

9          was based?

10    A.   I don't think -- huh-uh.  No.

11    Q.   Had you ever heard the term "ass and

12         elbows" before?

13    A.   Have I heard it?  Yeah, I've heard it.

14    Q.   Had you heard it before that day?

15    A.   Yeah, I heard it before.

16    Q.   Before that day?

17    A.   Uh-huh.

18    Q.   Before Culpepper allegedly made that

19         statement?

20    A.   Correct.

21    Q.   Do you use that term personally?

22    A.   No, I don't personally use it.

23    Q.   Have you ever?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 227

1    A.    Not in the same sentence, no.  No.

2    Q.    Not in the same what?

3    A.    I never told -- no.  My answer is no to
4          your question.

5    Q.    You don't know what Culpepper meant by
6          that term, do you?

7    A.    I don't know, but from like old people
8          used to say and the way I heard the saying
9          from that comment, it's like he's
10         basically just telling you to get to work
11         or, you know, he wanted to see -- I don't
12         know how to explain what the comment --

13   Q.    What do you think he -- you don't know
14         what he meant, do you?

15   A.    Huh-uh.

16   Q.    Is it possible you misheard him?

17   A.    No.

18   Q.    You don't know why he made that comment,
19         do you?

20   A.    Don't know why.

21   Q.    Do you know whether Culpepper made the
22         same comment to male employees?

23   A.    No.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 228

1    Q.    Do you know whether Culpepper made the
2          same comment to white employees?
3    A.    No.
4    Q.    Is this the only time you recall Culpepper
5          making this comment?
6    A.    That comment, yes.
7    Q.    And he did not reference your race or sex,
8          did he?
9    A.    Depend on how you look at "ass."  I mean,
10         I really don't know what he meant by it.
11   Q.    You don't think this comment has anything
12         to do with your race, do you?
13   A.    No, not race, but it could have something
14         to do with sexually or something.
15   Q.    Do you know?
16   A.    Do you know?
17   Q.    I'm asking you.  I'm asking the questions.
18   A.    I don't know.
19   Q.    You don't know?
20   A.    Huh-uh.
21   Q.    You don't know whether that was a sexual
22         statement or --
23   A.    Gesture or -- yeah, I don't know.  I don't

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 229

1     know what he meant at that time.  I just

2     know he said it.

3  Q.  Were you offended by that comment?

4  A.  Yeah.

5  Q.  But you don't know what he meant?

6  A.  I don't know what he meant, but I still

7     took offense to it for my manager to tell

8     me all he wanted to see was ass and

9     elbows.

10  Q.  What did you take offense to, the word

11     "ass"?

12  A.  Yeah.

13  Q.  Just the fact that it's a curse word?

14  A.  Yeah.  The fact that it -- yeah, the fact

15     that it's a cuss word and he was a

16     supervisor of higher power talking like

17     that --

18  Q.  Using that cuss word?

19  A.  Yeah.

20  Q.  Is that what you found objectionable?

21  A.  That's what I found objectionable.

22  Q.  Going back to the comment he allegedly

23     made about customers getting on his,

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 230

1       quote, fucking nerves, end quote, is what
2       you found objectionable about that comment
3       too, just the fact that the F-word is a
4       cuss word?
5    A. And he used it as a manager, explaining
6       that --
7    Q. You don't think it's appropriate for them
8       to use a cuss word in the workplace?
9    A. Exactly.  Around nobody.
10   Q. So back to this ass and elbows statement.
11      What you found objectionable about that is
12      the fact that a manager would use the word
13      "ass" in the workplace, because that's a
14      cuss word; is that right?
15   A. And not only because it's a cuss word;
16      he's talking about a specific part of your
17      body as a cuss word.
18   Q. Well, you don't know whether he was
19      talking about your ass, do you?
20   A. I don't know.  I don't know.
21   Q. I mean, you just don't have any idea?
22   A. No, I don't have any idea.  It's just what
23      I took of it, the offense that I took

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 231

1            against the word.

2      Q.    You testified that you've heard that term

3            before.  In what context have you heard it

4            used before?

5      A.    What?

6      Q.    The term "ass and elbows"?

7      A.    In a song.

8      Q.    What song?

9      A.    It was -- I mean, it was -- was it a song?

10           Oh, I'm thinking about something else.  I

11           thought I heard that.  I've done heard it

12           said before.

13     Q.    Do you think he was just being funny?

14     A.    I don't know.

15     Q.    Is it possible?

16     A.    At the time -- I'm trying to put myself

17           back in that environment.  At the time --

18           he could have; I don't know.  Because he

19           was buying everybody sodas, so maybe he

20           was in a good mood.

21     Q.    And maybe he was just kidding around?

22     A.    Well, I don't think he --

23     Q.    Is that possible?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 232

1    A.    I don't think he used to kid like that,

2          though.  I mean, he said little slick

3          comments and stuff, but --

4    Q.    Well, but do you know whether he was just

5          kidding around at that point?

6    A.    I don't know.  I can't recall.  I don't

7          know.

8    Q.    And back to Billy Pridgen.  When he made

9          the alleged comment regarding the coconut

10         bras, do you know whether he was just

11         kidding?

12   A.    I don't know.

13   Q.    I mean, is it possible he was just trying

14         to be funny?

15   A.    I know one thing, I have never made

16         comments towards them in any way to make

17         them think like it's okay to say cuss

18         words or anything around me, because I

19         didn't -- I never cussed at them or used

20         any kind of profanity, so --

21   Q.    Okay.  Well, we're talking about the

22         coconut bra comment?

23   A.    Yeah.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 233

1    Q.    That doesn't have any profanity.  Do you
2          know what --
3    A.    That still was a sexual gesture, though.
4    Q.    Do you know whether he was just teasing?
5    A.    I don't know.  I have no idea.  I don't
6          know what was going through his mind at
7          that time.
8    Q.    That was just an isolated incident, wasn't
9          it?
10   A.    Yeah.
11   Q.    And the ass and elbows comment was just an
12         isolated incident too?
13   A.    What do you mean by isolated, just one
14         that happened?
15   Q.    Yeah.
16   A.    Yeah, it was an incident that happened.
17   Q.    I know, but it was just an isolated
18         incident; this is the only time you recall
19         him using that term, correct?
20   A.    Ass and elbows?  Yeah.
21   Q.    You don't believe that Jerry Culpepper was
22         trying to come on to you in a sexual
23         manner, do you -- when he made the ass and

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 234

1           elbows comment, do you?

2    A.     No.

3    Q.     And did you just walk away after he made

4           that comment?

5    A.     Yeah.

6    Q.     You didn't tell Culpepper that you were

7           offended by it, did you?

8    A.     I just didn't say nothing else to him.

9    Q.     And you didn't complain to anyone else

10          about this comment, did you?

11   A.     Couldn't go back to him about it.

12   Q.     You didn't?

13   A.     No.

14   Q.     And you didn't complain to anyone else?

15   A.     No.

16   Q.     Culpepper's employment with Big Lots ended

17          before your termination, didn't it?  Are

18          you aware of that?

19   A.     I think so.  I think he did find -- I

20          think I do recall that, him finding a job

21          before the store actually closed.

22   Q.     Do you know the date his employment ended?

23   A.     Huh-uh.  I think I do remember that

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 238

1       information you gave to the EEOC regarding

2       your second charge are the charge itself

3       and then whatever pages are attached as an

4       exhibit; is that right?

5   A.  Correct.

6   Q.  I've just handed you two pages, which are

7       notes that you produced earlier today, and

8       they've been marked as Exhibit 24.  You

9       recognize these documents, I assume?

10                  (The referred-to document was

11                   marked for identification as

12                   Defendant's Exhibit No. 24.)

13  A.  Yes, I do.

14  Q.  Is this the other incident that you were

15      just about to tell me about?

16  A.  Yes.

17  Q.  All right.  And is this an incident that

18      allegedly occurred on August 4, 2003, at

19      12:00 p.m.?

20  A.  Yes, it is.

21  Q.  And did you make this note at the time?

22  A.  Yes, I did.

23  Q.  Tell me about this incident.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 239

1    A.    At this time I was working day shift, and

2          I was helping unload a truck.  And my hair

3          was real long, so instead of going there

4          unloading the truck, I had a bandanna

5          wrapped around my head so my hair wouldn't

6          sweat out.  And after we finished

7          unloading the truck, like we always do, we

8          get sodas and we take a break before we go

9          to the floor.  And at this time, since I

10         had a bandanna wrapped around my head, I

11         went to the break room.  And Billy came

12         out and looked at me and said, all you

13         need now is a bag of grits.

14   Q.    Is that all he said?

15   A.    That's what he said.  And every -- I mean,

16         the break room was packed, and everybody

17         -- and I looked at him like, bag of grits?

18         But he was just calling me Aunt Jemima.

19         That's exactly what he was calling me.

20   Q.    But he didn't say that?

21   A.    All you need to know -- I had a head band

22         tied --

23   Q.    I'm asking you what he said.  You've

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 240

1          already told me that.  I'm asking you what

2          he said.

3     A.   That's what he said.

4     Q.   What did he say?

5     A.   All you need now is a bag of grits.

6     Q.   And that's all he said?

7     A.   That's what he said.

8     Q.   Okay.  You're adding the Aunt Jemima part;

9          he didn't say that?

10    A.   But --

11    Q.   That's what you thought he meant?

12    A.   That's what I knew he meant.

13    Q.   How could you --

14    A.   I mean, I didn't hear it out his mouth,

15         but I knew that, as dark as I am, with

16         this thing tied around my head and a bag

17         of grits -- why would he come in the break

18         room saying I need a bag of grits?

19    Q.   I'm asking you the questions.  I'm asking

20         what he said.  Is Aunt Jemima, is that

21         anything -- is she even the symbol for

22         grits?

23    A.   Yeah, she's the symbol for something.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 242

1          was referring to Aunt Jemima or not, do

2          you?

3     A.   You don't either.

4     Q.   I'm asking you a question.  This is your

5          deposition.  Do you know?  You don't know

6          what he was thinking, do you?

7     A.   You don't know what he was thinking

8          either.  That was the most humiliating day

9          --

10    Q.   Do you know --

11    A.   -- of my life right there.

12    Q.   -- what he was thinking in his mind?

13    A.   I don't know what he was thinking.

14         Evidently, he didn't either.

15    Q.   Is this Billy Pridgen you're referring to?

16    A.   Uh-huh.

17    Q.   And this incident allegedly occurred in

18         August of 2003?

19    A.   Yes.

20    Q.   And so that was nearly two years before

21         you filed your first EEOC charge, correct?

22    A.   Correct.

23    Q.   And almost two years prior to the Mike

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 243

1          Williams pictures about which you

2          complained in your first EEOC charge,

3          correct?

4     A.   Nearly.

5     Q.   And was this incident included in your

6          first EEOC charge?

7     A.   No, it wasn't.

8     Q.   And did you not include it in your first

9          EEOC charge because it had occurred so far

10         before --

11    A.   Correct.

12    Q.   -- before you filed the EEOC charge, is

13         that correct?

14    A.   Correct.

15    Q.   And this is another isolated incident?

16    A.   That happened to -- but the next day

17         Billy, he didn't do --

18    Q.   Hold on.  Answer my question, then we can

19         move to something else.  But this was

20         another isolated incident; is that

21         correct?

22    A.   Incident that happened with -- yeah, by

23         itself, yes.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 244

1    Q.    Unrelated to any other incident?

2    A.    Correct.

3    Q.    Just a one-time comment made by Billy

4          Pridgen in 2003, correct?

5    A.    Correct.

6    Q.    And you testified that you don't know why

7          Billy Pridgen made that comment, correct?

8    A.    He acted on what he seen.

9    Q.    You don't know why he made that comment,

10         do you --

11   A.    No.

12   Q.    -- what he was thinking; is that correct?

13   A.    Yeah.

14   Q.    Do you know whether Billy Pridgen would

15         have made the same comment to a white

16         employee who was wearing a bandanna on his

17         or her head?

18   A.    No, he would have not made that same

19         comment.

20   Q.    You don't know, do you?

21   A.    He wouldn't have made that same comment --

22   Q.    How do you know?

23   A.    -- to no white employee with no bandanna

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 245

1         on their head.

2    Q.   How do you know?  Do you know whether he
3         ever did?

4    A.   No, I don't.

5    Q.   Do you recall any other employee wearing a
6         bandanna on his or her head?

7    A.   Yeah.  A guy named John, one of our
8         loaders, he used to always wear it because
9         he would have braids.  He's a black guy.

10   Q.   Do you know whether Billy Pridgen ever
11        made that comment to him?

12   A.   No.  Why would he tell him all he need was
13        a bag of grits?

14   Q.   Do you know whether he did, is my question
15        to you.

16   A.   No.

17   Q.   You don't know; is that correct?

18   A.   No, I don't know.

19   Q.   Do you know whether Billy was just joking?

20   A.   No.  I don't think he was joking.

21   Q.   Do you know?

22   A.   I know he wasn't joking, because the break
23        room got quiet.  When he came in there

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 247

1    Q.    That's not my question.  Did he ever make
2          a similar comment to you?
3    A.    Other employees, yes, not to me.
4    Q.    Answer my question, or we're going to be
5          here all night.
6    A.    I told you, not to me.  I'm not going to
7          be here all night.  I've got to go to
8          school tonight.
9    Q.    So the answer is no, he did not make any
10         other similar comment to you?
11   A.    No, he did not.
12   Q.    Your EEOC charges or the claims you're
13         making in this lawsuit don't have anything
14         to do with any comments Billy Pridgen
15         allegedly made to other individuals, do
16         they?
17   A.    No.
18   Q.    You don't know whether Billy Pridgen made
19         this comment in any way because of your
20         sex, do you?
21   A.    No.
22   Q.    And is it just your speculation or just
23         your personal belief that it had something

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 248

1          to do with your race?

2     A.   I'm almost sure of it, yes.

3     Q.   And the next page says, 10:30 a.m.,

4          8/5/03, he did apologize to me.  He said,

5          I was told that yesterday I said something

6          to you that offended to you, but I

7          apologize to you because I like working

8          with y'all.  Is that accurate?

9     A.   Y'all as in black people.  That's accurate

10         because I reported it to Larry Byrne.

11    Q.   Who is that?

12    A.   At that time he was the district manager

13         or something.

14    Q.   So for this incident you called the

15         district manager?

16    A.   I called whoever's name -- they had some

17         name up.  And then after he left, when all

18         the management stuff started changed --

19    Q.   What I'm asking you is, this incident back

20         in 2003 --

21    A.   I did report it.

22    Q.   You reported it?

23    A.   Yes, I did.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 249

1    Q.    And you reported it to the district
2          manager?  Is that your testimony?
3    A.    Larry -- I think his name was Larry Byrne.
4          I don't know what position he held, but I
5          know he was over Billy, but he wasn't in
6          the store.
7    Q.    So then the next day Billy apologized to
8          you?
9    A.    After I talked to the man.
10   Q.    Okay.  But Billy apologized?
11   A.    Yeah, he apologized.
12   Q.    And he didn't make any other comment to
13         you like this after that, did he?
14   A.    No.
15   Q.    Okay.  And you don't know what he meant
16         when he said, I like working with y'all,
17         do you?
18   A.    Y'all as in black people.
19   Q.    But --
20   A.    I don't know what he meant.
21   Q.    All right.  But he apologized and it
22         didn't happen again; is that correct?
23   A.    Not to me, it didn't.  Other employees,

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 250

1          yes, but not to me.

2    Q.    Your claims in this lawsuit are based on

3          what happened to you; is that correct?

4    A.    It is now.

5    Q.    So the one time that he made this comment

6          to you, you reported it; he apologized;

7          and there wasn't another comment like this

8          made by Billy Pridgen, correct -- to you?

9    A.    Oh, no, not to me.

10   Q.    Ms. Reed, I've just handed you a document

11         that's been marked as Exhibit 25.  Is this

12         a copy of the dismissal notice of rights

13         you received from the EEOC with respect to

14         your second charge?

15                   (The referred-to document was

16                    marked for identification as

17                    Defendant's Exhibit No. 25.)

18   A.    Correct.

19   Q.    And that was charge number 130-2005-06904;

20         is that right?

21   A.    Correct.

22   Q.    And you attached this document to your

23         complaint as an exhibit, didn't you?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 251

1    A.    Yes.

2    Q.    And the document indicates it was mailed

3          on February 6, 2006; is that right?

4    A.    Yes.

5    Q.    And according to your complaint, you

6          received the document on February 6, 2006;

7          is that right?

8    A.    Or something close around that.

9    Q.    I'm sorry?

10   A.    Or a date close to it.  Mail travels.

11   Q.    All right.  But you've alleged in your

12         complaint that you received it on February

13         6, 2006, so that must be correct; is that

14         right?

15   A.    Yeah.

16   Q.    And it states the EEOC is closing its file

17         on this charge for the following reason,

18         and the box is checked that states that,

19         based on the EEOC's investigation, it is

20         unable to conclude that the information

21         obtained establishes a violation of the

22         statute; is that correct?

23   A.    Correct.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 252

1    Q.    And you only have filed two EEOC charges,

2          the two we've discussed today; is that

3          right?

4    A.    Correct.

5    Q.    And the two EEOC charges and the attached

6          exhibits are the documents and information

7          you recall giving to the EEOC regarding

8          these charges, correct?

9    A.    Repeat that.

10   Q.    The two charges that we've discussed and

11         the attached exhibits are the documents

12         and information you recall giving to the

13         EEOC with respect to these two charges; is

14         that right?

15   A.    Yes.

16   Q.    And you don't recall ever amending these

17         two charges, do you?

18   A.    What do you mean, amending?

19   Q.    Changing them.

20   A.    No.

21   Q.    And so the alleged conduct on which you

22         based your two EEOC charges was alleged

23         race and sex harassment, correct?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 253

1    A.    Correct.

2    Q.    And have we now discussed all the

3          incidents on which you based your EEOC

4          charges?

5    A.    To my knowledge, yes.

6    Q.    And you've told me about any complaints

7          you made regarding any of the harassment

8          or discrimination you are alleging,

9          correct?

10   A.    Correct.

11                    MR. SMITH:  If you want to take

12                        maybe a short five-minute

13                        break.

14               (Brief recess.)

15   Q.    We're back on the record after a short

16         break.  You understand you're still under

17         oath, Ms. Reed?

18   A.    Yes.

19   Q.    Your employment with Big Lots ended

20         effective January 11, 2006; is that

21         correct?

22   A.    Correct.

23   Q.    And you testified earlier that you were

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 254

1           terminated because Store Number 818 where

2           you worked was closed permanently; is that

3           right?

4     A.    Correct.

5     Q.    And your termination, which resulted from

6           the store closing, is not part of your

7           claims in this lawsuit; is that correct?

8     A.    Correct.

9     Q.    According to Paragraph 4 of your

10          complaint, which we've already admitted as

11          an exhibit, the acts you're complaining of

12          in this lawsuit are of hostile environment

13          based on your race or sex; is that

14          correct?

15    A.    Correct.

16    Q.    And as you testified earlier, these are

17          the only claims you're alleging in this

18          lawsuit; is that correct?

19    A.    Correct.

20    Q.    You are aware that all hourly employees at

21          Store Number 818 were terminated when the

22          store closed, aren't you?

23    A.    No, because I was told that some of them

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 255

1          got transferred to 816, the other store.

2    Q.    But that's not the case.  Do you know

3          that?

4    A.    No.

5    Q.    Do you have any reason to disagree with

6          that?

7    A.    What, that --

8    Q.    The fact that no hourly employees were

9          transferred?

10   A.    No.

11   Q.    According to Paragraph 8 of your

12         complaint, the alleged discrimination

13         occurred on or about March 18th through

14         30th, 2005; is that correct?

15   A.    Correct.

16   Q.    Your claims in this lawsuit are based on

17         the pictures of employees made by Mike

18         Williams that we've already discussed; is

19         that correct?

20   A.    Correct.

21   Q.    And for clarification, you're not alleging

22         retaliation in this lawsuit, are you?

23   A.    No.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 275

1   A.   No, just about a deposition, asked her has
2        she -- asked her the last time she heard
3        from the lawyer -- heard from you all and
4        then asked her, hey, you got anything on a
5        deposition; you going to do it?  And that
6        was the last thing I talked to her about,
7        as far as the case.  Autherine Crosky --
8        oh, you didn't ask about her.
9   Q.   When was the last time you talked to Ms.
10       Crosky?
11  A.   Her personally, I didn't talk to.  I
12       talked to her husband on yesterday --
13       yesterday or Monday asking when her
14       deposition was.
15  Q.   You called them?
16  A.   Uh-huh.
17  Q.   Why did you care about when her deposition
18       was?
19  A.   Because I thought we was together.  I
20       thought she -- because just like last time
21       we appeared in court, me and her didn't
22       talk.  We hadn't even talked, and then it
23       was like, bam, both of us here together.

**Equal Employment Opportunity**                    **Last update: August 2005**

No person shall be discriminated against in employment because of race, color, religion, sex, sexual orientation, age, national origin, mental or physical disability or marital status.

This policy applies to all terms and conditions of employment including, but not limited to hiring, training, promotion, transfer, demotion, compensation, benefits, and termination.

The Executive Vice President is responsible for formulating, implementing, coordinating, and monitoring all efforts in the area of equal employment opportunity.

Each manager is responsible for initiating and administering this policy within his/her store/department.

Every associate is expected to adhere to the guidelines set forth in this policy in both practice and spirit.

Any formal or informal allegation that this policy has been violated should be referred immediately to Human Resources.

**Employing Persons with Disabilities**

Qualified individuals with disabilities are to be treated in a nondiscriminatory manner in the pre-employment process and in all terms, conditions, and privileges of employment.

All medical-related information is to be maintained in a confidential manner in separate, confidential files.

Applicants and associates with disabilities are to be provided reasonable accommodation, except where making an accommodation would create an undue hardship on the Company.

All requests for reasonable accommodation from qualified applicants and associates with disabilities are to be referred to the appropriate Human Resources manager. The Company will make a good faith effort to assist individuals seeking accommodations.

In determining the feasibility of the requested accommodation, the Company will consider the preference of the individual to be accommodated and, if there are two or more effective accommodations, will choose the least expensive or most practical accommodation that will provide equal opportunity for the applicant or associate.

Accommodation is generally initiated by a request from an applicant or associate. Situations may arise where an associate, who is known to have a disability, may be having difficulty performing the essential functions of his/her job and therefore, may need accommodation. The associate's supervisor should discuss the matter with the appropriate Human Resources manager. The Human Resources manager will advise the associate's supervisor on how to initiate a discussion with the associate.

Violations of this policy may result in disciplinary action, up to and including termination of employment. (See <u>Confidential Information</u>, <u>Harrassment-Free Environment</u>, <u>Open Door</u>)



DEFENDANT'S EXHIBIT

6

## Harassment-Free Environment                **Last update: August 2005**

Big Lots strictly prohibits harassment and/or discrimination based on race, color, religion, sex, sexual preference, age, national origin, mental or physical disability or marital status.

Each supervisor or manager is responsible for maintaining a work environment that is free of harassment both sexual and otherwise. This includes communication of this policy to all associates and assuring that they are not subjected to insulting, degrading or exploitative behavior as defined above.

Big Lots also strictly prohibits sexual harassment. Sexual harassment includes any unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature when:

- Submission to such conduct is made either explicitly or implicitly a term or a condition of an individual's employment.
- Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual.
- Such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment.

Likewise, all associates are responsible for adhering to these guidelines and are prohibited from engaging in discriminatory or harassing behavior. Any associate who believes he/she has been the subject of harassment is responsible for promptly reporting the alleged act to Human Resources or his/her immediate supervisor.

All reports of harassment will be promptly investigated under the direction of Human Resources. All investigations of alleged harassment will be conducted with the utmost concern for the confidential and personal nature of the allegation and with a high degree of sensitivity to the individuals involved. Any associate who is found to have engaged in discriminatory or harassing conduct will be subject to appropriate disciplinary action, up to and including termination. Likewise retaliation against anyone reporting acts of harassment will not be tolerated.

This policy is intended to be in compliance with all Federal laws, specifically Title VII of the Civil Rights Act of 1964, and all State and Local laws dealing with unlawful discrimination and/or harassment. (See Equal Employment Opportunity, Open Door, Standards of Conduct)

DEFENDANT'S EXHIBIT

7

## Open Door                                    Last update: August 2005

Big Lots believes in dealing directly with all associates and further believes that all associates have a right to express their opinions, concerns, and to ask any questions they may have relating to their job or the Company. Any associate with a question or problem is entitled to use the Open Door Policy and may contact anyone in the organization.

Take the question or concern to your immediate supervisor or manager.

OR

If you have a question and do not wish to discuss the matter with your direct manager or supervisor, go to the next level manager.

OR

If you have a question or you just feel uncomfortable discussing the issue with one of the managers listed above, contact the appropriate member of the Human Resources Department:
- **Store Associates:** Contact the Regional Human Resources Manager.
- **Distribution Associates:** Contact the Distribution and Transportation Services Human Resources Manager.
- **General Office Associates:** Contact the General Office Human Resources Manager.

Associates wishing to make anonymous complaints or ask a question may call the Get Real Hotline at 1-866-834-REAL (1-866-834-7325).

All members of management are expected to maintain the integrity and communicate the spirit of the Open Door Policy.

Any attempt to thwart or retaliate against an associate for exercising his/her Open Door rights will be considered a serious violation of Company policy and may result in disciplinary action, up to and including termination of employment. (See Harrassment-Free Environment, No Solicitation, Standards of Conduct, Union-Free Environment)

**DEFENDANT'S EXHIBIT**

8

## Standards of Conduct                 Last update: August 2005

Associates are expected to conduct themselves in a way that is conducive to an ethical business environment. Violations of company policy, public policy, or local, state, and federal laws will not be tolerated. Conduct is expected to reflect our Company's values at all times.

The following behaviors are unacceptable deviations from the Company Standards of Conduct:

- Violation of the Harassment-Free Environment Policy.
- Physical assault or attempted assault on another associate or customer.
- Engaging in conversation, gestures or behaviors that are considered lewd, offensive, abusive, and profane or threatening to associates and/or customers.
- Inappropriate fraternization, including having an intimate relationship with another associate whom you supervise, either directly or indirectly, or over whom you exert some influence or control by nature of your responsibility.
- Violation of the Drug-Free Workplace Policy, including but not limited to consuming intoxicating beverages or use of illegal drugs during scheduled work time; or reporting to work under the influence of intoxicating beverages or illegal drugs.
- Smoking in a company facility or company vehicle and/or use of chewing tobacco or similar products (See Smoke Free Policy).
- Conduct which results in a substantial risk of harm to a customer or another associate, or damage to Company property.
- Possession of weapons, including but not limited to, knives, firearms, explosives, or other instruments that may cause harm to others, intoxicating beverages, or illegal drugs on Company property, including parking lots, or while conducting Company business.
- Conviction of a criminal offense for a crime against the Company or related to the type of responsibilities performed for the Company.
- Dishonest activities such as, theft, selling merchandise at a price lower than that which is marked on the goods without authorization, consumption or use of merchandise that has not been previously purchased by the associate or approved by management.
- Violation of minor labor laws for those associates under eighteen (18) years of age. _NOTE: Associates less than eighteen (18) years of age are not permitted to load, unload or otherwise operate the cardboard baler. These associates are also not permitted to operate any type of power equipment._ (See Employment of Minors Policy).
- Violation of the No Solicitation Policy.
- Unauthorized use of Company property, facilities or resources (See Electronic Communications Policy).
- Unauthorized divulgence of personnel records or Company business (See Confidential Information Policy).
- Insubordination by refusing to complete work as assigned by a manager. In the event of conflicting instructions, the associate should follow the directions of the manager-on-duty and later request clarification.
- Unsatisfactory work performance including disregard of established safety practices and rules.
- Failure to cooperate with Company investigations or inspections.
- Excessive absenteeism or tardiness (See Attendance Policy).
- Working before or after scheduled time without specific authorization from management.
- Job abandonment, which includes two (2) consecutive days absence from scheduled work without calling into management (See Call-in Procedure Policy) or walking off the job without notifying management. These occurrences are considered voluntary terminations (See Termination of Employment Policy).
- Falsification of documents or records including but not limited to, employment application, expense reports, price change documents, timecards, permitting another associate to clock in or out for you, production reports, payroll management documents, etc.
- Misuse of the associate discount privilege by permitting someone not eligible to purchase items with the associate discount or by returning merchandise for a full refund when purchased with the associate discount (See Associate Discount

DEFENDANT'S EXHIBIT

9

Policy).

- Associates are not permitted to hold or hide merchandise for purchase at a later time. Associates may not purchase merchandise unless it is available for sale to the general public.
- The writing of bad checks to the Company.
- The following violations are store specific:
  o Any violation of established shopping regulations including processing unauthorized markdowns and/or ringing sales or handling any other transaction (i.e., returns, cashing checks, etc.) of your own or any immediate relative.
  o Improper use of "paid outs".
  o Cashing checks.
  o Use or unauthorized removal of store funds, or other Company resources, for personal use.
  o Unexplained single incident variance of $50 or greater where till integrity has been maintained.
  o Single till variance of $5 or more, and/or variances of $15 or more in a 30-day period.
  o Failure of store associates to perform established procedures, including but not limited to, the following:

    ▪ Completing daily bank deposits.
    ▪ Securing funds properly.
    ▪ Maintaining accountability for all funds transactions.
    ▪ Conducting "cash pickups" when cash totals in excess of $1500 in drop box and till.
    ▪ Ensuring that Register operator "till drops" are made when cash exceeds $100 of paper currency in till.
    ▪ Ensuring all doors are locked and alarms set as required.
    ▪ Ensuring all safety exits are accessible.
    ▪ Securing safe, as required including maintaining confidential safe combination.
    ▪ Maintaining key control.
    ▪ Ensuring that store security cameras are operating daily and tapes maintained as required.
    ▪ Allowing only authorized associates in controlled areas (i.e., stock room, cash office, etc.).

  o Violation of any other Company rules/regulations or any other action/activity that is deemed to be detrimental to the orderly operation of our Company.

Associates are expected to comply with this Policy and report violations immediately. In all of the above instances, the severity of an individual violation may warrant immediate termination. However, only those persons with the approval to terminate can make this determination (See Termination of Employment Policy).