MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 187

1    A.    Yes.

2    Q.    Ms. Reed, do you recognize this document?

3    A.    Yes, I do.

4    Q.    And is this document, which has been

5          marked as Exhibit 21, a copy of the second

6          charge of discrimination you filed against

7          Big Lots with the EEOC?

8                    (The referred-to document was

9                     marked for identification as

10                    Defendant's Exhibit No. 21.)

11   A.    Yes.

12   Q.    And you also attached a copy of this

13         charge as an exhibit to your complaint,

14         correct?

15   A.    Yes.

16   Q.    And this is charge number 130-2005-6904,

17         which was filed with the EEOC on September

18         22, 2005; is that correct?

19   A.    Correct.

20   Q.    Did someone prepare this for you?

21   A.    The same attorney, Gary Atchison.

22   Q.    Did you review this charge before you

23         submitted it to the EEOC?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 189

1    Q.    But you testified that you don't know if

2          you provided additional information

3          regarding the first charge or not; is that

4          right?

5    A.    Right, so --

6    Q.    All right.  So I was asking you, did you

7          file the second EEOC charge because the

8          EEOC had dismissed the first charge?

9    A.    Right.

10   Q.    So that's yes?

11   A.    Yes.

12   Q.    And this charge is also based on alleged

13         conduct that took place between March 28th

14         and March 30th, 2005; is that correct?

15   A.    That's what it says on the thing, yeah.

16   Q.    So the answer is yes, this charge is also

17         based on alleged conduct that took place

18         between March 28th and 30th, 2005?

19   A.    Well, that makes it seem like it just

20         happened only between those dates.  Is

21         that what it's saying?

22   Q.    This is your charge.

23   A.    So that might be...

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 190

1    Q.    I'm asking whether the conduct about which

2          this charge is based also took place

3          between March 28th and 30th, 2005, just

4          like your first charge.

5    A.    I know, but what I'm asking, is like March

6          28th through 30th is like the only time

7          period that things happened?  Is that what

8          that's saying?  It's looking like it's

9          saying it only happened between that time

10         period.  I'm just asking a question.

11    Q.    Well, I'm asking you the questions.  This

12         is your EEOC charge.

13    A.    Again, those dates refer to the pictures.

14    Q.    Okay.  So this charge is also based on

15         alleged conduct that took place between

16         March 28th and March 30th, 2005, just like

17         your first charge; is that correct?

18    A.    Referring to the pictures, yes, but little

19         comments and stuff made, no.

20    Q.    This second charge is based on the same

21         allegations of harassment or

22         discrimination that are included in your

23         first charge; isn't that true?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 191

1   A.    Yes.

2   Q.    Attached to the EEOC charge is Exhibit A

3         to the charge; is that correct?

4   A.    Correct.

5   Q.    And does Exhibit A contain all of the

6         allegations on which you base this EEOC

7         charge?

8   A.    Yes.

9   Q.    And this charge and the attached pages are

10        the only documents and information you

11        recall providing to the EEOC in support of

12        this, your second EEOC charge?

13  A.    Correct.

14  Q.    Did you draft Exhibit A?

15  A.    Huh?

16  Q.    Did you draft Exhibit A?

17  A.    The same attorney drafted it, typed

18        everything else up for us -- for me.

19  Q.    And in this Exhibit A to your second EEOC

20        charge, you also complain about the same

21        Mike Williams pictures you complained

22        about in your first EEOC charge, correct?

23  A.    Correct.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 192

1    Q.    And this conduct by Williams you testified

2          occurred between March 28th and 30th,

3          2005; isn't that correct?

4    A.    Correct.

5    Q.    And in Exhibit A to this, your second EEOC

6          charge, you have mentioned an alleged

7          statement made by Jerry Culpepper, the

8          store manager, in February 2005; is that

9          right?

10   A.    Yes.

11   Q.    And this is where he referred to a movie?

12   A.    Yes.  That other employee, Barbara Martin,

13         she had got a -- I guess you could say

14         assaulted like the day before, that

15         Sunday, at the Winn Dixie.  And she came

16         to Big Lots because she didn't know where

17         to go.  She came to Big Lots, and she was

18         telling them what happened about the guy

19         came up to her out of nowhere and pulled

20         his genitals out in front of her and it

21         frightened her.  So when she got back to

22         work, she told Culpepper, so that's when

23         he got to talking about it reminded him of

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 193

1      an old western about the guy behind the --

2      the white guy was managing the black guy

3      or something, and the white guy was

4      looking for the black guy and the white

5      guy was like, where you at or something

6      like that, and he was like shaking my

7      bush, boss, just shaking my bush, like he

8      was using the bathroom behind the bush.

9      And he actually was doing the example,

10     like shaking my bush, boss, just shaking

11     my bush.  But he told me I wouldn't

12     remember the old western because I

13     probably was too young.

14  Q.  Okay.  And so this comment was made

15     allegedly in February of 2005, right?

16  A.  Correct.

17  Q.  And that was before you filed your first

18     EEOC charge on June 23, 2005, correct?

19  A.  Yes.

20  Q.  And this is one of the incidents that you

21     included in your first EEOC charge?

22  A.  No, it wasn't -- that wasn't included in

23     the first EEOC charge.  It was just the --

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 195

1      the phone or something to them.

2   Q.    So it's possible that this is one of the

3      incidents that they were investigating

4      with respect to your first charge?

5   A.    It's possible, but I'm not sure.

6   Q.    Looking back at your first EEOC charge,

7      which was Exhibit 18, Exhibit A states

8      that there were other comments and

9      statements made during the last 180 days

10     other than just these pictures that you

11     were raising --

12  A.    Right.

13  Q.    -- in your charge.  So would this

14     statement, which occurred during that time

15     frame, be one of the incidents you were

16     referring to --

17  A.    Yes.

18  Q.    -- in your first EEOC charge?

19  A.    That would be it.

20  Q.    So you would have included this statement

21     in your first EEOC charge, as far as what

22     you were complaining about?

23  A.    Correct.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 197

1          really saying like what happened to

2          Barbara --

3     Q.   Was he talking to her?

4     A.   Yeah.  She was up there too.

5     Q.   So he wasn't to you; he was talking to

6          Barbara Martin?

7     A.   He was telling us the story.

8     Q.   But he wasn't really talking about you or

9          to you or anything that happened to you?

10    A.   No, because nothing -- no.  He just --

11    Q.   You just overheard him?

12    A.   No.  He got our attention -- stopped us

13         from doing what we were doing to get our

14         attention to tell us this story.  It was

15         like that.

16    Q.   Have you ever seen this movie --

17    A.   Who?

18    Q.   -- that he was referring to?

19    A.   No.  I don't even know what he's talking

20         about, the name of it or anything.

21    Q.   And have you told me all you can recall

22         about that incident?

23    A.   Yes.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 198

1    Q.    So you've never seen the movie that he was
2          referring to?

3    A.    Huh-uh.

4    Q.    So you have no personal knowledge as to
5          what scene he was referring to?

6    A.    No.

7    Q.    Do you know why he was referring to that
8          movie?

9    A.    Because of the other associate, Barbara
10         Martin, got insulted by a guy in a grocery
11         store, and he was referring that incident
12         to the movie.  How --

13   Q.    Do you know why he made that comment?

14   A.    Don't know why.

15   Q.    And do you know what he meant when he said
16         it reminded him of, I assume, what
17         happened to Barbara Martin?

18   A.    I don't know why.

19   Q.    So you have no personal knowledge as to
20         why Culpepper made the comment or what he
21         meant by it, do you?

22   A.    No.

23   Q.    And Culpepper didn't make any reference to

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 199

1      your race or your sex when he made this
2      comment, did he?
3  A.  No.
4  Q.  And he didn't make any reference to her
5      race, Barbara Martin's race or sex when he
6      made this comment, did he?
7  A.  No.
8  Q.  And Barbara Martin was a -- was she
9      another cashier?
10 A.  Yes.
11 Q.  Do you know whether Culpepper ever made
12     the same comment to white or male
13     employees or referenced this movie to
14     white or male employees?
15 A.  No.
16 Q.  You don't think that his statement
17     regarding this movie had anything to do
18     with your race or sex, do you?
19 A.  I mean, we're black females and he's
20     talking about a black guy behind a bush,
21     so it was kind of offensive for him to be
22     talking about a black male behind a bush,
23     you know, using the bathroom behind a

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 200

1        bush.

2   Q.   What does that have to do with your race

3        or your gender?

4   A.   I mean, why would a white male be sitting

5        here telling us a story about a black male

6        behind a bush shaking his privates?

7        That's insulting.  It's -- I mean, it's

8        like humiliating.

9   Q.   What does race have to do with it; do you

10       know?

11  A.   I'm still like, why would a white guy tell

12       you a story, so -- why would a white

13       supervisor --

14  Q.   What I'm asking you is, did that have

15       anything to do with your race, as far as

16       you know?

17  A.   Not as far as I know.

18  Q.   Now, did that have anything to do with

19       your gender, as far as you know?

20  A.   No.

21  Q.   Okay.  Now, when you said someone shaking

22       their privates, what are you talking

23       about?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 202

1          plant?

2    A.    I don't think that's what he was talking

3          about, the way he did his gesture.

4    Q.    Do you know?

5    A.    I don't know.  You don't know.

6    Q.    I'm asking the questions.  Do you know?

7    A.    You don't know, so -- so no, nobody knows

8          but Jerry.

9    Q.    Well, I've seen the movie, but I'm not

10         testifying here.

11   A.    Well, tell me what the movie's name is and

12         I'll go watch it and see.

13   Q.    This statement here doesn't say anything

14         -- mention anything about him making any

15         hand gesture, does it?

16   A.    No, it doesn't.  It say --

17   Q.    I'll show it to you.

18   A.    Those are my notes and stuff.

19   Q.    I've just handed you copies of two

20         documents that you produced earlier today;

21         they have been marked as Exhibit 22.  Do

22         you recognize these documents?

23                        (The referred-to document was

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 203

1                    marked for identification as

2                    Defendant's Exhibit No. 22.)

3    A.    Yes, I do.

4    Q.    Are these your handwriting?

5    A.    This one right here is, but this one is

6          not.

7    Q.    So you're saying that the -- which is your

8          handwriting?

9    A.    This one.  This is my handwriting, the one

10         that's got my name at the top of the page.

11   Q.    The one with your name at the top that's

12         written in manuscript that does not have

13         the exhibit sticker on it?

14   A.    Right.

15   Q.    But the one with the exhibit sticker is

16         not your handwriting?

17   A.    Correct.

18   Q.    Well, whose handwriting is that?

19   A.    This is Barbara Martin's handwriting.

20   Q.    Why would she have your notes?

21   A.    She had my notes because when we sat down

22         together -- when we had our first meeting

23         with the lawyer that we talked to, she was

bda54283-b1d2-4c60-a8e5-35ed6c437989

Page 207

1   A.    I don't know 100 percent, no, I do not.

2   Q.    So you don't know why you've written down

3       February 2005 as the date?

4   A.    In her handwriting --

5   Q.    No, I'm not talking about her handwriting;

6       I'm asking about yours.

7   A.    It happened that day.  That's when it

8       happened.  That's the month and the date

9       -- and the year that that incident was

10      said.

11  Q.    This states that he said, I'm just shaking

12      the bush, boss, just shaking the bush --

13      not my bush, but the bush.  Is that

14      accurate?

15  A.    That's what the -- that's what it says.

16  Q.    The bush?

17  A.    Yeah.

18  Q.    Is that what was said?

19  A.    That's what it says on the paper.

20  Q.    Right.  And is that what you wrote down

21      after the incident happened?

22  A.    Could have been.

23  Q.    And this states that the guy was using the

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 208

1      bathroom behind a tree.  Could that be

2      what he was talking about when he said

3      shaking the bush?

4   A.   Could be.

5   Q.   You don't know?

6   A.   Don't know.

7   Q.   And also in Exhibit A you have shaking the

8        bush, and you're referring to someone

9        behind a tree.  So again, that could be

10       referring to the plant or the tree,

11       couldn't it?

12  A.   Could be.

13  Q.   So there's nothing that has anything to do

14       with your sex?

15  A.   Not in that comment, no.  Not in that

16       comment.

17  Q.   Nor is there anything sexual in this

18       comment, is there?

19  A.   I feel it is, but...

20  Q.   What?

21  A.   You're trying to say shaking the -- okay.

22       No, it ain't.

23  Q.   I'm sorry?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 209

1    A.    It's not.

2    Q.    It's not sexual?

3    A.    No.

4    Q.    You never complained about this statement

5          to anyone, did you, at Big Lots?

6    A.    How could you go to the manager that said

7          it about the comment?

8    Q.    Answer my question.

9    A.    How can you go to the manager that said

10         the comment?

11   Q.    Did you go to any other manager?

12   A.    No, not when the other one was the one

13         taking pictures of you, putting your face

14         on --

15   Q.    In February of 2005?

16   A.    In February -- who was the managers then?

17   Q.    You don't recall who the managers were

18         then?

19   A.    I don't even recall who was the managers

20         at that time.

21   Q.    So my question was, did you complain to

22         anyone -- did you tell Jerry Culpepper

23         that you were offended by this statement?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 210

1    A.    Did I say it out my mouth?  No.

2    Q.    Okay.  Did you complain to anyone other

3          than Jerry Culpepper regarding this

4          statement?

5    A.    No.

6    Q.    Have you told me everything you can

7          remember about this alleged statement?

8    A.    To my knowledge, yes.

9    Q.    In Exhibit A you also state that in March

10         of 2005 Culpepper stated to you that,

11         quote, these customers get on my fucking

12         nerves, end quote.  Is that accurate?

13   A.    That's accurate and true.  I heard it with

14         my own ears, and I wrote that down that

15         day -- I wrote that down.  Somebody had --

16         anytime -- Mr. Culpepper used to always

17         cuss.  When somebody make him mad or keep

18         calling him to do this or do that thing

19         and --

20   Q.    I'm just asking you to answer my

21         questions.

22   A.    So yeah.

23   Q.    And this comment also allegedly occurred

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 211

1          prior to your filing the first EEOC charge

2          on June 23, 2005; is that right?

3    A.    Yeah, correct.

4    Q.    And this is also one of the incidents in

5          which you based your June 23rd EEOC

6          charge; is that right?

7    A.    Correct.

8    Q.    And Culpepper was referring to customers,

9          not you, when he allegedly made this

10         comment, correct?

11   A.    Correct.

12   Q.    And this statement had nothing to do with

13         you, did it?

14   A.    It was still -- fucking -- I mean, the

15         word "fucking," you're saying it in an

16         environment around females.  That's not

17         appropriate.

18   Q.    I'm asking whether this comment had

19         anything to do with you.

20   A.    I heard it.  He said it.

21   Q.    Other than the fact that you heard it,

22         this comment had nothing to do with you,

23         did it?  He was complaining about

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 212

1          customers; is that right?

2    A.    Right.

3    Q.    So it had nothing to do with you, correct?

4    A.    Correct.

5    Q.    And Culpepper did not reference your race

6          or your sex when he made this comment, did

7          he?

8    A.    No.

9    Q.    And this comment doesn't have anything to

10         do with your race or your sex, does it?

11   A.    I mean, still, the word "fucking," I mean

12         --

13   Q.    I'm asking -- you may not like the word,

14         but I'm asking whether it has anything to

15         do with your race or your sex.

16   A.    You're asking what you want to hear from

17         the word.  But no, it don't.

18   Q.    I'm sorry?

19   A.    You're asking --

20   Q.    Does it have anything to do with your race

21         or your sex?

22   A.    No, it doesn't.

23   Q.    In the context of this alleged statement,

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 213

1    Culpepper was not using this word in a
2    sexual manner, was he?
3  A.    (No response.)
4  Q.    Go ahead and answer.
5  A.    Oh, repeat the question.
6  Q.    In the context of this alleged statement,
7    Culpepper was not using the word in a
8    sexual manner, was he?
9  A.    No, not towards me.  Around me, but not
10    towards me.
11  Q.    But he's not using the F-word -- is what
12    I'll refer to it as -- in a sexual way, as
13    a sex word, is he?  He's just showing
14    frustration; is that correct?
15  A.    The word itself is a sex word itself,
16    though.
17  Q.    In that context?  He wasn't using it in a
18    sex context, was he?
19  A.    No.
20  Q.    Do you have personal knowledge as to why
21    Culpepper made this statement?
22  A.    No.
23  Q.    Do you know whether Culpepper ever made

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 214

1          the statement to male employees?

2     A.   No.

3     Q.   Do you know whether Culpepper ever made

4          this statement to white employees?

5     A.   No.

6     Q.   Did you complain to anyone about this

7          statement?

8     A.   No.  He used to cuss so much.

9     Q.   I'm sorry?

10    A.   I said he -- he cussed all the time.

11    Q.   Again, did you complain to anyone about

12         this statement made by Culpepper?

13    A.   Who would I complain to, him?  And he's

14         the one saying it?

15    Q.   Please answer my questions.

16    A.   I'm just asking, I'm going to complain to

17         him and he's the one saying it?

18    Q.   Did you complain to his boss?

19    A.   I don't know who his boss is.

20    Q.   You didn't know who the district manager

21         was?

22    A.   No.

23    Q.   Did you complain to HR?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 215

1   A.   No.

2   Q.   So you didn't complain to the district

3        manager, and you didn't complain to HR,

4        did you?

5   A.   No.

6   Q.   Did you call the complaint hotline?

7   A.   Didn't know the number.

8   Q.   We've already covered that.  The answer is

9        no?

10  A.   No.

11  Q.   You also alleged in your second charge

12       that Billy Pridgen made a comment on or

13       about July 18, 2005, regarding coconut

14       bras; is that correct?

15  A.   Correct.

16  Q.   Tell me about that incident.

17  A.   Lisa, the fellow employee, she was out --

18       she was off work that day.  She came into

19       the store to get boxes --

20  Q.   Was she a cashier?

21  A.   No.  She was like a stocker or something.

22       She came into the store to get boxes, and

23       when she came to the store to get boxes,

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 216

1    Billy was right at the door.  And he was

2    like, hey, Lisa, because I guess he was

3    throwing the boxes for her or whatever.

4    He was just like, hey, Lisa, tell Nicole

5    about them coconut bras.  And -- because

6    she -- it was her family reunion time, and

7    her family reunion theme was Hawaii, so --

8    I was like coconut bras?  And it was over

9    the wall, true enough, the little bitty

10   coconut bras.  And he said, coconut bras,

11   you and her are the only ones can fill

12   them.  And he actually put his hand on his

13   chest as if he had a breast.

14   Q.   You said in your exhibit, you and Lisa are

15        the only ones who can wear those coconut

16        bras.  Is that more accurate about what

17        was said?

18   A.   Yes, that's what he said, y'all the only

19        ones can wear them.  And he placed his

20        hand over his chest and he demonstrated it

21        and laughed, and I walked off.

22   Q.   And this was on or about July the 18th of

23        2005?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 217

1    A.    Yes.

2    Q.    And was this incident also included in

3          your first EEOC charge?

4    A.    It -- I don't know.  Probably over the

5          phone but not like in writing, because I

6          talked to several --

7    Q.    But you think you probably mentioned it to

8          the EEOC investigator?

9    A.    I could have.  Yeah, I could have.  I

10         don't recall, though.

11   Q.    And these coconut bras were being sold at

12         Big Lots with Hawaiian-themed attire?

13   A.    Yes, along with the lace and stuff like

14         that for the summertime, summer stuff.

15   Q.    And Lisa was present?  Lisa Poole was

16         present when the alleged comment was made?

17   A.    Uh-huh.  Yes.

18   Q.    Do you know that Lisa denies that he made

19         that comment?

20   A.    I don't know.

21   Q.    Is it possible you misheard or

22         misunderstood Pridgen?

23   A.    I don't know.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 219

1    A.    Yeah.

2    Q.    And again, you don't have any personal

3          knowledge about what he meant?

4    A.    No.

5    Q.    You don't think that comment had anything

6          to do with your race, do you?

7    A.    No.

8    Q.    Do you think he made that comment because

9          of your sex?

10   A.    Because of my small breasts, yes.

11   Q.    But that's just your speculation?

12   A.    Yes.

13   Q.    Is this the only time you recall Pridgen

14         making such a comment?

15   A.    Talking about as far as sexually, yes.

16   Q.    I'm asking you if this is the only time

17         you recall Pridgen making a similar

18         comment to this one.

19   A.    Similar, yeah.  Yes.

20   Q.    Did you tell Pridgen you were offended by

21         this comment?

22   A.    I walked off from him.

23   Q.    That's not responsive.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 221

1          something --

2    Q.    I'm asking you whether you told him --

3    A.    -- I'll walk off from him.

4    Q.    -- you were offended.  It's a yes or no

5          question.

6    A.    No, I did not tell him.

7    Q.    Thank you.  Did you complain to any

8          manager or supervisor or HR about this

9          comment?

10   A.    No.  Environment too hostile.  Didn't know

11         who to talk to.

12   Q.    I'll move to strike that as nonresponsive.

13   A.    I didn't know who to talk to.

14   Q.    The question was, did you complain to any

15         manager or supervisor about that

16         statement.

17   A.    Environment too hostile.  I didn't know

18         who to talk to.

19   Q.    Again, I'm asking you to answer my

20         question.  Did you?

21   A.    Environment too hostile.  I didn't know

22         who to go to.  I didn't know who to go to.

23         At that time when situations and instances

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 222

1       was happening, that's --

2    Q.    You haven't responded to my question.  You

3          didn't call HR?

4    A.    No.

5    Q.    You also alleged in your second charge

6          that Jerry Culpepper once made a comment

7          after he bought you a soda; is that

8          correct?

9    A.    That's correct.

10   Q.    Tell me about the incident.

11   A.    I was at my register; he was behind the

12         service desk.  And he said, would anybody

13         like something to drink.  I said, yes, I

14         would, a Sprite, please.  He went and got

15         the drink -- he went to the customer

16         service desk and bought it from another

17         cashier, came back, handed it to me.  I

18         said, thank you, Mr. Culpepper.  He said,

19         I'm going to tell you like the old folks

20         used to tell me, all I want to see now is

21         ass and elbows.

22   Q.    And what was your response?

23   A.    What was my response?  I was just like

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 223

1           shocked, was shocked and everything.

2    Q.    Did you have a response?

3    A.    Didn't have one.

4    Q.    So you have alleged here that that

5          incident occurred on or about August 17,

6          2005?

7    A.    Yeah.  I should have it -- I've got a -- I

8          should have a receipt for the soda.  I

9          kept that.

10   Q.    Why did you have the receipt?  Did he not

11         buy it for you?

12   A.    He bought the -- anytime they buy sodas

13         for us, they give us the receipt to keep

14         on the drink.  But if the --

15   Q.    So everyone will know that it was paid

16         for?

17   A.    Yeah, it was paid -- yeah.

18   Q.    So was he being nice, buying you a drink?

19   A.    I suppose.

20   Q.    Did he do that from time to time for the

21         employees?

22   A.    Yeah, after you unload a truck or do

23         something or if the store was just hot

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 226

1    evidence.

2    Q.    You can give me a copy of the receipt.

3    A.    Oh, okay.  I can do that.

4    Q.    Or you can call me and we can discuss it

5          and.  We'll make arrangements.

6    A.    Sure.

7    Q.    Is it possible that this is one of the

8          comments on which your first EEOC charge

9          was based?

10   A.    I don't think -- huh-uh.  No.

11   Q.    Had you ever heard the term "ass and

12         elbows" before?

13   A.    Have I heard it?  Yeah, I've heard it.

14   Q.    Had you heard it before that day?

15   A.    Yeah, I heard it before.

16   Q.    Before that day?

17   A.    Uh-huh.

18   Q.    Before Culpepper allegedly made that

19         statement?

20   A.    Correct.

21   Q.    Do you use that term personally?

22   A.    No, I don't personally use it.

23   Q.    Have you ever?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 227

1    A.    Not in the same sentence, no.   No.

2    Q.    Not in the same what?

3    A.    I never told -- no.  My answer is no to

4          your question.

5    Q.    You don't know what Culpepper meant by

6          that term, do you?

7    A.    I don't know, but from like old people

8          used to say and the way I heard the saying

9          from that comment, it's like he's

10         basically just telling you to get to work

11         or, you know, he wanted to see -- I don't

12         know how to explain what the comment --

13   Q.    What do you think he -- you don't know

14         what he meant, do you?

15   A.    Huh-uh.

16   Q.    Is it possible you misheard him?

17   A.    No.

18   Q.    You don't know why he made that comment,

19         do you?

20   A.    Don't know why.

21   Q.    Do you know whether Culpepper made the

22         same comment to male employees?

23   A.    No.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 228

1    Q.    Do you know whether Culpepper made the
2          same comment to white employees?
3    A.    No.
4    Q.    Is this the only time you recall Culpepper
5          making this comment?
6    A.    That comment, yes.
7    Q.    And he did not reference your race or sex,
8          did he?
9    A.    Depend on how you look at "ass."  I mean,
10         I really don't know what he meant by it.
11   Q.    You don't think this comment has anything
12         to do with your race, do you?
13   A.    No, not race, but it could have something
14         to do with sexually or something.
15   Q.    Do you know?
16   A.    Do you know?
17   Q.    I'm asking you.  I'm asking the questions.
18   A.    I don't know.
19   Q.    You don't know?
20   A.    Huh-uh.
21   Q.    You don't know whether that was a sexual
22         statement or --
23   A.    Gesture or -- yeah, I don't know.  I don't

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 229

1        know what he meant at that time.  I just

2        know he said it.

3   Q.   Were you offended by that comment?

4   A.   Yeah.

5   Q.   But you don't know what he meant?

6   A.   I don't know what he meant, but I still

7        took offense to it for my manager to tell

8        me all he wanted to see was ass and

9        elbows.

10  Q.   What did you take offense to, the word

11       "ass"?

12  A.   Yeah.

13  Q.   Just the fact that it's a curse word?

14  A.   Yeah.  The fact that it -- yeah, the fact

15       that it's a cuss word and he was a

16       supervisor of higher power talking like

17       that --

18  Q.   Using that cuss word?

19  A.   Yeah.

20  Q.   Is that what you found objectionable?

21  A.   That's what I found objectionable.

22  Q.   Going back to the comment he allegedly

23       made about customers getting on his,

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 230

1          quote, fucking nerves, end quote, is what

2          you found objectionable about that comment

3          too, just the fact that the F-word is a

4          cuss word?

5     A.   And he used it as a manager, explaining

6          that --

7     Q.   You don't think it's appropriate for them

8          to use a cuss word in the workplace?

9     A.   Exactly.  Around nobody.

10    Q.   So back to this ass and elbows statement.

11         What you found objectionable about that is

12         the fact that a manager would use the word

13         "ass" in the workplace, because that's a

14         cuss word; is that right?

15    A.   And not only because it's a cuss word;

16         he's talking about a specific part of your

17         body as a cuss word.

18    Q.   Well, you don't know whether he was

19         talking about your ass, do you?

20    A.   I don't know.  I don't know.

21    Q.   I mean, you just don't have any idea?

22    A.   No, I don't have any idea.  It's just what

23         I took of it, the offense that I took

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 231

1          against the word.

2   Q.     You testified that you've heard that term

3          before.  In what context have you heard it

4          used before?

5   A.     What?

6   Q.     The term "ass and elbows"?

7   A.     In a song.

8   Q.     What song?

9   A.     It was -- I mean, it was -- was it a song?

10         Oh, I'm thinking about something else.  I

11         thought I heard that.  I've done heard it

12         said before.

13  Q.     Do you think he was just being funny?

14  A.     I don't know.

15  Q.     Is it possible?

16  A.     At the time -- I'm trying to put myself

17         back in that environment.  At the time --

18         he could have; I don't know.  Because he

19         was buying everybody sodas, so maybe he

20         was in a good mood.

21  Q.     And maybe he was just kidding around?

22  A.     Well, I don't think he --

23  Q.     Is that possible?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 232

1    A.    I don't think he used to kid like that,

2          though.  I mean, he said little slick

3          comments and stuff, but --

4    Q.    Well, but do you know whether he was just

5          kidding around at that point?

6    A.    I don't know.  I can't recall.  I don't

7          know.

8    Q.    And back to Billy Pridgen.  When he made

9          the alleged comment regarding the coconut

10         bras, do you know whether he was just

11         kidding?

12   A.    I don't know.

13   Q.    I mean, is it possible he was just trying

14         to be funny?

15   A.    I know one thing, I have never made

16         comments towards them in any way to make

17         them think like it's okay to say cuss

18         words or anything around me, because I

19         didn't -- I never cussed at them or used

20         any kind of profanity, so --

21   Q.    Okay.  Well, we're talking about the

22         coconut bra comment?

23   A.    Yeah.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 233

1    Q.    That doesn't have any profanity.  Do you
2          know what --
3    A.    That still was a sexual gesture, though.
4    Q.    Do you know whether he was just teasing?
5    A.    I don't know.  I have no idea.  I don't
6          know what was going through his mind at
7          that time.
8    Q.    That was just an isolated incident, wasn't
9          it?
10   A.    Yeah.
11   Q.    And the ass and elbows comment was just an
12         isolated incident too?
13   A.    What do you mean by isolated, just one
14         that happened?
15   Q.    Yeah.
16   A.    Yeah, it was an incident that happened.
17   Q.    I know, but it was just an isolated
18         incident; this is the only time you recall
19         him using that term, correct?
20   A.    Ass and elbows?  Yeah.
21   Q.    You don't believe that Jerry Culpepper was
22         trying to come on to you in a sexual
23         manner, do you -- when he made the ass and

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 234

1            elbows comment, do you?

2    A.    No.

3    Q.    And did you just walk away after he made

4          that comment?

5    A.    Yeah.

6    Q.    You didn't tell Culpepper that you were

7          offended by it, did you?

8    A.    I just didn't say nothing else to him.

9    Q.    And you didn't complain to anyone else

10         about this comment, did you?

11   A.    Couldn't go back to him about it.

12   Q.    You didn't?

13   A.    No.

14   Q.    And you didn't complain to anyone else?

15   A.    No.

16   Q.    Culpepper's employment with Big Lots ended

17         before your termination, didn't it?  Are

18         you aware of that?

19   A.    I think so.  I think he did find -- I

20         think I do recall that, him finding a job

21         before the store actually closed.

22   Q.    Do you know the date his employment ended?

23   A.    Huh-uh.  I think I do remember that

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 238

1           information you gave to the EEOC regarding

2           your second charge are the charge itself

3           and then whatever pages are attached as an

4           exhibit; is that right?

5    A.     Correct.

6    Q.     I've just handed you two pages, which are

7           notes that you produced earlier today, and

8           they've been marked as Exhibit 24.  You

9           recognize these documents, I assume?

10                     (The referred-to document was

11                      marked for identification as

12                      Defendant's Exhibit No. 24.)

13   A.     Yes, I do.

14   Q.     Is this the other incident that you were

15          just about to tell me about?

16   A.     Yes.

17   Q.     All right.  And is this an incident that

18          allegedly occurred on August 4, 2003, at

19          12:00 p.m.?

20   A.     Yes, it is.

21   Q.     And did you make this note at the time?

22   A.     Yes, I did.

23   Q.     Tell me about this incident.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 239

1    A.    At this time I was working day shift, and

2          I was helping unload a truck.  And my hair

3          was real long, so instead of going there

4          unloading the truck, I had a bandanna

5          wrapped around my head so my hair wouldn't

6          sweat out.  And after we finished

7          unloading the truck, like we always do, we

8          get sodas and we take a break before we go

9          to the floor.  And at this time, since I

10         had a bandanna wrapped around my head, I

11         went to the break room.  And Billy came

12         out and looked at me and said, all you

13         need now is a bag of grits.

14   Q.    Is that all he said?

15   A.    That's what he said.  And every -- I mean,

16         the break room was packed, and everybody

17         -- and I looked at him like, bag of grits?

18         But he was just calling me Aunt Jemima.

19         That's exactly what he was calling me.

20   Q.    But he didn't say that?

21   A.    All you need to know -- I had a head band

22         tied --

23   Q.    I'm asking you what he said.  You've

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 240

1           already told me that.  I'm asking you what

2           he said.

3      A.   That's what he said.

4      Q.   What did he say?

5      A.   All you need now is a bag of grits.

6      Q.   And that's all he said?

7      A.   That's what he said.

8      Q.   Okay.  You're adding the Aunt Jemima part;

9           he didn't say that?

10     A.   But --

11     Q.   That's what you thought he meant?

12     A.   That's what I knew he meant.

13     Q.   How could you --

14     A.   I mean, I didn't hear it out his mouth,

15          but I knew that, as dark as I am, with

16          this thing tied around my head and a bag

17          of grits -- why would he come in the break

18          room saying I need a bag of grits?

19     Q.   I'm asking you the questions.  I'm asking

20          what he said.  Is Aunt Jemima, is that

21          anything -- is she even the symbol for

22          grits?

23     A.   Yeah, she's the symbol for something.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 242

1          was referring to Aunt Jemima or not, do

2          you?

3     A.   You don't either.

4     Q.   I'm asking you a question.  This is your

5          deposition.  Do you know?  You don't know

6          what he was thinking, do you?

7     A.   You don't know what he was thinking

8          either.  That was the most humiliating day

9          --

10    Q.   Do you know --

11    A.   -- of my life right there.

12    Q.   -- what he was thinking in his mind?

13    A.   I don't know what he was thinking.

14         Evidently, he didn't either.

15    Q.   Is this Billy Pridgen you're referring to?

16    A.   Uh-huh.

17    Q.   And this incident allegedly occurred in

18         August of 2003?

19    A.   Yes.

20    Q.   And so that was nearly two years before

21         you filed your first EEOC charge, correct?

22    A.   Correct.

23    Q.   And almost two years prior to the Mike

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 243

1          Williams pictures about which you

2          complained in your first EEOC charge,

3          correct?

4    A.    Nearly.

5    Q.    And was this incident included in your

6          first EEOC charge?

7    A.    No, it wasn't.

8    Q.    And did you not include it in your first

9          EEOC charge because it had occurred so far

10         before --

11   A.    Correct.

12   Q.    -- before you filed the EEOC charge, is

13         that correct?

14   A.    Correct.

15   Q.    And this is another isolated incident?

16   A.    That happened to -- but the next day

17         Billy, he didn't do --

18   Q.    Hold on.  Answer my question, then we can

19         move to something else.  But this was

20         another isolated incident; is that

21         correct?

22   A.    Incident that happened with -- yeah, by

23         itself, yes.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 244

1    Q.    Unrelated to any other incident?

2    A.    Correct.

3    Q.    Just a one-time comment made by Billy

4          Pridgen in 2003, correct?

5    A.    Correct.

6    Q.    And you testified that you don't know why

7          Billy Pridgen made that comment, correct?

8    A.    He acted on what he seen.

9    Q.    You don't know why he made that comment,

10         do you --

11   A.    No.

12   Q.    -- what he was thinking; is that correct?

13   A.    Yeah.

14   Q.    Do you know whether Billy Pridgen would

15         have made the same comment to a white

16         employee who was wearing a bandanna on his

17         or her head?

18   A.    No, he would have not made that same

19         comment.

20   Q.    You don't know, do you?

21   A.    He wouldn't have made that same comment --

22   Q.    How do you know?

23   A.    -- to no white employee with no bandanna

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 245

1          on their head.

2     Q.   How do you know?  Do you know whether he

3          ever did?

4     A.   No, I don't.

5     Q.   Do you recall any other employee wearing a

6          bandanna on his or her head?

7     A.   Yeah.  A guy named John, one of our

8          loaders, he used to always wear it because

9          he would have braids.  He's a black guy.

10    Q.   Do you know whether Billy Pridgen ever

11         made that comment to him?

12    A.   No.  Why would he tell him all he need was

13         a bag of grits?

14    Q.   Do you know whether he did, is my question

15         to you.

16    A.   No.

17    Q.   You don't know; is that correct?

18    A.   No, I don't know.

19    Q.   Do you know whether Billy was just joking?

20    A.   No.  I don't think he was joking.

21    Q.   Do you know?

22    A.   I know he wasn't joking, because the break

23         room got quiet.  When he came in there

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 247

1    Q.    That's not my question.  Did he ever make

2          a similar comment to you?

3    A.    Other employees, yes, not to me.

4    Q.    Answer my question, or we're going to be

5          here all night.

6    A.    I told you, not to me.  I'm not going to

7          be here all night.  I've got to go to

8          school tonight.

9    Q.    So the answer is no, he did not make any

10         other similar comment to you?

11   A.    No, he did not.

12   Q.    Your EEOC charges or the claims you're

13         making in this lawsuit don't have anything

14         to do with any comments Billy Pridgen

15         allegedly made to other individuals, do

16         they?

17   A.    No.

18   Q.    You don't know whether Billy Pridgen made

19         this comment in any way because of your

20         sex, do you?

21   A.    No.

22   Q.    And is it just your speculation or just

23         your personal belief that it had something

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 248

1        to do with your race?

2  A.    I'm almost sure of it, yes.

3  Q.    And the next page says, 10:30 a.m.,

4        8/5/03, he did apologize to me.  He said,

5        I was told that yesterday I said something

6        to you that offended to you, but I

7        apologize to you because I like working

8        with y'all.  Is that accurate?

9  A.    Y'all as in black people.  That's accurate

10       because I reported it to Larry Byrne.

11  Q.    Who is that?

12  A.    At that time he was the district manager

13       or something.

14  Q.    So for this incident you called the

15       district manager?

16  A.    I called whoever's name -- they had some

17       name up.  And then after he left, when all

18       the management stuff started changed --

19  Q.    What I'm asking you is, this incident back

20       in 2003 --

21  A.    I did report it.

22  Q.    You reported it?

23  A.    Yes, I did.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 249

1    Q.    And you reported it to the district

2          manager?  Is that your testimony?

3    A.    Larry -- I think his name was Larry Byrne.

4          I don't know what position he held, but I

5          know he was over Billy, but he wasn't in

6          the store.

7    Q.    So then the next day Billy apologized to

8          you?

9    A.    After I talked to the man.

10   Q.    Okay.  But Billy apologized?

11   A.    Yeah, he apologized.

12   Q.    And he didn't make any other comment to

13         you like this after that, did he?

14   A.    No.

15   Q.    Okay.  And you don't know what he meant

16         when he said, I like working with y'all,

17         do you?

18   A.    Y'all as in black people.

19   Q.    But --

20   A.    I don't know what he meant.

21   Q.    All right.  But he apologized and it

22         didn't happen again; is that correct?

23   A.    Not to me, it didn't.  Other employees,

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 250

```
1              yes, but not to me.
2    Q.    Your claims in this lawsuit are based on
3          what happened to you; is that correct?
4    A.    It is now.
5    Q.    So the one time that he made this comment
6          to you, you reported it; he apologized;
7          and there wasn't another comment like this
8          made by Billy Pridgen, correct -- to you?
9    A.    Oh, no, not to me.
10   Q.    Ms. Reed, I've just handed you a document
11         that's been marked as Exhibit 25.  Is this
12         a copy of the dismissal notice of rights
13         you received from the EEOC with respect to
14         your second charge?
15                   (The referred-to document was
16                    marked for identification as
17                    Defendant's Exhibit No. 25.)
18   A.    Correct.
19   Q.    And that was charge number 130-2005-06904;
20         is that right?
21   A.    Correct.
22   Q.    And you attached this document to your
23         complaint as an exhibit, didn't you?
```

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 251

1   A.   Yes.

2   Q.   And the document indicates it was mailed

3        on February 6, 2006; is that right?

4   A.   Yes.

5   Q.   And according to your complaint, you

6        received the document on February 6, 2006;

7        is that right?

8   A.   Or something close around that.

9   Q.   I'm sorry?

10  A.   Or a date close to it.  Mail travels.

11  Q.   All right.  But you've alleged in your

12       complaint that you received it on February

13       6, 2006, so that must be correct; is that

14       right?

15  A.   Yeah.

16  Q.   And it states the EEOC is closing its file

17       on this charge for the following reason,

18       and the box is checked that states that,

19       based on the EEOC's investigation, it is

20       unable to conclude that the information

21       obtained establishes a violation of the

22       statute; is that correct?

23  A.   Correct.

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 252

1   Q.    And you only have filed two EEOC charges,

2         the two we've discussed today; is that

3         right?

4   A.    Correct.

5   Q.    And the two EEOC charges and the attached

6         exhibits are the documents and information

7         you recall giving to the EEOC regarding

8         these charges, correct?

9   A.    Repeat that.

10  Q.    The two charges that we've discussed and

11        the attached exhibits are the documents

12        and information you recall giving to the

13        EEOC with respect to these two charges; is

14        that right?

15  A.    Yes.

16  Q.    And you don't recall ever amending these

17        two charges, do you?

18  A.    What do you mean, amending?

19  Q.    Changing them.

20  A.    No.

21  Q.    And so the alleged conduct on which you

22        based your two EEOC charges was alleged

23        race and sex harassment, correct?

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 253

1    A.    Correct.

2    Q.    And have we now discussed all the

3          incidents on which you based your EEOC

4          charges?

5    A.    To my knowledge, yes.

6    Q.    And you've told me about any complaints

7          you made regarding any of the harassment

8          or discrimination you are alleging,

9          correct?

10   A.    Correct.

11                MR. SMITH:  If you want to take

12                    maybe a short five-minute

13                    break.

14              (Brief recess.)

15   Q.    We're back on the record after a short

16         break.  You understand you're still under

17         oath, Ms. Reed?

18   A.    Yes.

19   Q.    Your employment with Big Lots ended

20         effective January 11, 2006; is that

21         correct?

22   A.    Correct.

23   Q.    And you testified earlier that you were

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 254

1          terminated because Store Number 818 where

2          you worked was closed permanently; is that

3          right?

4     A.   Correct.

5     Q.   And your termination, which resulted from

6          the store closing, is not part of your

7          claims in this lawsuit; is that correct?

8     A.   Correct.

9     Q.   According to Paragraph 4 of your

10         complaint, which we've already admitted as

11         an exhibit, the acts you're complaining of

12         in this lawsuit are of hostile environment

13         based on your race or sex; is that

14         correct?

15    A.   Correct.

16    Q.   And as you testified earlier, these are

17         the only claims you're alleging in this

18         lawsuit; is that correct?

19    A.   Correct.

20    Q.   You are aware that all hourly employees at

21         Store Number 818 were terminated when the

22         store closed, aren't you?

23    A.   No, because I was told that some of them

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 255

1      got transferred to 816, the other store.

2  Q.   But that's not the case.  Do you know

3      that?

4  A.   No.

5  Q.   Do you have any reason to disagree with

6      that?

7  A.   What, that --

8  Q.   The fact that no hourly employees were

9      transferred?

10  A.   No.

11  Q.   According to Paragraph 8 of your

12      complaint, the alleged discrimination

13      occurred on or about March 18th through

14      30th, 2005; is that correct?

15  A.   Correct.

16  Q.   Your claims in this lawsuit are based on

17      the pictures of employees made by Mike

18      Williams that we've already discussed; is

19      that correct?

20  A.   Correct.

21  Q.   And for clarification, you're not alleging

22      retaliation in this lawsuit, are you?

23  A.   No.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

bda54283-b1d2-4c60-a8e5-35ed6c437989

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 275

1    A.    No, just about a deposition, asked her has

2          she -- asked her the last time she heard

3          from the lawyer -- heard from you all and

4          then asked her, hey, you got anything on a

5          deposition; you going to do it?  And that

6          was the last thing I talked to her about,

7          as far as the case.  Autherine Crosky --

8          oh, you didn't ask about her.

9    Q.    When was the last time you talked to Ms.

10         Crosky?

11   A.    Her personally, I didn't talk to.  I

12         talked to her husband on yesterday --

13         yesterday or Monday asking when her

14         deposition was.

15   Q.    You called them?

16   A.    Uh-huh.

17   Q.    Why did you care about when her deposition

18         was?

19   A.    Because I thought we was together.  I

20         thought she -- because just like last time

21         we appeared in court, me and her didn't

22         talk.  We hadn't even talked, and then it

23         was like, bam, both of us here together.

bda54283-b1d2-4c60-a8e5-35ed6c437989

**Equal Employment Opportunity**          **Last update: August 2005**

No person shall be discriminated against in employment because of race, color, religion, sex, sexual orientation, age, national origin, mental or physical disability or marital status.

This policy applies to all terms and conditions of employment including, but not limited to hiring, training, promotion, transfer, demotion, compensation, benefits, and termination.

The Executive Vice President is responsible for formulating, implementing, coordinating, and monitoring all efforts in the area of equal employment opportunity.

Each manager is responsible for initiating and administering this policy within his/her store/department.

Every associate is expected to adhere to the guidelines set forth in this policy in both practice and spirit.

Any formal or informal allegation that this policy has been violated should be referred immediately to Human Resources.

**Employing Persons with Disabilities**

Qualified individuals with disabilities are to be treated in a nondiscriminatory manner in the pre-employment process and in all terms, conditions, and privileges of employment.

All medical-related information is to be maintained in a confidential manner in separate, confidential files.

Applicants and associates with disabilities are to be provided reasonable accommodation, except where making an accommodation would create an undue hardship on the Company.

All requests for reasonable accommodation from qualified applicants and associates with disabilities are to be referred to the appropriate Human Resources manager. The Company will make a good faith effort to assist individuals seeking accommodations.

In determining the feasibility of the requested accommodation, the Company will consider the preference of the individual to be accommodated and, if there are two or more effective accommodations, will choose the least expensive or most practical accommodation that will provide equal opportunity for the applicant or associate.

Accommodation is generally initiated by a request from an applicant or associate. Situations may arise where an associate, who is known to have a disability, may be having difficulty performing the essential functions of his/her job and therefore, may need accommodation. The associate's supervisor should discuss the matter with the appropriate Human Resources manager. The Human Resources manager will advise the associate's supervisor on how to initiate a discussion with the associate.

Violations of this policy may result in disciplinary action, up to and including termination of employment. (See <u>Confidential Information</u>, <u>Harrassment-Free Environment</u>, <u>Open Door</u>)



DEFENDANT'S EXHIBIT
6

**Harassment-Free Environment**                    **Last update: August 2005**

Big Lots strictly prohibits harassment and/or discrimination based on race, color, religion, sex, sexual preference, age, national origin, mental or physical disability or marital status.

Each supervisor or manager is responsible for maintaining a work environment that is free of harassment both sexual and otherwise. This includes communication of this policy to all associates and assuring that they are not subjected to insulting, degrading or exploitative behavior as defined above.

Big Lots also strictly prohibits sexual harassment. Sexual harassment includes any unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature when:

- Submission to such conduct is made either explicitly or implicitly a term or a condition of an individual's employment.
- Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual.
- Such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment.

Likewise, all associates are responsible for adhering to these guidelines and are prohibited from engaging in discriminatory or harassing behavior. Any associate who believes he/she has been the subject of harassment is responsible for promptly reporting the alleged act to Human Resources or his/her immediate supervisor.

All reports of harassment will be promptly investigated under the direction of Human Resources. All investigations of alleged harassment will be conducted with the utmost concern for the confidential and personal nature of the allegation and with a high degree of sensitivity to the individuals involved. Any associate who is found to have engaged in discriminatory or harassing conduct will be subject to appropriate disciplinary action, up to and including termination. Likewise retaliation against anyone reporting acts of harassment will not be tolerated.

This policy is intended to be in compliance with all Federal laws, specifically Title VII of the Civil Rights Act of 1964, and all State and Local laws dealing with unlawful discrimination and/or harassment. (See Equal Employment Opportunity, Open Door, Standards of Conduct)

**DEFENDANT'S EXHIBIT**

7

**Open Door**                                **Last update: August 2005**

Big Lots believes in dealing directly with all associates and further believes that all associates have a right to express their opinions, concerns, and to ask any questions they may have relating to their job or the Company. Any associate with a question or problem is entitled to use the Open Door Policy and may contact anyone in the organization.

Take the question or concern to your immediate supervisor or manager.

OR

If you have a question and do not wish to discuss the matter with your direct manager or supervisor, go to the next level manager.

OR

If you have a question or you just feel uncomfortable discussing the issue with one of the managers listed above, contact the appropriate member of the Human Resources Department:

- Store Associates: Contact the Regional Human Resources Manager.
- Distribution Associates: Contact the Distribution and Transportation Services Human Resources Manager.
- General Office Associates: Contact the General Office Human Resources Manager.

Associates wishing to make anonymous complaints or ask a question may call the Get Real Hotline at 1-866-834-REAL (1-866-834-7325).

All members of management are expected to maintain the integrity and communicate the spirit of the Open Door Policy.

Any attempt to thwart or retaliate against an associate for exercising his/her Open Door rights will be considered a serious violation of Company policy and may result in disciplinary action, up to and including termination of employment. (See Harrassment-Free Environment, No Solicitation, Standards of Conduct, Union-Free Environment)

**DEFENDANT'S EXHIBIT**

8

Print Policy

**Standards of Conduct**                    **Last update: August 2005**

Associates are expected to conduct themselves in a way that is conducive to an ethical business environment. Violations of company policy, public policy, or local, state, and federal laws will not be tolerated. Conduct is expected to reflect our Company's values at all times.

The following behaviors are unacceptable deviations from the Company Standards of Conduct:

- Violation of the <u>Harassment-Free Environment Policy</u>.
- Physical assault or attempted assault on another associate or customer.
- Engaging in conversation, gestures or behaviors that are considered lewd, offensive, abusive, and profane or threatening to associates and/or customers.
- Inappropriate fraternization, including having an intimate relationship with another associate whom you supervise, either directly or indirectly, or over whom you exert some influence or control by nature of your responsibility.
- Violation of the <u>Drug-Free Workplace Policy</u>, including but not limited to consuming intoxicating beverages or use of illegal drugs during scheduled work time; or reporting to work under the influence of intoxicating beverages or illegal drugs.
- Smoking in a company facility or company vehicle and/or use of chewing tobacco or similar products (<u>See Smoke Free Policy</u>).
- Conduct which results in a substantial risk of harm to a customer or another associate, or damage to Company property.
- Possession of weapons, including but not limited to, knives, firearms, explosives, or other instruments that may cause harm to others, intoxicating beverages, or illegal drugs on Company property, including parking lots, or while conducting Company business.
- Conviction of a criminal offense for a crime against the Company or related to the type of responsibilities performed for the Company.
- Dishonest activities such as, theft, selling merchandise at a price lower than that which is marked on the goods without authorization, consumption or use of merchandise that has not been previously purchased by the associate or approved by management.
- Violation of minor labor laws for those associates under eighteen (18) years of age. *NOTE: Associates less than eighteen (18) years of age are not permitted to load, unload or otherwise operate the cardboard baler. These associates are also not permitted to operate any type of power equipment.* (<u>See Employment of Minors Policy</u>).
- Violation of the No Solicitation Policy.
- Unauthorized use of Company property, facilities or resources (<u>See Electronic Communications Policy</u>).
- Unauthorized divulgence of personnel records or Company business (<u>See Confidential Information Policy</u>).
- Insubordination by refusing to complete work as assigned by a manager. In the event of conflicting instructions, the associate should follow the directions of the manager-on-duty and later request clarification.
- Unsatisfactory work performance including disregard of established safety practices and rules.
- Failure to cooperate with Company investigations or inspections.
- Excessive absenteeism or tardiness (<u>See Attendance Policy</u>).
- Working before or after scheduled time without specific authorization from management.
- Job abandonment, which includes two (2) consecutive days absence from scheduled work without calling into management (<u>See Call-in Procedure Policy</u>) or walking off the job without notifying management. These occurrences are considered voluntary terminations (<u>See Termination of Employment Policy</u>).
- Falsification of documents or records including but not limited to, employment application, expense reports, price change documents, timecards, permitting another associate to clock in or out for you, production reports, payroll management documents, etc.
- Misuse of the associate discount privilege by permitting someone not eligible to purchase items with the associate discount or by returning merchandise for a full refund when purchased with the associate discount (<u>See Associate Discount</u>

DEFENDANT'S EXHIBIT

9

Policy).

- Associates are not permitted to hold or hide merchandise for purchase at a later time. Associates may not purchase merchandise unless it is available for sale to the general public.
- The writing of bad checks to the Company.
- The following violations are store specific:
  - o Any violation of established shopping regulations including processing unauthorized markdowns and/or ringing sales or handling any other transaction (i.e., returns, cashing checks, etc.) of your own or any immediate relative.
  - o Improper use of "paid outs".
  - o Cashing checks.
  - o Use or unauthorized removal of store funds, or other Company resources, for personal use.
  - o Unexplained single incident variance of $50 or greater where till integrity has been maintained.
  - o Single till variance of $5 or more, and/or variances of $15 or more in a 30-day period.
  - o Failure of store associates to perform established procedures, including but not limited to, the following:

    - Completing daily bank deposits.
    - Securing funds properly.
    - Maintaining accountability for all funds transactions.
    - Conducting "cash pickups" when cash totals in excess of $1500 in drop box and till.
    - Ensuring that Register operator "till drops" are made when cash exceeds $100 of paper currency in till.
    - Ensuring all doors are locked and alarms set as required.
    - Ensuring all safety exits are accessible.
    - Securing safe, as required including maintaining confidential safe combination.
    - Maintaining key control.
    - Ensuring that store security cameras are operating daily and tapes maintained as required.
    - Allowing only authorized associates in controlled areas (i.e., stock room, cash office, etc.).

  - o Violation of any other Company rules/regulations or any other action/activity that is deemed to be detrimental to the orderly operation of our Company.

Associates are expected to comply with this Policy and report violations immediately. In all of the above instances, the severity of an individual violation may warrant immediate termination. However, only those persons with the approval to terminate can make this determination (See Termination of Employment Policy).